UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

       Plaintiff,

v.

JOHN DONNELLY SWEENEY and
POINT BUCKLER CLUB, LLC

       Defendants.

2:17-cv-00112-KJM-KJN

ORDER

1

TABLE OF CONTENTS

2   I.   BACKGROUND ........................................................................................... 3

3       A.   Nature of the Case ............................................................................... 3

4       B.   Witnesses ............................................................................................. 4

5       C.   Exhibits ................................................................................................ 7

6       D.   Objections Generally ........................................................................... 8

7       E.   Briefing and Arguments ..................................................................... 10

8   II.   JURISDICTION ........................................................................................ 11

9       A.   Standing ............................................................................................. 11

10      B.   Ripeness ............................................................................................. 11

11  III.  FACTUAL FINDINGS .............................................................................. 12

12      A.   Point Buckler Island and Suisun Marsh Generally ........................... 13

13      B.   Point Buckler Island Supported a Tidal Marsh Ecosystem Before Defendants'

14      Actions on the Island ................................................................................. 21

15      C.   Sweeney Bought Island in 2011; Conducted Various Activities ....... 28

16      D.   Starting in 2014, Sweeney Constructed a Nearly Mile-long Earthen Levee ............. 30

17      E.   Since Sweeney's Activities, Point Buckler Island has Ceased Functioning as a Tidal

18      Marsh Ecosystem ........................................................................................ 39

19  IV.  CONCLUSIONS OF LAW RE: DEFENDANTS' LIABILITY ................ 47

20      A.   Elements and Standard of Proof ........................................................ 47

21      B.   Defendants are Responsible "Persons" .............................................. 48

22      C.   Defendants "Added Pollutants" ......................................................... 51

23      D.   Structures Placed on Island Not "Pollutants" ................................... 59

24      E.   Defendants Discharged Pollutants from "Point Sources" .................. 60

25      F.   Defendants Discharged Pollutants into "Waters of the United States" ..................... 62

26      G.   Defendants' Discharges Were Not Authorized by Permit .................. 75

27      H.   Defendants' Discharges are not Exempt ............................................ 80

28  V.   DEFENDANTS' REMAINING DEFENSES ............................................. 82

A.     Defendants' Affirmative Defenses Based on the Takings Clause .............................. 83

B.     Defendants' Vindictive Prosecution and First Amendment Defense ........................ 88

C.     Defendants' Void-for-Vagueness Defense .................................................. 91

VI.  Restoration and Other Remedies ........................................................... 93

VII. JUDGMENT ............................................................................... 95

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   I.      BACKGROUND[1]

2          The parties tried this action to this court as a bench trial from May 20 to June 5, 2019.

3   Andrew Doyle and Hubert Lee of the United States Department of Justice's Environment and

4   Natural Resources Division and Brett Moffatt of Region 9 of the United States Environmental

5   Protection Agency ("EPA") represented plaintiff United States of America.  Lawrence Bazel of

6   Briscoe Ivester & Bazel LLP represented defendants John Donnelly Sweeney and Point Buckler

7   Club, LLC.

8          Having carefully considered the evidence and the arguments of counsel, the court renders

9   the following findings of fact and conclusions of law, as provided by Federal Rule of Civil

10  Procedure 52.[2]  *See* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury or with

11  an advisory jury, the court must find the facts specially and state its conclusions of law

12  separately.").  The court distinguishes findings of fact from conclusions of law by numbering its

13  findings of fact only, beginning in the section below.

14         The court enters judgment in favor of the United States on the issue of liability, as clarified

15  below.

16         A.      Nature of the Case

17                Plaintiff United States of America commenced this action in January 2017,

18  alleging that defendants John Donnelly Sweeney and Point Buckler Club, LLC have violated and

19  remain in violation of sections 301 and 404 of the Clean Water Act ("CWA" or "the Act"), 33

20  U.S.C. §§ 1311, 1344, based on defendants' unauthorized construction of a levee, placement of

21  structures, and other activities that added pollutants, consisting of dredged or fill material, from

22  point sources, namely mechanized equipment, to waters of the United States, defined as areas at

23  or below the high tide line consisting of tidal channels and abutting wetlands, on Point Buckler

24

25  [1]  In crafting this order, the court adopts much of the United States' Amended Proposed Findings

26  of Fact, ECF No. 176, as consistent with the court's own conclusions.  The order is carefully
    tailored however to reflect the determinations the court itself makes independently.

27

28  [2]  To the extent that a finding of fact actually constitutes a conclusion of law, the court adopts it as
    such.  Likewise, to the extent that a conclusion of law actually constitutes a finding of fact, the
    court adopts it as such.

1   Island.  Point Buckler Island is located in the Suisun Marsh, which is part of the greater San

2   Francisco Bay, and is also within Solano County, California.

3          The United States asserts that defendants' CWA violations have resulted in the

4   loss of nearly 30 acres of tidal waters and wetlands and the loss of those features' important

5   chemical, physical and biological functions.  The United States seeks, among other things,

6   declaratory and injunctive relief.

7          Defendants contest liability and assert several defenses.

8      B.    Witnesses

9          The court heard testimony from nine witnesses, in the following order:  Stuart

10  Siegel, Ph.D.; Daniel Martel; Peter Baye, Ph.D.; James Kulpa; Bruce Herbold, Ph.D.; David

11  Mayer, Ph.D.; Terry Huffman, Ph.D.; defendant Sweeney; and Daniel Leistra-Jones.

12         The United States in its case in chief called the first five witnesses; defendants

13  called Drs. Mayer and Huffman as well as Mr. Sweeney.  In rebuttal, the United States called

14  Mr. Leistra-Jones.  With the exception of Sweeney, all of the witnesses are experts retained by a

15  party.

16     1.    Dr. Siegel

17         The United States tendered, and the court accepted, Dr. Siegel as an expert in six

18  related fields:  (1) the functional assessment of natural and restored tidal channel and marsh

19  systems, with functions meaning those relating to the chemical, physical and biological integrity

20  of waters and wetlands; (2) impact assessment or harm resulting from human or natural events to

21  the functions of tidal channel and marsh systems; (3) restoration design, planning and

22  construction of tidal channel and marsh systems; (4) analysis of the reach of the tides;

23  (5) interpretation of the many varieties of aerial photographs in support of the foregoing work;

24  and (6) also in support of the foregoing work, oversight of the technical work of others, including

25  channel and marsh surveying, hydrodynamic modeling and soil and water chemical analysis.

26  Trial Tr., May 20, 2019 at 36:4–37:17.

27         Defendants made a concerted effort to discredit Dr. Siegel, both at trial and in

28  their post-trial briefing.  Through the trial testimony, the court became aware of an interpersonal

1   conflict between Dr. Siegel and Sweeney, and finds that, on various occasions, both witnesses

2   acted in poor judgment in their dealings with one another.  Their behaviors created or amplified

3   the animosity between them, as also came to light through the testimony elicited and exhibits

4   introduced at trial, and the defendants in particular focus on the animosity in their post-trial

5   briefing.  *See* Defs.' Resp. Br. at 23.  In particular, Sweeney described an incident in which Dr.

6   Siegel offered to do work for him; later in an email inadvertently copying Sweeney, Siegel

7   warned one of Siegel's colleagues that he should "be careful dealing with Sweeney.*"  See* Trial

8   Tr., May 21, 2019 (Dr. Siegel's testimony) at 151:6–152:21 (explaining Sweeney was copied on

9   the email unintentionally); *id.* 146:5–11 (Dr. Siegel's testimony) (testifying he had at one point

10  submitted written proposal to do work for Sweeney).  It appears this email exchange ignited their

11  feud.  Soon thereafter, Sweeney launched a crude, personal attack against Dr. Siegel on social

12  media.  *See* USA Ex. 204 (Facebook post of cartoon showing rats copulating with caption:

13  "Stuart Siegel assisting Steve Chappell in this weeks [sic] depositions to try and save their grant

14  money or stay out of jail like Lee Lehman #FBI").  The testimony of both Dr. Siegel and Mr.

15  Sweeney was marred at times by their dislike of and disrespect for each other, with resulting

16  damage to their credibility in some respects.  The court nevertheless finds each person's

17  testimony credible to the extent the court relies on it below.

18          2.   Mr. Martel

19       The United States also tendered, and the court accepted, Mr. Martel as an expert

20  in identifying the presence of wetlands and their extent, including in tidal environments and

21  where human activities have impacted a site's vegetation, soils or hydrology.  Trial Tr., May 23,

22  2019 at 346:18–25.

23          3.   Dr. Baye

24       The United States tendered, and the court accepted, Dr. Baye as an expert in the

25  following fields:  (1) identification of wetlands vegetation, including in tidal environments where

26  human activities have impacted the vegetation; (2) wetlands impact assessment, including harm

27  resulting from human disturbances of wetlands, including tidal marsh wetlands; and

28  /////

(3) restoration and management of coastal wetlands, including tidal channel and marsh ecosystems in the Suisun Marsh.  Trial Tr., May 23, 2019 at 404:24–406:7.

### 4.   Mr. Kulpa

The United States tendered, and the court accepted, Mr. Kulpa as an expert in the following fields: (1) conducting and managing topographic surveys, including in tidal channels and marsh environments; (2) conducting and managing bathymetric[3] surveys, including in tidal channels; (3) interpreting topographical and bathymetric survey data; and (4) hydrography.  Trial Tr., May 28, 2019 at 514:5–17.

### 5.   Dr. Herbold

The United States tendered, and the court accepted, Dr. Herbold as an expert in: (1) fish species and their biology, ecology, habitats and movements in tidal water bodies and tidal marshes, including those surrounding and in proximity to Point Buckler Island; (2) protected fish species and their designated critical habitat in the San Francisco Estuary and encompassing Point Buckler Island; and (3) water sampling and assessment of the water sampling results as they relate to ability of tidal marsh and disturbed marsh to support fish.  Trial Tr., May 28, 2019 at 548:17–549:17.

### 6.   Dr. Mayer

Defendants tendered, and the court accepted, Dr. Mayer as an expert on fisheries issues.  Trial Tr., May 29, 2019 at 676:4–9.

### 7.   Dr. Huffman

Defendants tendered, and the court accepted, Dr. Huffman as an expert in "three limited areas of opinions only" regarding land use, tidal debris and restoration.  Trial Tr., May 29, 2019 at 704:1–705:16.

/////

/////

/////

---

[3] "Bathymetry" is "the measurement of water depth at various places in a body of water." Merriam-Webster, *Bathymetry*, https://www.merriam-webster.com/dictionary/bathymetric.

8.   Mr. Leistra-Jones

The United States tendered, and the court accepted, Mr. Leistra-Jones as an expert in financial analysis and assessing an individual's and a company's ability to meet the financial requirements of a judgment.  Trial Tr., June 4, 2019 at 1106:15–1110:8.

9.   Certain Direct Testimony Presented By Declaration

The court provided each side "the option to present the direct testimony of retained . . . expert witnesses in writing."  Am. Final Pretrial Order at 7.  Following this allowed procedure, the United States filed declarations by Dr. Siegel, ECF No. 132; Trial Tr., May 20, 2019 at 31:13–32:25 (admitted as corrected or clarified); Mr. Martel, ECF No. 129-1; Trial Tr., May 23, 2019 at 344:5–345:1 (admitted as corrected or clarified); Dr. Baye, ECF No. 133; Trial Tr., May 23 2019, at 400:13–402:21 (admitted as corrected or clarified); Mr. Kulpa, ECF No. 130; Trial Tr., May 28, 2019 at 512:17–513:14 (admitted as corrected or clarified); and Dr. Herbold, ECF No. 127; Trial Tr., May 28, 2019 at 546:8–548:5 (admitted as corrected or clarified); Trial Tr., May 29, 2019 at 603:23–608:15 (as further corrected or clarified).[4]

Defendants did not file any expert declarations.

C.   Exhibits

The trial record consists of hundreds of exhibits, including, for example, expert declarations as noted above, excerpts from expert reports, deposition excerpts, maps, aerial and ground photographs, and scientific publications.[5]

The admitted exhibits are listed in the following post-trial filings, with the exceptions discussed below:

- United States' Final Admitted Exhibit List, ECF No. 154; and
- Defendants' Final Exhibit List, ECF No. 155.

---

[4]  As cited herein, an expert declaration's page number refers to those generated by the CM/ECF system, not the documents internal pagination.

[5]  An exhibit's page number, as cited here and consistent with the parties' practice during trial, generally corresponds with the page number embedded in the Bates stamp.  For example, if the court cites "USA Ex. 123 at 4," that corresponds with the document that is Bates-stamped "USA Ex. 123.004."

The parties also submitted proposed deposition excerpts and objections to those excerpts in the following post-trial filings (which are admitted unless otherwise discussed below):

- Deposition Excerpts, Exhibits, and Objections associated with William Lee of Region 9 of the EPA, ECF No. 156;

- Deposition Excerpts, Exhibits, and Objections associated with Katerina Galacatos, Ph.D. of the San Francisco District of the United States Army Corps of Engineers ("Corps"), ECF No. 157;

- Deposition Excerpts, Exhibits, and Objections associated with Steven Chappell of the Suisun Resource Conservation District, ECF No. 158; and

- Deposition Excerpts and Objections associated with Agnes Farres of the San Francisco Bay Regional Water Quality Control Board, ECF No. 159.

D.    Objections Generally

Defendants did not object to the admission of the United States' exhibits, but they objected to Dr. Herbold's testimony, ECF No. 137, Dr. Siegel's testimony, ECF No. 139, and Mr. Leistra-Jones' testimony, ECF No. 143.  The court overruled these objections generally at trial.  Trial Tr., May 28, 2019 at 548:17–549:17 (accepting Dr. Herbold as expert); Trial Tr., May 20, 2019 at 36:4–37:17 (accepting Dr. Siegel's as expert); Trial Tr., June 4, 2019 at 1106:15–1110:8 (accepting Leistra-Jones as expert with certain limitations).

The United States also filed a motion *in limine* to exclude all testimony and documentary evidence related to the following of defendants' affirmative defenses alleged in defendants' answer: "Unconstitutional Vindictiveness," "First Amendment Retaliation," "Unconstitutional Conditions," "Taking," "Procedural Due Process," "Substantive Due Process," "Excessive Fines," "Double Penalties," "Estoppel," and "Unclean Hands."  MIL ECF No. 111. Defendants opposed the motion, ECF No. 114, and the United States replied, ECF No. 115.  The court denied this motion without prejudice prior to trial.  *See* Am. Final Pretrial Order, ECF No. 122, at 12. Once the parties submitted their proposed exhibit lists, the United States specifically objected to the admissibility or scope of admissibility of 42 of defendants' exhibits on the same grounds raised in their motion *in limine*.  *See* United States' Objections to Defendants' Trial

8

1   Exhibits subject to the United States' Motion *in Limine*, ECF No. 161; Defs.' Response, ECF

2   No. 160.  The court addresses evidentiary objections below.

3          With respect to all of defendants' exhibits to which the United States objects,

4   defendants "bear[] the burden of proof of admissibility."  *Pfingston v. Ronan Eng'g Co.*, 284

5   F.3d 999, 1004 (9th Cir. 2002) (party seeking admission of evidence "bears the burden of proof

6   of admissibility").

7          The United States is correct that most of the 42 exhibits to which it objects are

8   irrelevant and thus inadmissible.  Defendants have attempted to demonstrate the relevance of

9   only 16:  Defendants' Exhibits 2060, 2067, 2076, 2078, 2082, 2088, 2089, 2093, 2129, 2141,

10  2142, 2149, 2171, 2172, 2176 and 2249.  *See* Defs.' Initial Post-Trial Submission ("Defs.' Br."),

11  ECF No. 172, at 22, 43–48 (defendants' discussion of 14 of these exhibits); Defs.' Proposed

12  Findings of Fact, ECF No. 177, at 64 (defendants' citation of Exs. 2060, 2078).  The United

13  States has cited Exhibit 2040, and the court finds it relevant.  U.S.'s Am. Proposed Findings of

14  Fact ("Gov.'s Br."), ECF No. 176, at 31.  The court considers these 17 exhibits and overrules the

15  United States' objections to them.  Absent defendants' use of the remaining exhibits or some

16  showing of their relevance either at trial or in defendants' post-trial briefing, the court sustains

17  the United States' objection to the admissibility of the remaining 26 exhibits:  Defendants'

18  Exhibits 2019, 2045, 2046, 2048, 2064, 2065, 2072, 2079, 2094, 2098, 2100, 2102, 2106, 2112,

19  2137, 2140, 2143, 2147, 2158, 2178, 2180, 2181, 2182, 2202, 2203.

20         Likewise, defendants have not established the relevancy of most of defendants'

21  designated excerpts from Mr. Lee's deposition, Defs.' Ex. 2209.  The court finds this testimony

22  is relevant only to defendants' affirmative defenses, to the extent discussed below.  Accordingly,

23  the court overrules the United States' objections as to those excerpts cited herein.

24         However, defendants have not demonstrated the relevancy of the designated

25  excerpts from Mr. Chappell's deposition, Defs.' Ex. 2207, to which the government objects.  *See*

26  Defs.' Br. (no citation to Ex. 2207); Defs.' Proposed Findings of Fact (same).  Accordingly, the

27  court sustains the United States' objections listed in ECF No. 158 at 1–2.

28  /////

1        Defendants also have not demonstrated the relevancy of the designated excerpts

2 from Ms. Farres' deposition, Defs.' Ex. 2204, to which the government objects. *See* Defs.' Br.

3 (no citation to Ex. 2204); Defs.' Proposed Findings of Fact (no citation to Ex. 2204).

4 Accordingly, the court sustains the United States' objections as listed in ECF No. 159 at 1.

5        By contrast, defendants have sufficiently demonstrated the relevancy of most of

6 defendants' designated excerpts from Dr. Galacatos' deposition, Defs.' Ex. 2205.  Def.'s

7 Proposed Findings of Fact at 49 (discussing Ex. 2206 at 7–8, 14, 103–31, 137–38 and Dep. Ex.

8 506); Defs.' Br. at 13 (citing Ex. 2206 at 82).  The United States withdrew its objection to page

9 58, line 10 through page 60, line 8.  Gov.'s Br. at 10.  Because defendants established the

10 relevancy of the majority of the deposition excerpts to which the government objects on

11 relevancy grounds, the remaining objections on relevancy are overruled.  Galacatos Dep.

12 Excerpts, ECF No. 157, at 1–2.

13     E.    <u>Briefing and Arguments</u>

14        Prior to trial, the parties filed a pretrial statement containing each side's proposed

15 facts, points of law and witnesses, as well as the United States' proposed judgment.  Joint

16 Pretrial Statement ("JPS"), ECF No. 110.  The parties also filed trial briefs prior to trial.  ECF

17 Nos. 124–125.  Counsel presented opening statements, Trial Tr., May 20, 2019 at 18:24–29:6,

18 and closing arguments, Trial Tr., June 5, 2019 at 1217:14–1308:23.

19        Following trial, the parties filed written closing arguments in the form of opening

20 submittals on August 27, 2019, *see* Defs.' Br.; Gov.'s Proposed Findings of Fact, ECF No. 173,

21 and responsive submittals on October 16, 2019, Defs.' Proposed Findings of Fact; Gov.'s Br.

22 Opening submittals were to consist of "briefing and/or proposed findings of fact and conclusions of

23 law."  Post-Trial Joint Status Report ("Post-Trial JSR"), ECF No. 151, at 2; Minute Order, ECF

24 No. 153.  Further, each side's opening submittal was required to address "(at least) the issues on

25 which that side bears the burden of proof."  Post-Trial JSR at 2.  Responsive submittals were to

26 consist of "briefing and/or proposed findings of fact and conclusions of law as informed by

27 consideration of the opposing side's opening submittal."  *Id.* at 2.  "In addition to addressing issues

28 on which the opposing side bears the burden of proof," each side, as part of its responsive

submittal, had the option of "revis[ing] . . . the party's opening proposed findings of fact and conclusions of law." *Id.* at 2.

II.     JURISDICTION

    A.     Standing

As a threshold matter, defendants argue the court does not have jurisdiction over the United States' claims, for lack of standing.  First, defendants argue "[t]he harm alleged by the United States . . . cannot be redressed by its remedy, because defendants "cannot pay" for the injunctive remedy sought by the United States, the implementation of the Restoration Plan for Point Buckler Island, USA Ex. 1, and "Sweeney cannot be ordered to perform the work himself because he does not have the equipment, and because the Thirteenth Amendment prohibits involuntary servitude."  JPS at 8–9.

The court does not address the extent of any mandatory injunction in this order, and so does not reach defendants' Thirteenth Amendment attack against the United States' requested injunction at this time.  Even if the requested injunction contravenes the Thirteenth Amendment, the United States' still has standing, because the United States also seeks a prohibitory injunction and declaratory relief that is unrelated to defendants' ability to pay for implementation of a restoration plan, and would prevent further violations of the CWA.  *See* Gov.'s Proposed Judgment, ECF No. 110-3, at 6; *cf. Stauffer v. Brooks Bros., Inc.*, 619 F.3d 1321, 1325 (Fed. Cir. 2010) (explaining that "a violation of [a federal statute] inherently constitutes an injury to the United States" and, therefore, "the government would have standing to enforce its own law").

Defendants' standing argument is unavailing.

    B.     Ripeness

Defendants also argue "[t]he case is not ripe because the Corps has not acted on" defendants' February 9, 2015 regional general permit submittal,[6] and "[i]f the Corps were to approve that application, the levee repair at issue would indisputably not be in violation."  JPS at 9. As the United States contends and the court finds below, defendants violated the Clean Water

---

[6] The parties have not notified the court of any update on this as of the date of this order.

Act without a permit; the fact that defendants submitted a permit application that was never approved or denied does not shield defendants from liability.  In March 2016, a Corps official issued a letter to Sweeney that stated:  "During a site visit on October 21, 2015, my staff confirmed the unauthorized discharge of fill material into jurisdictional tidal waters."  Defs.' Ex. 2111[7] (Corps' violation notice) at 1.  Dr. Galacatos, the chief of the South Branch in the Regulatory Division of the Corps' San Francisco District, testified that, during that site visit, she and her colleague observed newly deposited fill material in areas that had recently been tidal channels.  Defs.' Ex. 2205 (Galacatos Dep.) at 7:20–8:12, 86:2–87:23, 136:7–139:4; USA Exs. 434, 435.  The Corps advised Sweeney during that visit to cease further unauthorized discharges.  Trial Tr., May 30, 2019 at 771:20–22 (Dr. Huffman's testimony that Sweeney was advised to cease and desist in October).[8]  Dr. Galacatos discovered, in Spring 2016, that defendants had submitted a regional general permit application on February 9, 2015, but that discovery did not change the Corps' position.  Defs.' Ex. 2205 (Galacatos Dep.) at 34:20–35:11; *see also* 33 C.F.R. § 326.3(e) ("Situations where no permit application will be processed" include "when … enforcement litigation … has been initiated by other Federal, state, or local regulatory agencies"); *Ogeechee-Canoochee Riverkeeper, Inc. v. T.C. Logging, Inc.*, No. 608CV064, 2009 WL 2390851, at *9 (S.D. Ga. Aug. 4, 2009) ("The regulation prohibits acceptance of an after-the-fact permit application when 'the district engineer is aware of enforcement litigation that has been initiated by other Federal, state, or local regulatory agencies, unless he determines that concurrent processing of an after-the-fact permit application is clearly appropriate.'" (quoting 33 C.F.R. § 326.3(e)(l)(iv)).

Defendants' ripeness argument also fails.

III.   FACTUAL FINDINGS

In making its factual findings, the court relies primarily on unrefuted and highly persuasive evidence such as maps, aerial photographs, public records, admissions by defendants

---

[7] Admitted for non-hearsay purposes only.

[8] Neither party objected to this testimony at trial.

12

and expert testimony offered by the government.  With respect to certain facts, however, the court has resolved an evidentiary dispute and in doing so credits the testimony and exhibits cited here, as well as any corroborating evidence in the record.  If contradictory evidence exists relative to a finding of fact but the court does not discuss or cite that evidence in this order, the court does not credit it.

The court sets forth its findings regarding the core issues in this matter immediately below.  Those core issues relate to Point Buckler Island, its characteristics before Sweeney purchased it, Sweeney's activities on the island, and the effects of those activities.  The court makes additional findings later in the order, incorporated into its analysis.

A.    Point Buckler Island and Suisun Marsh Generally

1.    The greater San Francisco Bay includes the Suisun Marsh, the largest contiguous brackish water marsh remaining on the west coast of North America and a critical part of the San Francisco Bay/Sacramento-San Joaquin River Delta estuary ecosystem.  Siegel Decl., ECF No. 132, at 8:14–17[9]; USA Ex. 448 (Suisun Marsh, Habitat Management, Preservation, and Restoration Plan, Final EIS/EIR (Nov. 2011)) at 4–5.

2.    The general location of the Suisun Marsh is shown on the following map (USA Ex. 448 at 6):[10]

---

[9] Again, when the court cites to declarations filed on the docket, it references the pagination applied by the CM/ECF system, not the document's internal pagination.

[10] When the court inserts graphic exhibits from the record, gaps in the text of the order may appear where, as here, proper formatting of the exhibit requires that it appear on the page following the citation to it.  Where such gaps appear, they are intentional.



USA Ex. No. 0448.006

3.      The Suisun Marsh encompasses Point Buckler Island, where defendants' alleged violations of the Act occurred.  USA Ex. 3 (map); *see also* USA Ex. 11 (Answer) ¶ 34.

4.      Point Buckler Island is located off the western tip of Simmons Island, comprises approximately 39.8 acres, and has been assigned the following Solano County, California, Assessor Parcel Number: 0090-020-010.  Trial Tr., June 4, 2019 (Sweeney's testimony) at 1023:18–1024:10; *see also* USA Ex. 11 ¶ 34.

5.      Point Buckler Island is surrounded by water bodies that are navigable in the traditional sense and subject to the ebb and flow of the tide.  Siegel Decl. at 9:16–18 (describing as "navigable, tidal waters"); *see also* USA Ex. 11 (Answer) ¶ 43 (defendants' admission, prior to alleged violations, there were channels on island and "some portion of these were open to tidal inflows and outflows").

6.      Relative to Point Buckler Island, Grizzly Bay is located to the north and west, Suisun Cutoff to the south, and Andy (or Annie)[11] Mason Slough to the east.  Siegel Decl. at 9:16–18; USA Ex. 3.

_____

[11] The witnesses used both names to refer to this slough.

7.     Immediately south of Suisun Cutoff is Suisun Bay, and immediately east of Suisun Cutoff is Honker Bay.  Siegel Decl. at 9:18–19; USA Ex. 3.

8.     Suisun Bay connects the Sacramento-San Joaquin River Delta with San Francisco Bay to the east, and the Pacific Ocean to the west.  Siegel Decl. at 8:19–20.

9.     Point Buckler Island and its surrounding water bodies are shown on the following United States Geological Survey ("USGS") map (USA Ex. 3):



10.     Grizzly Bay, Suisun Cutoff, Andy Mason Slough, Honker Bay and Suisun Bay (among other waters and wetlands) are integral parts of the Suisun Marsh and the greater San Francisco Bay.  Siegel Decl. at 9:20–23.

11.     Point Buckler Island is located in a heavily utilized fish migratory corridor.  Herbold Decl. at 7:4; Trial Tr., May 29, 2019 (Dr. Mayer's testimony) at 695:12–20 (larval and juvenile longfin smelt found in waters surrounding Point Buckler Island).

12.     Point Buckler Island falls within the critical habitat of the endangered Sacramento River Winter-Run Chinook Salmon (*Oncorhynchus tshawytscha*), 50 C.F.R. § 226.204; 70 Fed. Reg. 37,160 (June 28, 2005), and the threatened Delta Smelt (*Hypomesus transpacificus*), 50 C.F.R. § 17.95(e); 59 Fed. Reg. 65256-01 (Dec. 19, 1994), among other species.  Trial Tr., May 28, 2019 (Dr. Herbold's testimony) at 555:16–557:21; Trial Tr., May 29, 2019 (Dr. Mayer's testimony) at 696:7–23.

13.     Point Buckler Island's location within the critical habitat of the Sacramento River Winter-Run Chinook Salmon is identified on the following National Oceanic and Atmospheric Administration ("NOAA") map by the blue arrow, USA Ex. 406[12]:

---

[12] Admitted as subject to judicial notice and as basis for expert opinion.



14.     Point Buckler Island's location within the critical habitat of the Delta Smelt is identified on the following Fish and Wildlife Service ("FWS") map by a red star, USA Ex. 404[13]:



USA Ex. No. 0404

---

[13] Admitted as subject to judicial notice and as basis for expert opinion.

15.     Point Buckler Island also is located within the habitat range of the Longfin Smelt (*Spirinchus thaleichthys*), protected by California's Endangered Species Act, and which spawn in tidal channels and marshes within Suisun Bay.  Herbold Decl. at 7:14–16, 13:13–19; USA Ex. 403 (Grimaldo, *et al*., Sampling Uncharted Waters: Examining Rearing Habitat of Larval Longfin Smelt (*Spirinchus thaleichthys*) in the Upper San Francisco Estuary).

16.     The maps introduced by the government , USA Ex. 403 at 5 & 9; Herbold Decl. at 17, show:  (a) Longfin Smelt sampling locations near Point Buckler Island; (b) the density of Longfin Smelt larvae collected at these sampling locations; and (c) Point Buckler Island's location, with the latter identified by a blue arrow in each map:



Figure 2. CDFW Fall Midwater Trawl Channel and Grimaldo et al. 2017 Sampling Locations



Figure 4. Grimaldo et al. 2017 Sampling Results

17.     In addition to supporting federally and state-protected fish, as well as other fish, wildlife and plant species, tidal marsh within the Suisun Marsh performs important functions such as water quality enhancement, flood attenuation and carbon sequestration.  Siegel Decl. at 18:19–19:11; USA Ex. 448; *see also* Trial Tr., May 21, 2019 (Dr. Siegel's testimony) at 260:13–14.

18.     Tidal marshes are among the most productive types of ecosystems in the world, Trial Tr., May 21, 2019 (Dr. Siegel's testimony) at 248:12–15, in terms of converting carbon dioxide to organic matter; *id.* at 244:17–246:18, 247:5–15.

B.     Point Buckler Island Supported a Tidal Marsh Ecosystem Before Defendants' Actions on the Island

19.     Prior to and through the year 2011, almost all of Point Buckler Island supported and functioned as a tidal channel and tidal marsh wetlands system.  Siegel Decl. at 18:19–22, 23:19–21, 63:20–28; Trial Tr., May 20, 2019 (Dr. Siegel's testimony) at 48:23–57:23; USA Ex. 241, Fig. 7A (National Wetlands Inventory map by the Fish and Wildlife Service, 2011 data update); USA Ex. 336 (figure illustrating Mr. Martel's and Dr. Baye's wetlands determination).

20.     At that time, tidal water flowed into and out of the island's channels every day, supporting the island's tidal marsh.  Trial Tr., May 23, 2019 (Dr. Siegel's testimony) at 313:11–13.

21.     Point Buckler Island, like other tidal marshes in the Suisun Marsh, is composed of organic soils developed over thousands of years from the accumulation of dead plant material.  Siegel Decl. at 18:23–25; Martel Decl. at 12:8–11; *see also* Trial Tr., May 28, 2019 (Dr. Baye's testimony) at 480:21–23 ("[M]arsh soils develop shear strength [from] the cohesion of roots and rhizomes that work very much like geotextile fabrics.").

22.     Point Buckler Island was dominated by native vegetation commonly found in fresh and brackish water tidal marshes in the Suisun Marsh, primarily tule, bulrush, cattail, and reed.  Baye Decl. at 15:22–26; *see also id.* at 7:2–5 ("The original tidal marsh vegetation in the interior of Point Buckler Island was dominated by tules, bulrushes, and cattails, all of which

require low (fresh to slightly brackish) salinity and year-round soil saturation or flooding near the marsh surface.").

23.     As of 2011, Point Buckler Island, like other tidal marsh in the Suisun Marsh, performed ecologically important chemical, physical and biological functions, including filtering pollutants, providing habitat and migratory shelter for fish, and producing and exporting coarse organic matter for the estuarine aquatic food chain.  Siegel Decl. at 17:19–22, 23:22–24:5; Trial Tr., May 21, 2019 (Dr. Siegel's testimony) at 244:17–246:18, 247:5–15, 249:18–250:3; Trial Tr., May 23, 2019 (Dr. Siegel's testimony) at 276:14–277:5; Herbold Decl. at 6:1–7:7, 11:3–16 & 12:1–12.[14]

24.     Some of Point Buckler Island's tidal channels were man-made remnants of the island's managed wetlands history**.**  Siegel Decl. at 23:4–6, 24:6–14.

25.     At some point before 1958, a prior owner of Point Buckler Island had excavated a "borrow" ditch and, with soil from that ditch, constructed a levee around the general perimeter of the island.  Siegel Decl. at 24:6–14, 24:4–6; USA Ex. 248 (aerial photograph from 1958).

---

[14] In making this finding, the court accepts the inference Dr. Siegel draws from literature about tidal marshes generally, although that literature does not address Point Buckler Island specifically.

26.     An aerial photograph of Point Buckler Island from 1985 (USA Ex. 250)  shows the old levee as it existed at that time:



USA Ex. No. 0250

27.     A review of aerial photographs shows that 1985 was the last time major levee repairs had been conducted on Point Buckler Island to provide the water control necessary to maintain managed, non-tidal wetland conditions.  Siegel Decl. at 28:1–5 (reviewing aerial photos from 1988–2011).

28.     Between 1985 and 2003, Point Buckler Island's old levee had eroded and subsided in large part, allowing the island to return naturally to tidal marsh.  Siegel Decl. at 24:7–14, 27:3–5; USA Ex. 305[15] (timeline and annotated aerial photographs) at 7–8 & 11–24.

29.     By no later than 1991, the tidal waters that surround Point Buckler Island had breached the old levee in several locations, creating three openings greater than 100 feet long each.  Siegel Decl. at 24:9–11; USA Ex. 252 (aerial photograph from 1991 with visible breaches).

30.     By 2003, the number of breaches had reached seven.  Siegel Decl. at 29:3–11; *see* USA Ex. 255 (aerial photograph from October 2003); USA Ex. 253 (aerial photograph from August 1993); USA Ex. 2[16] at 8 (figure showing approximate year of breaches).

31.     On May 28, 2003, while conducting research in the Suisun Marsh, Dr. Siegel took photographs of Point Buckler Island.  Trial Tr., May 20, 2019 (Dr. Siegel's testimony) at 48:13–49:12.

32.     One photo Dr. Siegel took of Point Buckler Island at ground elevation on May 28, 2003 appears below, USA Ex. 4, with an annotated aerial photograph from 2003 showing its location:

---

[15] Admitted only as the basis for an expert opinion.

[16] Admitted only as a demonstrative and as forming the basis for an expert opinion.

24



33.     Tidal channels and tidal marsh are visible in the foregoing ground elevation photograph.  Siegel Decl. at 18:28–19:1.

34.     This photograph and others taken that day, USA Ex. 242, also show at least four obligate wetland tidal marsh plant species: bulrush in the interior, cattail, tule and reed along the island perimeter.  Trial Tr. of May 28, 2019 (Dr. Baye's testimony) at 440:14–441:7.

35.     This photograph also shows the water to be turbid[17] and tan and grey in color, indicating suspended fine mineral sediment in the tidal channels and functioning tidal marsh.  Siegel Decl. at 20:5–7; Trial Tr., of May 28, 2019 (Dr. Baye's testimony) at 440:18–25.

36.     As of 2011, a total of approximately 545 feet of the old levee had breached and had become fully open to the tides.  Siegel Decl. at 28:12; Trial Tr. of May 20, 2019 (Dr. Siegel's testimony) at 58:8–13.

37.     Also as of 2011, approximately 9,500 linear feet, slightly less than two miles, of tidal channels that were both naturally formed and man-made carried water into,

---

[17] "Turbid" means "thick or opaque with or as if with roiled sediment."  Merriam-Webster, *Turbid*, https://www.merriam-webster.com/dictionary/turbid.

throughout and out of the tidal marsh.  Siegel Decl. at 24:11–14 (by 2003, there were

approximately 9,500 linear feet of naturally forming and man-made channels); Trial Tr., May 20,

2019 (Dr. Siegel's testimony) at 57:14– 58:7 (same number applicable in 2011).

        38.     An April 2011 aerial photograph of Point Buckler Island captured this

image (USA Ex. 5):



USA Ex. No. 0005

1        39.     Dr. Siegel annotated an aerial photograph identifying Point Buckler

2  Island's tidal channels and breaches as of April 2011 (USA Ex. 332), Siegel Decl. at 29:12–

3  30:38, below:



USA Ex. No. 0332

27

C.     Sweeney Bought Island in 2011; Conducted Various Activities

40.     In the summer of 2010, Sweeney discovered Point Buckler Island while exploring locations for kiteboarding.  USA Ex. 31 (internet posting) at 3.

41.     Sweeney regarded Point Buckler Island to be "the best spot in all of California" for kiteboarding.  USA Ex. 31 at 3.

42.     In March 2011, Sweeney wrote to a potential investor in Point Buckler Club, LLC, about using the island as a kiteboarding business.  USA Ex. 1019NC (March 13, 2011 email from John Sweeney to [redacted]. Re: New Island).

43.     In his correspondence, Sweeney referenced Point Buckler Island as having "deep water access" so that a "big boat could tie up."  USA Ex. 1019NC.

44.     In April 2011, Sweeney purchased Point Buckler Island for approximately $150,000.  USA Ex. 11 (Answer) ¶ 35; USA Ex. 12 (Sweeney Dep.) at 145:3–6.

45.     By that time, Sweeney was pursuing "fish habitat restoration [wetland mitigation] bank[ing]."  Trial Tr., May 30, 2019 (Sweeney's testimony) at 800:15–803:8.

46.     At one point, Sweeney and others made a "completed tidal restoration" proposal to the State and Federal Contractors Water Agency (SFCWA) to sell the agency four Suisun Marsh properties for $75,000 per acre:  Point Buckler Island, Spinner Island, Chipps Island and Wings Landing.  Trial Tr., May 30, 2019 (Sweeney's testimony) at 803:23–804:18. The proposal was unsuccessful.

47.     Also by early 2011, Sweeney had communicated with the dredge-and-fill permitting agency for the CWA in the Suisun Marsh, the San Francisco District of the Corps, regarding authorization for activities in other areas of the Suisun Marsh, as reviewed below.

48.     In 2008, Sweeney sought and received authorization from the Corps of Engineers[18] under a CWA regional permit, Regional General Permit 3, to replace floodgates on

---

[18] Sweeney testified that the permit "was filled out by someone" other than himself, and denies it was submitted to the Corps of Engineers, however he conceded the copy of the application introduced as Exhibit 18 shows a date sent to the Corps (March 31, 2008) and a date on which the Corps approved the application (April 21, 2008).  The court concludes from this evidence

Spinner Island.  Trial Tr., June 4, 2019 (Sweeney's testimony) at 1041:22–25; 1042:24–1043:17; USA Ex. 18 (Spinner Island submittal).

49.     In 2011, Sweeney sought authorization and received it from the Corps of Engineers under Regional General Permit 3 to fix a levee breach on Chipps Island.  Trial Tr., June 4, 2019 (Sweeney's testimony) at 1044:3–1047:2; USA Ex. 19[19] (email correspondence regarding Chipps Island) at 3–51, 58, 84, 87 & 93.

50.     There is no evidence Sweeney initiated any similar contact with the Corps about Point Buckler Island in 2011.

51.     At no time prior to 2014 did Sweeney communicate with or submit any written inquiry or request for authorization to the Corps concerning Point Buckler Island.  Trial Tr., June 4, 2019 (Sweeney's testimony) at 1008:18–1009:20; USA Ex. 12 (Sweeney Dep.) at 172:11–14.

52.     Sweeney did not prepare any written plans for any activity he contemplated on Point Buckler Island.  Trial Tr., June 4, 2019 (Sweeney's testimony) at 1009:21–23.

53.     In 2011, Sweeney knew from his own observations and the island's prior owner that the island's old levee had eroded; as Sweeney describes it: "half the island . . . had the existing levee and the other half had eroded on the outside."  USA Ex. 12 (Sweeney Dep.) at 200:19–25; *see also* Trial Tr., May 30, 2019 (Sweeney's testimony) at 806:16–23 (Sweeney's conversation with seller).

54.     Before he began the levee work in 2014, Sweeney also learned that Solano County zoned the island as "Marsh Land."  Trial Tr., June 4, 2019 (Sweeney's testimony) at 1026:8–1027:1; USA Ex. 459 (information from Solano County Assessor's Office).

---

that the application was submitted to and approved by the Corps of Engineers.  Trial Tr., June 4, 2019 (Sweeney's testimony) at 1041:22–1043:17.

[19] Admitted for non-hearsay purposes only, except the statements by Sweeney, which are admitted in full.  *See* Trial Tr., June 5, 2019 (Mr. Doyle speaking) at 1147 at 1–16.

55.     In addition, Sweeney looked at a United States Geological Survey map. Trial Tr., June 4, 2019 (Sweeney's testimony) at 1025:23–25.

56.     Also prior to purchasing Point Buckler Island in 2011, Sweeney conducted limited "due diligence"; for example, he obtained information about "mineral rights."  Trial Tr., June 4, 2019 (Sweeney's testimony) at 1023:2–17.

57.      Sweeney made no other inquiries concerning Point Buckler Island prior to purchasing the island.  *See id.* at 1019:25–1020:3 (did not consult environmental consultant), 1015:1–9 (did not consider tide chart or research tide predictions), 1024:15–19 (did not commission topographic survey), 1015:21–23 (did not consult hydrologist), 1017:7–9 (did not consult with civil engineer), 1017:16–19 (did not consult with wetlands expert), 1018:8–10 (did not consult with fish ecologist).

D.     Starting in 2014, Sweeney Constructed a Nearly Mile-long Earthen Levee

58.     When Sweeney purchased Point Buckler Island, he planned to construct a new levee, *id.* at 1006:1–3, but needed to "raise some funds."  Trial Tr., June 3, 2019 (Sweeney's testimony) at 886:15–21 ("I sold two collector cars and then eventually sold my house in 2014 in Tiburon.").

59.     Beginning in 2012, without a levee on the island, Sweeney operated a kiteboarding business on Point Buckler Island.  USA Ex. 417[20] (document entitled "Point Buckler Restoration Plan and Mitigation and Monitoring Plan submitted by John D. Sweeney and Point Buckler Club, LLC," dated Feb. 10, 2017, submitted in accordance with orders issued by the Regional Board and BCDC against defendants) at 9 ("The levee repair at issue took place in 2014. His purpose in repairing the levee was to restore the duck ponds.  The levee repair was not needed for kiteboarding, which had been going on since 2012 outside the levee."); Trial Tr., June 4, 2019 (Sweeney's testimony) at 1061:8 ("I approved it," i.e., the document marked as USA Ex. 417); USA Ex. 31 at 2 (photos of kiteboarding operation); USA Ex. 99 (photo of kiteboarding operation from 2013, matching one photo at USA Ex. 31 at 2).

---

[20] Admitted for non-hearsay purposes only.

60.     From 2012 to 2013, Sweeney made relatively minor alterations to the island's tidal waters and wetlands.   Siegel Decl. at 31:27–28.  Sweeney's father-in-law Mike Frost, at Sweeney's behest, excavated two or three small trenches or ponds, placing the spoils in adjoining areas.  Siegel Decl. at 30:28–31:2; USA Ex. 12 (Sweeney Dep.) at 46:21–49:10; USA Ex. 29[21] (Sweeney's hearing testimony dated Dec. 14, 2016) at 229:11–230:23 (testifying Sweeney excavated two ponds in 2012).

61.     In addition, he placed two trailers on the island's western corner close to where kiteboards launched, using a landing craft and a bulldozer.  USA Ex. 12 at 43:7–14; USA Ex. 11 (Answer) ¶ 54.

62.     In addition to buying a large landing craft and an excavator, Sweeney and Point Buckler Club, LLC "purchased … a small landing craft, a dump truck, a crane, a Polaris, and two work boats."  Trial Tr., June 3, 2019 (Sweeney's testimony) at 892:7–15; *see also* Trial Tr., May 30, 2019 (Sweeney's testimony) at 808:3–9 ("The club, Point Buckler, purchased a small landing craft which can hold, like one bulldozer.  And then I purchased a large landing craft that can hold, say four bulldozers.").

63.     In October 2013, Sweeney told a potential investor that Point Buckler Island was his "dream kite spot" and that "it has been epic to kite almost daily this summer."  USA Ex. 1001NC (email dated Oct. 25, 2013).

64.     Sweeney also shared his "long term" goal of having a "nice kite lodge with docks for big boats."  USA Ex. 1002NC (email dated Oct. 27, 2013) at 1.

65.     Sweeney referred to the costs of "legal battles and equipment" and suggested the investor make an offer.  *Id.*

66.     In November 2013, Sweeney told the investor he had purchased "a Long Reach excavator for the Island" so he could "get to work on rebuilding the levees" "so its [sic] driveable by summer."  USA Ex. 1003NC (email dated Nov. 13, 2013) at 1; *see also id.* at 3 (figure showing "New Levees Built").

---

[21] The court cites the page numbers at the top right-hand corner of this exhibit, not the Bates-stamped page numbers.

67.     Sweeney's excavator has two large hydraulic arms with a bucket.  Trial Tr., June 3, 2019 (Sweeney's testimony) at 892:16–24.  Essentially, it is a "very large backhoe[]" that "move[s] earthen material."  *Id.*

68.     Using the long-reach excavator between February and November 2014, Sweeney "excavated soil from one location and deposited that soil in another location" on the island.  Trial Tr., June 4, 2019 (Sweeney's testimony) at 1031:18–23; USA Ex. 12 (Sweeney Dep.) at 95:24–97:4 (testifying he took another "pass" around the levee "and put another foot of material around the entire levee on the second pass" either in October or the beginning of November, 2014, and levee work was complete when BCDC visited the island); *see also* USA Ex. 11 ¶ 56 (Defendants admit "Sweeney excavated a borrow ditch" and "Sweeney used the material" to construct the levee).

69.     Sweeney estimates he excavated to a depth of "seven, eight feet"; deposited the soil "maybe 15, 20 feet" away from where it was excavated, with the goal of building up the levee until it reached a "uniform" height of "three feet" once the soil dried.  USA Ex. 12 at 71:12–72:23.

70.     Sweeney "moved clockwise around the island" until he completed "a couple of laps" of levee construction by the end of 2014.  Trial Tr., June 4, 2019 (Sweeney's testimony) at 1031:22–1032:1.

71.     By the end of 2014, the new levee spanned over 4,700 feet in length around the general perimeter of the island.  Siegel Decl. at 42:1–2.

72.     Sweeney constructed approximately 3,300 feet of the new levee "further away from the tidal waters that surround the island and toward the island's interior."  Siegel Decl. at 42:11–14; Trial Tr., May 20, 2019 (Dr. Siegel's testimony) at 65:19–67:8; Trial Tr., May 21, 2019 (Dr. Siegel's testimony) at 212:10–12; USA Ex. 304 at 10, fig. F-6 (path of old levee superimposed onto aerial photograph from 2016 showing new levee).[22]

---

[22] The remainder of this exhibit is admitted as the basis for an expert opinion only.

73.     Less than a third, approximately 1,400 feet, of the new levee roughly follows the path of the old levee along the southern side of Point Buckler Island.  Siegel Decl. at 42:10–11; USA Ex. 304 at 10, fig. F-6.[23]

74.     During the excavation-and-deposit phase of the levee construction, Sweeney moved approximately 16,000 cubic yards of soil.  Siegel Decl. at 32:7–8.

75.     Sweeney excavated from an area measuring approximately 2.62 acres.  *Id.* at 32:8–9.  The area where soil was deposited is approximately 2.56 acres.  *Id.* at 31:9–10.

76.     In late September or early October 2014, the San Francisco Bay Conservation and Development Commission ("BCDC") contacted Sweeney about his activities on Point Buckler Island.  Trial Tr., June 3, 2019 (Sweeney's testimony) at 911:19–912:2.  BCDC is a state agency charged with implementing the Suisun Marsh Habitat Maintenance Preservation Restoration Plan, mandated by the Suisun Marsh Protection Act of 1977.  Trial Tr., May 29, 2019 (Dr. Huffman's testimony) at 711:19–24.

77.     In early October 2014, a Corps staffer, Alisha Kerschbaum, asked and obtained from BCDC the identity of the "new owner/developer" of Point Buckler Island.  Defs.' Ex. 2034[24] (email communication between Corps staff and BCDC dated Oct. 9, 2014) at 1.

78.     Also as of at least early October 2014, the website "Point Buckler Kite Island California," operated by Sweeney, described the island as being "transformed into a kite base camp for those who want to stay remotely or just kite for the day."  USA Ex. 31 (www.pointbucklerisland.com website as visited Oct. 9, 2014) at 1.

79.     The "target market for the club" was "Tech Execs" interested in a "Private Exclusive Kiteboarding Island."  USA Ex. 36 (logo contest) at 1–2; Trial Tr., June 4, 2019 (Sweeney's testimony) at 1053:19–22 ("That and duck hunting, yes."); *see also* USA Ex. 1006NC (Sweeney's description dated Nov. 15, 2014, as "[t]he only private high end Kite Island Club on West Coast").

---

[23] The remainder of this exhibit is admitted as the basis for an expert opinion only.

[24] Admitted for non-hearsay purposes only.

80.     Defendants explained, now that "[n]ew levees and flood gate" surrounded the interior of the island, USA Ex. 1006NC, "[t]he days of mud and mowing to make a kite launch" were over, USA Ex. 99 (Point Buckler Club Facebook post dated Nov. 12, 2015, stating: "Flash back Point Buckler Club 2013 when we just anchored off the point and kited pre improvements.  The days of mud and mowing to make a kite launch . . . .").

81.     On or about October 27, 2014, Sweeney transferred ownership of Point Buckler Island from himself to Point Buckler Club, LLC, which he controls.  USA Ex. 11 (Answer) ¶¶ 8, 9, 36–38.

82.     In exchange for the transfer of ownership of the island, Point Buckler Club, LLC issued a promissory note to Sweeney, the amount of which reflected, among other things, the cost of the earthmoving equipment Sweeney had purchased and the levee construction.  Trial Tr., June 4, 2019 (Sweeney's testimony) at 1036:18–1037:12.

83.     In November 2014, BCDC inspected Point Buckler Island.  Trial Tr., June 3, 2019 (Sweeney's testimony) at 883:7–8 & 912:9–20 (BCDC inspected Point Buckler Island and suggested to Sweeney he may need to obtain an "after-the-fact" permit).

84.     During that inspection, BCDC provided Sweeney with a copy of the island's management plan from 1984 (Defs.' Ex. 2006).  Trial Tr., June 3, 2019 (Sweeney's testimony) at 912:21–913:2.

85.     In December 2014, Ms. Kerschbaum of the Corps contacted Sweeney.  Trial Tr., June 3, 2019 (Sweeney's testimony) at 919:24–920:5.  In early February 2015, Ms. Kerschbaum met with Sweeney on Point Buckler Island, and Sweeney handwrote information on a Regional General Permit 3 form he gave to Ms. Kerschbaum.  Trial Tr., June 3, 2019 (Sweeney's testimony) at 920:2–921:11; Defs.' Exhibit 2040 (Defendants' submittal dated 2015).

86.     Sometime after defendants' February 2015 submittal, "once [the mud] dried," Sweeney "drove a bulldozer across" the levee to "spread it out further" which made it "wider" and more uniform.  USA Ex. 12 at 71:12–73:9 & 84:23–85:9; *see also* Trial Tr., June 4,

2019 (Sweeney's testimony) at 1051:21–1052:4; USA Ex. 39 (ground photos of levee on or about February 9, 2015, showing uneven, pre-bulldozed condition).

87.     Defendants intended for the new levee to function as a road. *See* Trial Tr., June 4, 2019 (Sweeney's testimony) at 1051:24–1052:4; USA Ex. 1003NC (Sweeney's statement in email dated Nov. 13, 2013, that new levee would be "driveable") at 1; USA Ex. 1001NC (Sweeney's statement in email dated Oct. 25, 2013:  "I really want to get some docks in at buckler and get it finished with a levee to drive on"); Defs.' Br. at 17:1 ("levees provide roadways").

88.     In early 2015, Sweeney operated "[a]n excavator and a dump truck," USA Ex. 12 at 100:1–15, to create four "crescent-shaped ponds."  USA Ex. 11 (Answer) ¶ 58; USA Ex. 29 (Sweeney testimony dated Dec. 14, 2016) at 235:2–12 (between January 30, 2015 and April 2015, Sweeney created two of the four ponds); USA Ex. 292 (aerial photograph dated Dec. 31, 2014, showing no ponds); USA Ex. 293 (aerial photograph dated Jan. 29, 2015, showing three of four ponds); USA Ex. 294 (aerial photograph dated Apr. 1, 2015, showing some work on fourth pond).

89.     Afterwards, Sweeney deposited the excavated soil from creating the ponds on the island's western side, "[t]o create a ramp to the water for the landing craft."  USA Ex. 12 at 64:5–65:20.

90.     The area from which Sweeney excavated the soil for the pond work is just under a third of an acre.  Siegel Decl. at 32:20–22.  The area where Sweeney deposited the excavated soil is approximately 0.43 acres.  *Id.*

91.     On October 21, 2015, Katerina Galacatos, Ph.D., the chief of the South Branch in the Regulatory Division of the Corps' San Francisco District, and other regulators conducted an inspection of Point Buckler Island.  Defs.' Ex. 2111[25] (Corps' notice of violation to Defendants dated Mar. 28, 2016) at 1.

92.     The Corps observed newly deposited fill material in three areas that had recently been tidal channels.  Defs.' Ex. 2205 (Galacatos Dep.) at 7:20–8:12, 86:2–87:23, 136:7–139:4; USA Exs. 434 & 435.

---

[25] Admitted for non-hearsay purposes only.

93.     The Corps "made no other determinations," one way or the other, as to "whether the rest of Point Buckler [Island] was waters of the United States" or "whether the work on the rest of the island was unauthorized fill."  Defs.' Ex. 2205 (Galacatos Dep.) at 130:8– 132:12.

94.     The Corps verbally advised Sweeney to cease further unauthorized discharges.  Trial Tr., May 30, 2019 (Dr. Huffman's testimony) at 771:20–22 ("[I]t was clear to me . . . from . . . a conversation I had with Sweeney[] that he was advised . . . to cease and desist, do no further work in October [2015].").[26]

95.     Region 9 of the United States Environmental Protection Agency, first learned of defendants' activities on or about July 21, 2015; representatives of the EPA attended the October 2015 inspection.  Defs.' Ex. 2209 (deposition of EPA's William Lee) at 32:8–16; USA Ex. 440[27] (EPA report of Oct. 21, 2015 inspection).

96.     Between approximately October 2014 and May 2016, "Sweeney . . . placed shipping containers, trailers, helicopter pads, wind-break platforms, and artificial turf on the island."  USA Ex. 11 (Answer) ¶ 58; *see also* USA Ex. 12 at 102:20–23 (after February 2015, "the containers and the trailers got relocated"); Trial Tr., June 4, 2019 (Sweeney's testimony) at 1054:16–18 (in February 2016 "we dragged two [helicopter pads] out there").

97.     Defendants' structures on Point Buckler Island cover an area of approximately 0.17 acre.  Siegel Decl. at 33:9–10.

98.     Additional inspections occurred on various dates between early March 2016 and late March 2018.  USA Ex. 326 at 1–3, Table 5[28] (listing dates of inspection by United

---

[26] Neither party objected to this testimony at trial.

[27] Admitted for non-hearsay purposes only.

[28] The remainder of this exhibit was admitted as a basis for an expert opinion only.

States' experts); USA Ex. 441[29] (EPA report of Feb. 9, 2017 inspection); USA Ex. 442[30] (EPA report of Mar. 29, 2018 inspection).

99.   In late March 2016, the Corps advised defendants by letter that the Corps' October 2015 site visit had "confirmed the unauthorized discharge of fill material into jurisdictional tidal waters of the U.S.," and that the EPA would serve as the lead CWA enforcement agency.  Defs.' Ex. 2111[31] at 1–2.

100.   The Corps "again advised" defendants "not to proceed with any further dredge or fill activities."  *Id.* at 2.

101.   In May 2016, Sweeney wrote to a potential investor: "They cannot stop the club from existing or stop kiteboarding so that is not the issue."  USA Ex. 1014NC (email dated May 12, 2016).

102.   Sweeney also wrote:  "The argument is simply over if the land had tidal elements pre construction [sic]."  *Id.*

---

[29] Admitted for non-hearsay purposes only.

[30] Admitted for non-hearsay purposes only.

[31] Admitted for non-hearsay purposes only.

103.    Defendants' new levee, borrow ditch and most of the other results of their activities on Point Buckler Island are clearly visible in an aerial photograph dated Nov. 19, 2015, USA Ex. 8:



USA Ex. No. 0008

38

E.     Since Sweeney's Activities, Point Buckler Island has Ceased Functioning as a
       Tidal Marsh Ecosystem

104.     Defendants' construction of a nearly mile-long earthen levee, including defendants' filling and closure of seven breaches and their new, higher levee's blockage of overbank flow, harmed waters and wetlands on Point Bucker Island.  Siegel Decl. at 72:3–76:24; USA Exs. 311–314 (appendices to May 2016 report)[32]; USA Exs. 343–345, 358–360, 364, 365 (appendices to July 2018 report)[33].

105.     Defendants filled and closed breaches where tidal waters had previously eroded the old levee and/or constructed a new levee closer to the interior than where the original levee was; either way, "the outcome is identical" because defendants' fill material blocked tidal exchange.  Trial Tr., May 23, 2019 (Dr. Siegel's testimony) at 284:25–286:5; *see also id.* at 284:19–23 ("If the breach is connected to a channel, it is providing tidal exchange into the island. If you build a new levee to the interior of it, then that breach is no longer providing that tidal exchange, and therefore the function of that breach has been closed."); *id.* at 287:2–7 ("[T]he function of the breach is to provide tidal exchange across a levee path and to get tidal waters to the inside.  So by constructing a new levee interior . . . Sweeney . . . has cut off the tidal connections that those breaches provided to the interior . . ."); *id.* 288:6–11.

106.     Specifically, the new levee eliminated tidal exchange to nearly 30 acres. Siegel Decl. at 72:5–8; Trial Tr., May 20, 2019 (Dr. Siegel's testimony) at 91:5–93:24; Trial Tr., May 21, 2019 (Dr. Siegel's testimony) at 116:18–118:14 & 201:20–23; *see also* Trial Tr., May 29, 2019 (Dr. Mayer's testimony) at 694:16–19 ("Q. Dr. Mayer, do you acknowledge that the levee construction . . . blocked tidal flow into the island?  A. Yes."); *compare* USA Ex. 331 (aerial photograph from Sept. 1, 2011), *with* USA Ex. 366 at 29 (aerial photograph from Aug. 28, 2017).

---

[32] Admitted as a basis for an expert opinion only.

[33] Admitted as a basis for an expert opinion only.

107.    The figure below, USA Ex. 335, which was prepared by Dr. Siegel, shows the location of affected acres, including areas underlying the new levee and the entirety of the island's interior, *see* Trial Tr., May 20, 2019 (Dr. Siegel's testimony) at 91:20–21, 92:14–22:



USA Ex. No. 0335

108.     Based on the conclusions above and the expert testimony of Drs. Siegel, Baye and Herbold, the court finds these nearly 30 acres of Point Buckler Island no longer function as a tidal channel and marsh ecosystem.  Siegel Decl. at 74:27–28; Baye Decl. at 15:7–15; Herbold Decl. at 7:20–8:2.

109.     The court also finds defendants harmed aquatic habitat.  Defendants' activities occurred in the critical habitat of the endangered Sacramento River Winter-Run Chinook Salmon and the threatened Delta Smelt, among other species, and in the habitat of the state-protected Longfin Smelt.  Herbold Decl. at 7:8–19; Trial Tr. of May 29, 2019 (Dr. Mayer's testimony) at 696:7–23.

110.     The new levee blocked virtually all access by fish to Point Buckler Island.  Herbold Decl. at 7:21–22; *see also* Trial Tr., May 29, 2019 (Dr. Mayer's testimony) at 694:25–695:3 ("Q.  Wouldn't you … agree that this blockage of tidal flow interrupted the ability of fish to access tidal channels that existed in the interior of Point Buckler Island?  A. Yes.").

111.     In addition to impacting fish habitat, defendants' activities impacted fish.  The impacted fish include migrating juvenile endangered Sacramento River Winter-Run Chinook Salmon, which typically use littoral[34] edges and marsh channels such as those found within Point Buckler Island for feeding and protection from predators.  Herbold Decl. at 8:6–11:16 & 18:5–15; *see also* Trial Tr., May 29, 2019 (Dr. Mayer's testimony) at 701:4–7 ("Q.  And you agree with the proposition that there is literature supporting the idea that vegetative marsh edge can provide foraging and shelter for small fish?  A. Yes.").

112.     The fish impacted also include Longfin Smelt, which likely used Point Buckler Island for rearing.  Herbold Decl. at 13:13–17:28, 17:16–19:28; USA Ex. 403 (Grimaldo, *et al*., Sampling Uncharted Waters: Examining Rearing Habitat of Larval Longfin Smelt (*Spirinchus thaleichthys*) in the Upper San Francisco Estuary); Kulpa Decl. at 17:1–18:22.

113.     As of the United States' last inspection in late March 2018, the waters on Point Buckler Island, including the new borrow ditch from which Sweeney excavated soil to

---

[34] "Littoral" means "of, relating to, or situated or growing on or near a shore especially of the sea."  Merriam-Webster, *Littoral*, https://www.merriam-webster.com/dictionary/littoral.

construct the new levee, are in fact lethal to fish, because the pH level of the water is not within the range suitable for freshwater fish.  Herbold Decl. at 11:17–28, 20:3–21:2; Trial Tr., May 28, 2019 (Dr. Herbold's testimony) at 554:21–555:15 (during the March 2018 inspection, Dr. Herbold observed "remarkably dead" and "desolate" conditions and "nothing vertebrate alive in the water"); *see also* Trial Tr., May 29, 2019 (Dr. Mayer's testimony) at 700:15–19 ("Q.  Isn't it true that neither delta smelt nor longfin smelt could survive in water with pH values as set forth in [the March 2018 borrow ditch water sampling]?  A… If there is a lab test, that's probably true.").  Even mosquitofish, which are very tolerant of poor water quality, have disappeared. Herbold Decl. at 21:1–2.

114.   The new levee also blocked exportation of food sources produced in the tidal marsh wetlands to the tidal water bodies surrounding Point Buckler Island, previously used by Delta Smelt, Sacramento River Winter-run Chinook Salmon and other species.  Herbold Decl. at 7:22–23; *see also* Trial Tr., May 29, 2019 (Dr. Mayer's testimony) at 694:20–24 ("Q. Wouldn't you agree that this blockage of tidal flow interrupted habitat services such as the export of food . . . . sources from the island into adjacent waters?  A. Yes.").

115.   The fish species impacted by Sweeney's activities also include the threatened Delta Smelt, which lost access to food production from Point Buckler Island's tidal marsh wetlands as a result.  Herbold Decl. at 12:7–13:12; *see also* Trial Tr., May 29, 2019 (Dr. Mayer's testimony) at 695:21–24 (agreeing with statement, "tidal wetlands are sources of food for delta smelt living in nearby open waters").

116.   Defendants also harmed tidal marsh wetlands vegetation, as reviewed below.

117.   The once-dominant native fresh and brackish water tidal marsh wetlands vegetation, including tules, bulrushes, and cattails, "has either completely died or been reduced to very sparse, stunted shoots."  Baye Decl. at 16:10–11.

118.   "Almost the entirety of the below-ground roots and shoots of the wetland plants have died and lost their potential for regrowth from buds at any time of year."  Baye Decl. /////

at 16:11–13; *see also* Trial Tr., May 30, 2019 (Dr. Huffman's testimony) at 735:5–11 ("The majority of [rhizomes] were clearly dead and decomposing.").

119.    Areas relatively barren of plants have expanded over time, as of the United States' last inspection of Point Buckler Island on March 29, 2018.  Baye Decl. at 12:7–14:28; Siegel Decl. at 75:10–17; USA Exs. 9, 366–371 (aerial photographs from 2016–18).

120.    Almost all vegetation Drs. Baye and Siegel found on Point Buckler Island during the March 2018 inspection was not the dominant native marsh vegetation that had existed for decades prior to 2011.  Baye Decl. at 18:10–12, 18:24–28; Siegel Decl. at 75:13–15.

121.    Below is an aerial photograph taken June 12, 2018, USA Ex. 9, which shows the vegetative-cover difference between the majority of Point Buckler Island interior of the new levee, appearing predominantly grey or brown, and the perimeter of the island bayside of the new levee, appearing predominantly light or dark green:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



USA Ex. No. 0009

22        122.    Largely cut off from tidal influence, the island's soil has become
23   extremely acidic and saline.  Baye Decl. at 18:1–4, 19:3–20; USA Ex. 365 at 2, fig. 1, 4; *id.*
24   Table 3 (soil and water testing results)[35]; *see also* Trial Tr., May 30, 2019 (Dr. Huffman's
25   testimony) at 735:12–21 (defendants' expert observed conditions "indicative of soils with high
26   salinity").

27

28

_____

[35] The remainder of this exhibit was admitted as the basis for an expert opinion only.

123.     The soils no longer support tules, bulrushes, and cattails, Baye Decl. at 18:5–18; *see also* Trial Tr., May 30, 2019 (Dr. Huffman's testimony) at 793:1–14 (agreeing plant level "greatly diminished"), which require low salinity and year-round soil saturation,  Baye Decl. at 18:5–18; *see also* Trial Tr., May 30, 2019 (Dr. Huffman's testimony) at 735:22–737:12 ("Once the soils are reduced to low salinity conditions, then the vegetation … could persist throughout the year … [t]o the extent the root stock is alive.").

124.     Sweeney took photographs just before trial showing that water was present in the island's interior.  This water increased the vigor of some stands of surviving tidal marsh plants such as bulrush, but it did not create adequate conditions for full tidal marsh restoration and, in fact, possibly contributed to the advance of invasive species such as brass buttons.  Trial Tr., May 28, 2019 (Dr. Baye's testimony) at 453:4–7 ("As you can see [from Defs.' Ex. 2250 (Sweeney's recent photographs)], the matrix of this view is not target or desirable vegetation for tidal marsh restoration in Suisun Marsh. These are all either incidental species [such as salt grass] or indicators of disturbance); *id.* at 455:1–8 ("So you can see the standing water in spring. Clearly, the vegetation is responding with increased growth. The majority of them are not desirable or are invasive species that would need to be controlled . . . the invigoration of the reeds is problematic because they could rapidly dominate the island."); *see also* Trial Tr., May 29, 2019 (Dr. Huffman's testimony) at 719:2–9 ("[I]f you have another series of dry seasons, your salts are going to build back up.  You'll get a, sort of, reoccurrence of vegetation growth during heavy rains because the salts are reduced, but as the island dries out, the interior, the salts will begin to increase again.").

125.     Defendants' building of the levee also harmed water quality, as reviewed below.

126.     As of Drs. Herbold, Baye and Siegel's most recent inspection in March, 2018 occurring after defendants' activities, in contrast to the quality of the surrounding water bodies, Point Buckler Island's waters are extremely acidic and saline.  Herbold Decl. at 11:25–28

1  & 20:3–9; Baye Decl. at 16:16–18:20; USA Ex. 365 at 2, fig. 1 & 4; *id.* Table 3 (soil and water

2  testing results).[36]

3        127.    During Drs. Herbold, Baye and Siegel's late March 2018 inspection, Point

4  Buckler Island's waters contained extensive algae, were stagnant, and bright green in color,

5  manifesting conditions consistent with the measured level of dissolved oxygen.  Siegel Decl. at

6  76:1–6.

7        128.    Two ground photographs showing the waters' condition, USA Ex. 364 at

8  1, are shown below:



H-2. Interior Plain and levee benches above perimeter ditch, northeast Point Buckler Island (left) and
south Point Buckler Island (right) dominated by the noxious invasive wetland weed, perennial
pepperweed (*Lepidium latifolium*) in former tule-cattail-bulrush marsh.

20        129.    The waters' discoloration is also visible in the June 12, 2018 aerial

21  photograph reproduced above at paragraph 138, USA Ex. 9, Siegel Decl. at 77:18–19.

22        130.    Defendants' actions have caused harm to the chemical, physical and

23  biological functioning of Point Buckler Island's pre-existing tidal channels and marsh wetlands,

24  and that harm is ongoing.  Siegel Decl. at 103:1–16; Herbold Decl. at 7:24–8:2; *see also* Trial

25  Tr., May 28, 2019 (Dr. Baye's testimony) at 447:11–23 ("The diked drained conditions . . .

26  caused strong accumulation of soil salts . . . and also some of the most extreme acid sulfate soil

27  conditions I've observed in the San Francisco Estuary.  These are beyond the normal highly

28

---

[36] The remainder of this exhibit was admitted as a basis for an expert opinion only.

acidic conditions of the soil types that are prevent in Suisun Marsh, because . . . the soil was influenced by hydrology that exaggerated some of these harsh soil conditions for a number of years.").

131.    If the harm defendants have caused to Point Buckler Island's soil, vegetation, tidal marshland, fish habitat and fish species, as well as the areas surrounding the Island, is not mitigated, the Island's native vegetation is likely to be lost permanently and the Island is likely to subside significantly. Siegel Decl. at 103:1–16; Herbold Decl. at 7:24–8:2; *see also* Trial Tr., May 28, 2019 (Dr. Baye's testimony) at 447:19–23 ("[I]t would be necessary to flush out the salts and allow the acids to either convert back to other biogeochemical forms or be buffered by sea salts in order for the sensitive seedling roots of the new colonizing native vegetation to establish in the soil surface."); Trial Tr., May 23, 2019 (Mr. Martel's testimony) at 368:24–369:17 (without restoration of tidal hydrology to island interior "eventually the organic material and the soil horizons would oxidize and the soil would subside back to its mineral components," which would cause the soil surface to drop eight to 10 inches).

## IV.    CONCLUSIONS OF LAW RE: DEFENDANTS' LIABILITY

### A.    Elements and Standard of Proof

To establish that defendants have violated and remain in violation of the Clean Water Act, the United States must prove defendants are (1) persons responsible for (2) adding dredged or fill material (3) from a point source (4) to waters of the United States (5) without a permit. *See* 33 U.S.C. §§ 1311(a), 1344, 1362(6), (7), (12)(A), (14); *see also Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 532 (9th Cir. 2001); *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993).

"The CWA is a strict liability statute." *Duarte Nursery, Inc. v. U.S. Army Corps of Eng'rs*, No. 2:13-cv-02095-KJM, 2016 WL 4717986, at *13 (E.D. Cal. June 10, 2016).  The United States need not prove the conduct in question was intentional, knowing, or negligent, but only that it occurred.  *United States v. Brace*, 41 F.3d 117, 122 (3d Cir. 1994) ("Unpermitted discharge is the archetypical Clean Water Act violation, and subjects the discharger to strict liability."  (citation omitted)).

1    Contrary to defendants' argument, the United States need not establish

2    defendants' liability by clear and convincing evidence.  Defs.' Trial Br., ECF No. 125, at 16

3    (citing *Addington v. Texas*, 441 U.S. 418, 425 (1979)).  In *Addington*, the Supreme Court held

4    the standard of clear and convincing evidence applied to a very different kind of impingement on

5    a liberty interest: civil commitment to a mental hospital proceedings because of the significant

6    deprivation of liberty at stake.  *Id.*  The Clean Water Act authorizes "civil" enforcement actions,

7    33 U.S.C. § 1319(d), and there is no textual, structural, or other indication that Congress

8    intended to hold the United States to a heightened level of proof.  Indeed, "courts have not

9    viewed cases involving 'even severe civil sanctions' to implicate 'important individual interests

10   or rights' to warrant a higher standard of proof."  *United States v. Garrity*, 304 F. Supp. 3d 267,

11   271 (D. Conn. 2018) (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983)).

12   Rather, the applicable standard is "proof by a preponderance of the evidence."

13   *United States v. Larkins*, 657 F. Supp. 76, 84 n.20 (W.D. Ky. 1987), *aff'd*, 852 F.2d 189 (6th Cir.

14   1988); *see also United States v. Ward*, 448 U.S. 242, 251 (1980) (finding constitutional

15   protections afforded criminal defendants not applicable to defendants facing civil claims under

16   § 311(b)(6)); *see, e.g.*, *United States v. Adam Bros. Farming, Inc.*, 369 F. Supp. 2d 1166, 1175

17   (C.D. Cal. 2003) (applying preponderance-of-evidence standard in CWA civil enforcement

18   action);  *Borden Ranch P'ship v. U.S. Army Corps of Eng'rs,* No. 2:97-cv-858-GEB-JFM, 1999

19   WL 1797329, at *9 (E.D. Cal. Nov. 8, 1999) (same), *aff'd in part, vacated in part, and rev'd in*

20   *part on other grounds,* 261 F.3d 810 (9th Cir. 2001), *aff'd by an equally divided Court*, 537 U.S.

21   99 (2002) (per curiam); *Leslie Salt Co. v. United States*, 820 F. Supp. 478, 480 (N.D. Cal. 1992)

22   (same).

23   **B.**     Defendants are Responsible "Persons"

24   The United States has established the first element of CWA liability, that

25   defendants are responsible "persons."

26   The Act's pollutant-discharge prohibition applies to "any person," 33 U.S.C.

27   § 1311(a), defined to include, among others, "an individual, corporation, partnership, [or]

28   association[.]"  *Id.* § 1362(5).  Defendant John Donnelly Sweeney is a responsible person within

the meaning of the Act.  The evidence of Sweeney's responsibility is unambiguous.  Sweeney admits that he "directed, supervised, and managed" the activities in question.  USA Ex. 20 (interrogatory) at 4:16–17.  Further, defendants admit "Sweeney has owned, operated, supervised, and/or controlled Point Buckler Island since at least April 2011 through today, whether in his individual capacity or as the principal, president, and/or managing partner of Defendant Point Buckler Club."  USA Ex. 11 (Answer) ¶ 39.

Defendant Point Buckler Club, LLC is also a responsible person within the meaning of the Act, which "imposes liability both on the party who actually performed the work and on the party with responsibility for or control over performance of the work."  *United States v. Lambert*, 915 F. Supp. 797, 802 (S.D. W. Va. 1996) (citing *United States v. Bd. of Trustees of Fla. Keys Cmty. Coll.*, 531 F. Supp. 267, 274 (S.D. Fla. 1981)); *see also In re Carsten*, 211 B.R. 719, 730 (Bankr. D. Mont. 1997) (citing *Lambert*, 915 F. Supp. at 802); *but see id.* ("[W]here a party has no decision-making authority, does not participate in the planning of a project, and whose will has no impact on whether and to what extent dredge materials are discharged into waters of the United States, that party cannot suffer liability under CWA.").

Defendants admit in their Answer that:  (a) Point Buckler Club, LLC is a corporation formed under the laws of California; (b) since at least October 2014 Sweeney has been the principal, president and/or managing partner of Point Buckler Club, LLC; (c) on or about October 27, 2014, Sweeney transferred ownership of Point Buckler Island from himself to Point Buckler Club, LLC; and (d) Point Buckler Club, LLC is the current owner of the island. USA Ex. 11 (Answer) ¶¶ 8, 9, 36–38.

Because Sweeney has been the principal, president and/or managing partner of Point Buckler Club, LLC since at least October 2014,[37] Point Buckler Club, LLC, would be liable for Sweeney's actions as they relate to Point Buckler Island, because Sweeney acted as an agent of Point Buckler LLC, and his decisions with respect to Point Buckler Island are the decisions of Point Buckler LLC.  *See United States v. Hummel*, No. 00 C 5184, 2003 WL 1845365, at *12 (N.D. Ill. Apr. 8, 2003) (finding "[u]nder traditional principles of agency law"

---

[37] The formation documents for Point Buckler, LLC, do not appear to be part of the trial record.

defendant was liable for illegal discharges by his agent where discharges were "within the scope of [the agent's] employment and authority"); *In re Carsten*, 211 B.R. at 730 ("Courts have imposed liability for CWA violations on . . . those responsible for or in control of performance of work in violation of the statute." (citation omitted)).  This finding is corroborated by Sweeney's testimony that both he and Point Buckler Club, LLC purchased equipment used on the island. Trial Tr., June 3, 2019 (Sweeney's testimony) at 892:7–15 ("[W]e purchased an excavator, a small landing craft, a dump truck, a crane, a Polaris, and two work boats."); *see also* Trial Tr., May 30, 2019 (Sweeney's testimony) at 808:3–9 ("The club, Point Buckler, purchased a small landing craft which can hold, like one bulldozer.  And then I purchased a large landing craft that can hold, say four bulldozers.").

      Moreover, Sweeney testified at trial that: (a) in exchange for transferring ownership of the island, Point Buckler Club, LLC issued a promissory note to Sweeney; and (b) the amount of the note at that time, $1.2 million, reflected, inter alia, the cost of earthmoving equipment Sweeney had purchased and the levee construction.  Trial Tr., June 4, 2019 at 1036:18–1037:12 ("Q. You had the company issue a promissory note in the amount of approximately $1.2 million; is that correct?  A.  I believe that's what the accountant set up, yes . . . .  Q . . . In your mind, your plan to recover your costs of the operation was reflected in the purchase price from the LLC to you; is that correct?  A. Yes, certainly.");  Defs.' Br. at 23 ("Sweeney paid $150,000 for Point Buckler Island, and the Club owes Sweeney $1.2 million for the island.").  This evidence further supports the conclusion that Sweeney was acting within the scope of his authority as an agent of Point Buckler Club, LLC when he worked on the levee.

      The levee work in question took place sometime between February 2014 and November 2014, and Sweeny was an agent of Point Buckler Club LLC starting in October 2014. There is insufficient evidence in the record for the court to find that Point Buckler Club LLC is independently liable for Sweeney's violations of the Act related to any levee work that occurred before October 27, 2014.  *See* Trial Tr., June 4, 2019 (Sweeney's testimony) at1031:15–1032:4 (testifying that, after the initial pass with the excavator in February 2014, Sweeney took "two approximate laps" around the island); USA Ex. 12 (Sweeney Dep.) at 95:24–97:4 (testifying he

took another "pass" around the levee "and put another foot of material around the entire levee on the second pass" either in October or the beginning of November, 2014, and levee work was complete by time of BCDC's visit to the island, which occurred in November 2014); *In re Carsten*, 211 B.R. at 730 ("[W]here a party has no decision making authority, does not participate in the planning of a project, and whose will has no impact on whether and to what extent dredge materials are discharged into waters of the United States, that party cannot suffer liability under CWA.").

However, the evidence shows that, after October 2014, Point Buckler Club, LLC owned Point Buckler during the time further pollutant-discharge activities occurred. Specifically, Point Buckler Club is liable for Sweeney's violations of the Clean Water Act that occurred after its creation on or about October 27, 2014, when the Club purchased the island, U.S. Ex. 11 (Answer) ¶ 36, as described further below.  While less extreme than the construction of the levee, these later actions were not "insignificant," as defendants posit.  Defs.' Proposed Findings of Fact at 13.  As noted above, in 2015, on other parts of the island, Mr. Sweeney dug crescent-shaped ponds and dumped the soil he had excavated on "the far west corner," to create a ramp for watercraft.  Trial Tr., June 3, 2019 (Sweeney's testimony) at 917:16–918:14; U.S. Ex. 333; Siegel Decl. at 31:25–33:10; USA Ex. 292 (aerial photograph dated Dec. 31, 2014, showing no ponds); USA Ex. 293 (aerial photograph dated Jan. 29, 2015, showing three of four ponds); USA Ex. 294 (aerial photograph dated Apr. 1, 2015, showing some work on fourth pond).

Thus, provided all other elements of CWA liability are met, Sweeney's violations after Point Buckler Club, LLC purchased the island in October 2014 are Point Buckler Island, LLC's violations; Point Buckler Island, LLC's violations are Sweeney's violations; for these post-October 27, 2014 violations, defendants are jointly and severally liable.

C.      Defendants "Added Pollutants"

The United States has met the second element of liability, that defendants "added pollutants."  The CWA defines the operative term "discharge of a pollutant" to include "any addition of any pollutant," 33 U.S.C. § 1362(12)(A), and "pollutant" to include constituents such as "dredged spoil," "solid waste," "biological materials," "wrecked or discarded equipment,"

"rock," "sand" and "cellar dirt." *Id.* § 1362(6).  The Act authorizes the Corps to render permit

decisions for discharges of specified constituents: "dredged or fill material." *Id.* § 1344(a);

*Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 268 (2009).  "Dredged

material" is defined to include "material that is excavated or dredged from waters of the United

States."  33 C.F.R. § 323.2(c); *see also id.* § 323.2(d)(1) ("[T]he term discharge of dredged

material . . . includes . . . [t]he addition of dredged material to a specified discharge site located

in waters of the United States.").  "Fill material" is defined to include "material placed in waters

of the United States where the material has the effect of:  (i) [r]eplacing any portion of a water of

the United States with dry land; or (ii) [c]hanging the bottom elevation of any portion of a water

of the United States."  33 C.F.R. § 323.2(e)(1).

       The Act's implementing regulations explicitly reference "levee[]" construction as

an example of an activity that can involve discharges of fill material.  *See* 33 C.F.R. § 323.2(f)

("The term discharge of fill material means the addition of fill material into waters of the United

States.  The term generally includes, without limitation, the following activities: . . .

levees . . . ."); *see, e.g.*, *Larkins*, 657 F. Supp. at 85 ("The use of earthmoving equipment to

construct earthen dikes and levees on wetlands constitutes a discharge of pollutants into waters

of the United States for which a permit is required."); *Bayou Des Familles Dev. Corp. v. U.S.

Army Corps of Eng'rs*, 541 F. Supp. 1025, 1036 (E.D. La. 1982) ("The discharges of fill into the

tidal wetlands in question and the discharges of dredged or fill material to dam Bayou Boeuf and

Kenta Canal as part of [the violator's] levee project construction constituted discharges of

pollutants into the navigable waters within the meaning of the [Clean Water Act].").  The

regulations also explicitly reference, as an example of fill material, "overburden from . . .

excavation activities."  33 C.F.R. § 323.2(e) (without defining "overburden").  *See, e.g.*, *United

States v. Deaton*, 209 F.3d 331, 335–36 (4th Cir. 2000) ("[O]nce that material was excavated

from the wetland, its redeposit in that same wetland *added* a pollutant where none had been

before." (emphasis in original)).  Another relevant example of fill material is "materials used to

create any structure or infrastructure in the waters of the United States."  33 C.F.R. § 323.2(e)(2).

*See, e.g.*, *United States v. Bailey*, 571 F.3d 791, 794 (8th Cir. 2009) ("Bailey constructed a road

on a parcel of wetlands . . . without obtaining a permit under [33 U.S.C. § 1344] of the Clean Water Act[.]"); *United States v. Brink*, 795 F. Supp. 2d 565, 580 (S.D. Tex. 2011) ("Defendants have filled La Para [Creek] with approximately 210 yards of concrete for the purpose of creating a 'structure, infrastructure, or impoundment[.]'") (quoting 33 C.F.R. § 323.2(f)).

The evidence admitted at trial, including aerial photography, topographic data and Sweeney's own description of his activities, leads the court to conclude that, since 2011, defendants[38] discharged significant quantities of dredged and fill material throughout Point Buckler Island.

Dr. Siegel credibly estimated the areal and volumetric extent of defendants' activities using aerial photographs of Point Buckler Island from May 2012 to February 2016 (USA Exs. 9, 267–300, 302), when defendants conducted activities, Siegel Decl. at 31:8–11; Trial Tr., May 20, 2019 (Dr. Siegel's testimony) at 59:3–21, as well as topographic survey data collected by Mr. Kulpa from areas of the island where activities had, and had not, occurred. Siegel Decl. at 30:12–19; Kulpa Decl. at 4:11–11:12; USA Ex. 303 (Appendix E to the May 2016 report) at 30, table 1[39] (table of baseline elevations against which activities were compared) & 1, 5–15, 29, 31–34 (describing methodology).

As supported by trial testimony and Dr. Siegel's declaration, Siegel Decl. at 31:25–33:10; *see also* USA Ex. 310 (Appendix K to the May 2016 report, part of Dr. Siegel's basis, describing and quantifying 2012–16 activities, annotating aerial photographs from this period of time, and identifying for each time interval status of activities),[40] and as found above:

a.     During 2012, three trenches were excavate with the spoils placed atop the nearby tidal marsh surface, and two trailers were brought onto the island.

---

[38] As explained above, Point Buckler Club LLC is only liable for violations occurring after October 27, 2014.

[39] The remainder of this exhibit was admitted as a basis for an expert opinion only.

[40] Only portions of the Appendix, namely 22(B), 40, 45 and 47, were admitted in full; the remainder was admitted as a basis for an expert opinion only.

b.      Between approximately February and October 2014, a 4,700-foot levee and associated excavated areas, namely a borrow ditch, were constructed around the general perimeter of the island.  Approximately 16,000 cubic yards of soil were excavated and discharged.[41]  The areal extent of excavation is approximately 2.62 acres.  The areal extent of where soil was deposited is approximately 2.56 acres.

c.      At the end of 2014, two shipping containers and two platforms were brought to the island and placed to the interior of the new levee.

d.      In 2015, earthmoving activities occurred in conjunction with the creation of four small crescent basins, also referred to as ponds, to the interior of the new levee. Three of the four ponds were created by late January 2015, and the fourth pond was completed no earlier than April 2015.   USA Ex. 292 (aerial photograph dated Dec. 31, 2014, showing no ponds); USA Ex. 293 (aerial photograph dated Jan. 29, 2015, showing three of four ponds); USA Ex. 294 (aerial photograph dated Apr. 1, 2015, showing some work on fourth pond); USA Ex. 295 (aerial photograph dated Apr. 18, 2015, showing more work on fourth pond).  The combined extent of the area from which defendants excavated soil is just under a third of an acre, and the combined extent of the area where they deposited soil is approximately 0.43 acres.

e.      Sweeney confirmed that ultimately "all the fill [from the creation of ponds in 2015] went to the far west corner," for the watercraft ramp.  Trial Tr., June 3, 2019 (Sweeney's testimony) at 917:16–918:14.

f.      Also in 2015, grading took place to establish a dirt road across the island.  An equipment staging and social area, including storage lockers, was set up on the west side of the island with the shipping containers and two of the trailers.  A section of the newly excavated borrow ditch was filled in the southwest corner to allow access between the island

---

[41]  Dr. Siegel provided a helpful analogy during his testimony:  "[I]f you see a very large 18-wheeled truck driving down the road full of dirt . . . those trucks might carry about 10 or 15 cubic yards of soil.  So 16,000 [cubic yards] would be almost 2,000 truckloads, maybe 1,500 truckloads of dirt would have to be moved, approximately."  Trial Tr., May 20, 2019 at 61:4–11. Notwithstanding the government's presentation of evidence on soil volume, defendants' expert "didn't do any calculations of the material used in the levee work."  Trial Tr., May 30, 2019 (Dr. Huffman's testimony) at 766:20–23.

1  interior and the perimeter levee, and a road was built from the new levee to the shore on the

2  western tip of the island.  A third trailer was set up on the eastern side.

3                   g.       In early 2016, three platforms were brought to the island and

4  placed between the two shipping containers on the west side, creating a wind-sheltered patio

5  between the two shipping containers.  Four more platforms were brought to the island and set up

6  in pairs and painted with the large helicopter landing pads, marked with the circle "H".

7                   h.      The areal extent of defendants' structures on Point Buckler Island

8  was approximately 0.17 acres as of 2016.

9              Dr. Siegel color coded the result of defendants' activities resulting in discharges

10  in an annotated aerial photograph (USA Ex. 333, Figure 6 of the July 2018 report):[42]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  _____

28  [42] As discussed below in Section IV.F, while the court finds defendants were responsible for placing the structures identified here onto the island, the United States has not met its burden of showing the structures qualify as "pollutants" under the CWA.

Figure 6

Dredge and Fill Activities, 2012 - 2016

USA Ex. No. 0333

1    Defendants' admissions corroborate certain of the foregoing conclusions, as

2 follows:

3    a.    In or about May 2012, as noted above, Sweeney's father-in-law,

4 Mike Frost, at Sweeney's behest, operated an excavator and deposited soil to the side of small

5 excavated areas, which Sweeney describes as duck ponds.[43]  USA Ex. 12 (Sweeney Dep.) at

6 46:21–49:10; USA Ex. 29 (Sweeney's hearing testimony dated Dec. 14, 2016) at 229:11–

7 230:23).

8    b.    In or about August 2012, Sweeney used a landing craft and a

9 bulldozer to deposit two "military" trailers on the island's western corner close to where

10 kiteboards launched.  USA Ex. 12 at 43:7–14; USA Ex. 11 (Answer) ¶ 54.

11    c.    Between February 2014 and approximately November 2014,

12 Sweeney operated an excavator with a 45 to 50-foot reach and "excavated soil from one location

13 and deposited that soil in another location."  Trial Tr., June 4, 2019 (Sweeney's testimony) at

14 1029:1–1031:21; USA Ex. 12 at 96:3–25; *see also* USA Ex. 11 ¶ 56 (defendants admit "Sweeney

15 excavated a borrow ditch" and "Sweeney used the material" to construct new levee).

16    d.    In the course of creating the new levee in 2014, Sweeney estimates

17 he excavated to a depth of "seven, eight feet"; deposited the soil "maybe 15, 20 feet" away from

18 where it was excavated, with the goal of building up the levee until it reached a "uniform" height

19 of "three feet" once the soil dried.  USA Ex. 12 at 71:12–72:23.

20

21

22

23

24 [43] The evidence suggests Mike Frost, at Sweeney's behest, excavated two ponds in 2012, which
are separate from the "four crescent ponds," that Sweeney excavated in 2014, and which are

25 visible from aerial photographs.  *See* USA Ex. 12 (Sweeney Dep.) at 46:21–49:10; USA Ex. 29
(Sweeney's hearing testimony dated Dec. 14, 2016) at 229:11–230:23); USA Ex. 11 ¶ 58; USA

26 Ex. 29 (Sweeney testimony dated Dec. 14, 2016) at 235:2–12 (between January 30, 2015 and
April 2015, Sweeney created two of the four ponds); USA Ex. 292 (aerial photograph dated Dec.

27 31, 2014, showing no ponds); USA Ex. 293 (aerial photograph dated Jan. 29, 2015, showing
three of four ponds); USA Ex. 294 (aerial photograph dated Apr. 1, 2015, showing some work on

28 fourth pond); *see also* Defs.' Br. at 17 ("Sweeney excavated . . . four semi-circular ponds . . . .")

1              e.       Sweeney "moved clockwise around the island" until he completed

2 "a couple of laps" of levee construction by the end of 2014.  Trial Tr., June 4, 2019 (Sweeney's

3 testimony) at 1031:22–1032:4.

4              f.       Sometime after early February 2015, "once [the mud] dried,"

5 Sweeney "drove a bulldozer across" the levee to "spread it out further" which made it "wider"

6 and more uniform.   USA Ex. 12 at 72:24–73:9, 71:12–72:23, 84:23–85:9; *see also* Trial Tr.,

7 June 4, 2019 (Sweeney's testimony) at 1051:21–1052:1; USA Ex. 39 (ground photos of levee on

8 or about February 9, 2015, showing uneven, pre-bulldozer condition).

9              g.       In early 2015, Sweeney operated "[a]n excavator and a dump

10 truck," USA Ex. 12 at 100:1–15, to create four "crescent-shaped ponds."  USA Ex. 11 ¶ 58; USA

11 Ex. 29 (Sweeney testimony dated Dec. 14, 2016) at 235:2–12 (between January 30, 2015 and

12 April 2015, Sweeney created two of the four ponds); USA Ex. 292 (aerial photograph dated Dec.

13 31, 2014, showing no ponds); USA Ex. 293 (aerial photograph dated Jan. 29, 2015, showing

14 three of four ponds); USA Ex. 294 (aerial photograph dated Apr. 1, 2015, showing some work on

15 fourth pond); *see also* Defs.' Br. at 17 ("Sweeney excavated . . . four semi-circular ponds . . . .").

16 Defendants do not dispute that "fill material" is a pollutant.  Trial Tr., June 5, 2019 (Defendants'

17 closing argument) at 1300:1–11.

18             h.      Sweeney deposited the excavated soil on the island's western side,

19 "[t]o create a ramp to the water for the landing craft."  USA Ex. 12 at 64:5–65:20.  Like the

20 construction of the levee, the creation of a ramp using excavated dirt also constituted the

21 "discharge of a pollutant" onto Point Buckler.

22           In light of these findings, the United States has met its burden of showing

23 defendants discharged pollutants within the meaning of the CWA.  Defendant Sweeney

24 discharged pollutants as a result of his levee construction, *see* 33 C.F.R. § 323.2(f) ("The term

25 discharge of fill material means the addition of fill material into waters of the United States.  The

26 term generally includes, without limitation, the following activities: . . . levees . . . .") (emphasis

27 added), and both defendants are liable for discharging pollutants by depositing excavated soil

28 and/or dirt elsewhere on Point Buckler Island.

D.    Structures Placed on Island Not "Pollutants"

The government argues the structures defendants placed on the island constituted "pollutants" under the CWA, Gov.'s Br. 56–57, but the court finds the government has not met its burden in this respect, *see* Defs.' Proposed Findings of Fact at 29–30 (citing 33 C.F.R. § 323.2(e)(2)).

As noted above, between approximately October 2014 and May 2016, "Sweeney … placed shipping containers, trailers, helicopter pads, wind-break platforms, and artificial turf on the island."  USA Ex. 11 ¶ 58; *see also* USA Ex. 12 at 102:20–23 (after February 2015, "the containers and the trailers got relocated"); Trial Tr., June 4, 2019 (Sweeney's testimony) at 1054:16–18 (in February 2016 "we dragged two [helicopter pads] out there").

As photographs show, these items functioned as structures that defendants placed atop the island's surface to serve kiteboarding customers.  *See, e.g.*, USA Ex. 114 (Facebook post dated Feb. 10, 2016, with ground photo showing helicopter pad accompanied by following statement attributable to defendants:  "A few upgrades to make island access easy"); USA Ex. 145 (Facebook post dated June 26, 2016, with ground photo showing artificial turf and kiteboarding customer lounging outside shipping container).

The government argues these structures fall under CWA's implementing regulations' reference to "materials used to create any structure" in waters of the United States as an example of fill material.  33 C.F.R.  § 323.2(e)(2); *see* Gov. Br. at 57.  However, on its face, the regulatory text "materials used to create any structure" does not necessarily encompass the structures themselves.  The government has not pointed to, and the court has not located, authority for the structures such as those at issue here qualifying as "pollutants" within the meaning of the CWA.  *See 307 Campostella, LLC v. Mullane*, 143 F. Supp. 3d 407, 415–16 (E.D. Va. 2015) ("[W]hile concrete and similar materials by themselves may constitute fill material, structures that hold the material and infrastructure such as docks do not.") (citing *United States v. Lambert*, 915 F. Supp. 797, 802–04 (S.D.W. Va. 1996) (impliedly classifying broken concrete, stone, and soil as fill material but referring to dock as structure); *cf. Starr Indem. & Liab. Co. v. Cont'l Cement Co.*, No. 4:11CV809 JAR, 2013 WL 1442456, at *18 (E.D.

1    Mo. Apr. 9, 2013) (summarizing Corps enforcement letter impliedly classifying concrete inside

2    of a sunken barge, but not barge itself, as "fill material")).

3              The touchstone for whether the structures at issue constitute "fill material" is

4    whether the structures "replac[e] any portion of a water . . .with dry land" or "change the bottom

5    elevation of the water" on which they sit.  33 C.F.R. § 323.2(e)(1) (defining "fill material").  For

6    example, one district court has indicated that a vessel may be "fill material" when it is

7    "aground[44] at almost all times."  *307 Campostella, LLC*, 143 F. Supp. 3d at 415–16 (accepting

8    argument that "unlicensed pier/storage facility and vessels" "change the bottom elevation of the

9    waterway and thus represent fill material" because they are "aground at almost all times"); *see*

10   *also* 33 C.F.R. § 323.4 ("A discharge which elevates the bottom of waters of the United States

11   without converting it to dry land does not thereby reduce the reach of, but may alter the flow or

12   circulation of, waters of the United States.").  The United States has not presented any evidence

13   of a change in water elevation levels on Point Buckler Island directly resulting from defendants'

14   placement of structures thereon.

15             The United States has not met its burden of showing the structures placed on

16   Point Buckler "replac[e] any portion of a water . . .with dry land" or "change the bottom

17   elevation of the water" on which they sit.  33 C.F.R. § 323.2(e)(1).  Accordingly, the structures

18   defendants placed in waters of the United States on Point Buckler Island do not qualify as

19   pollutants, and defendants' are not liable for CWA violations based on the placement of the

20   structures.

21             E.      Defendants Discharged Pollutants from "Point Sources"

22             The United States has established the third element of liability, that defendants

23   discharged the pollutants as found above from "point sources."

24             The Act defines "point source" broadly to include "any discernible, confined and

25   discrete conveyance . . . from which pollutants are or may be discharged."  33 U.S.C.

26   § 1362(14).  "[T]he term 'point source' includes bulldozers, dump trucks, and other equipment

27

28   ───────────────

[44] "Aground" means "on or onto the shore or the bottom of a body of water," in other words, not
afloat.  *See* Merriam-Webster, *Aground*, merriam-webster.com/dictionary/aground;

1  used to place dredged or fill material in waters of the United States." *United States v. Banks*, 873

2  F. Supp. 650, 657 (S.D. Fla. 1995), *aff'd*, 115 F.3d 916 (11th Cir. 1997); *see also Borden Ranch*

3  *P'ship v. U.S. Army Corps of Eng'rs*, 261 F.3d 810, 815 (9th Cir. 2001) ("[B]ulldozers and

4  backhoes can constitute point sources.") (citation and internal quotation marks omitted), *aff'd by*

5  *an equally divided Supreme Court*, 537 U.S. 99 (2002) (per curiam); *United States v. Pozsgai*,

6  999 F.2d 719, 726 n.6 (3d Cir. 1993) ("Courts have consistently held that dump trucks and

7  bulldozers, such as those used for depositing and spreading fill . . . , qualify as 'point sources.'")

8  (collecting cases).

9          In 2012, Sweeney directed the use of an excavator to create two ponds.  USA Ex.

10  12 (Sweeney Dep.) at 46:21–49:10.  Throughout 2014, defendant Sweeney used an excavator to

11  construct the levee, as Sweeney testified, Trial Tr., June 4, 2019 at 1029:1–18 & 1031:15–

12  1032:1, and as reflected in aerial photographs, *see, e.g.*, USA Ex. 310 at 40, 45, 47.  The

13  excavator, as Sweeney confirmed, "move[d] earthen material."  Trial Tr., June 3, 2019

14  (Sweeney's testimony) at 892:16–24; *see also* Trial Tr., June 4, 2019 (Sweeney's testimony) at

15  1031:13–21 (this equipment "excavated soil from one location and deposited that soil in another

16  location").  In early 2015, defendant Sweeney operated an excavator and a dump truck to create

17  the four crescent-shaped ponds and used a dump truck to deposit the excavated soil near the

18  water's edge.  USA Ex. 12 at 64:5–65:20 & 100:1–15; USA Ex. 11 (Answer) ¶ 58; USA Ex. 292

19  (aerial photograph dated Dec. 31, 2014, showing no ponds); USA Ex. 293 (aerial photograph

20  dated Jan. 29, 2015, showing three of four ponds); USA Ex. 294 (aerial photograph dated Apr. 1,

21  2015, showing some work on fourth pond).  A ground photograph from 2015, USA Ex. 7, shows

22  the excavator (on the left) and the bulldozer (on the right) that were used to construct the levee

23  and duck ponds:

24

25

26

27

28



USA Ex. No. 0007

The excavator, bulldozer, dump truck and other mechanized equipment defendants operated on Point Buckler Island constitute "point sources" from which defendants discharged the pollutants described, *supra*, in Section IV.C.

  F. <u>Defendants Discharged Pollutants into "Waters of the United States"</u>

The United States also has proven the fourth element of liability, that defendants discharged the pollutants found above from point sources into "waters of the United States."

The CWA prohibits any discharge of pollutants to "navigable waters," i.e., "waters of the United States," except to the extent compliant with the Act's permit or exemption provisions.  33 U.S.C. §§ 1311(a), 1362(7), 1362(12)(A).[45]  The Act's implementing regulations define the term "waters of the United States" to include tidal waters, that is, "[a]ll waters which

---

[45] The court references the version of these statutes effective from 2008 to 2014, which does not materially differ from the current version.

1    are currently used, or were used in the past, or may be susceptible to use in interstate or foreign

2    commerce, including all waters which are subject to the ebb and flow of the tide." 51 Fed. Reg.

3    41206-0133 (Nov. 13, 1986) (codified at C.F.R. § 328.3(a)(1)) (hereinafter C.F.R. § 328.3(a)(1)

4    (1986)).  The Corps and the EPA revised the regulatory definition of waters of the United States

5    in mid-2015, *see* Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg.

6    37,054 (June 29, 2015) (codified at 33 C.F.R. § 328), then put the revision on hold for a period

7    of time,[46] then reverted to the pre-2015 regime.[47]  On June 22, 2020, a new final rule came into

8    effect, which further amended the definition of "waters of the United States."  *See* 85 Fed Reg.

9    22,250-01 (explaining edits definition intended to "streamline and simplify the definition").

10   None of these regulatory machinations affect the Act's longstanding coverage of tidal waters.

11   *See* 33 C.F.R. § 328.3(a)(1) (effective June 22, 2020) ("The term waters of the United States

12   means . . . all waters which are subject to the ebb and flow of the tide" and "adjacent wetlands").

13            "Waters of the United States" have also long been defined to include "wetlands,"

14   including "marshes," that abut tidal waters.  *Compare* 33 C.F.R. § 328.3(b) (1986) (defining

15   "wetlands"), *id.* § 328.3(a)(7) ("wetlands adjacent" to tidal waters)[48] *with* 33 C.F.R. § 328.3

16   (a)(4), (c)(1), (c)(16) (effective June 22, 2020) (as pertinent, same as 1986 regulation).

17            In finding Point Buckler Island comprises "waters of the United States" as

18   explained fully below, the court cites and applies the 1986 version of the Act's regulatory

19   definition, as the version in effect at the times relevant here.  *See* Trial Tr., June 5, 2019 (closing

20   arguments) at 1288:9–10 (Defendants "concur with the government that the regulations in effect

21   at the time [of defendants' conduct] ought to be applied").

22

23   ───────────────

24   [46] *See In re EPA and Dep't of Def. Final Rule*, 803 F.3d 804 (6th Cir. 2015), *vacated*, 713 Fed.
     App'x 489 (6th Cir. 2018); *S.C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959

25   (D.S.C. 2018).

26   [47] *See* Definition of "Waters of the United States,"—Recodification of Pre-Existing Rules, 84
     Fed. Regis. 56,626, 2019 WL 5307183 (Oct. 22, 2019) (codified at 33 C.F.R. § 328).

27

28   [48] *See* Final Rule for Regulatory Programs of the Corps of Engineers, 51 Fed. Reg. 41, 206-01,
     1986 WL 116041 (1986) (codified at 33 C.F.R. §§ 320–330).

Under the Act, the term "waters of the United States" covers area beyond tidal waters and their high tide line to encompass adjacent wetlands. 33 C.F.R. § 328.4(b)(2) (1986). "The term wetlands means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b) (1986). "Wetlands generally include swamps, marshes, bogs, and similar areas." *Id.*

The court finds that defendants discharged pollutants into "waters of the United States," because, as explained more fully below, at the time defendants initiated their activities, Point Buckler Island consisted almost entirely of tidal-water channels and marsh wetlands abutting tidal waters, except for a 0.31-acre area on the island's eastern edge, and defendants discharged pollutants into those aquatic areas. Because virtually the entire island comprised, at the time of defendants' violations, "waters of the United States" within the meaning of the Act, when defendants discharged pollutants from point sources onto Point Bucker Island, they discharged pollutants into "waters of the United States." Further, the court finds that defendants added dredged and fill material from point sources directly into tidal channels and abutting wetlands qualifying as waters of the United States.

Because the court so finds, it need not reach the United States' argument that CWA jurisdiction extends to Point Buckler for a second, independent reason that the high tide line at Point Buckler Island is and was, at all times relevant, at least 7.4 ft. NAVD88.[49] Gov.'s Br. at 60–61.

      1.    <u>Point Buckler Island fell under Definition of "Waters of the United States" in 2011</u>

The court first addresses its threshold finding that Point Buckler Island consisted of tidal channels and land with marsh conditions as of 2011, before defendants' levee-constructing and other earthmoving.

---

[49] NAVD88 stands for "North American Vertical Datum of 1988," "the nation's common elevation survey data" which is "used throughout the United States as established by the National Geodetic Survey." Trial Tr., May 20, 2019 (Dr. Siegel's testimony) at 67:18–68:3.

1    "Decades of historical aerial photographs of Point Buckler Island (and comparing

2   them with decades of aerial photographs of nearby tidal channel and marsh systems) . . . show

3   signatures of tidal channels and marsh wetlands throughout the island."  Siegel Decl. at 20:25–

4   28; USA Exs. 5, 247–255 (aerial photographs taken at various points in time between 1948 and

5   2012 of Point Buckler Island); USA Exs. 257–261 (aerial photographs taken at similar points in

6   time of nearby Freeman Island, which Dr. Siegel has inspected and confirmed as supporting a

7   tidal marsh ecosystem); USA Exs. 262–266 (aerial photographs taken at similar points in time of

8   nearby Snag Island, which Dr. Siegel has inspected and confirmed as supporting a tidal marsh

9   ecosystem); Trial Tr., May 20, 2019 (Dr. Siegel's testimony) at 16–54:11 (discussion of Freeman

10  Island); *see also* Trial Tr., May 20, 2019 (Dr. Siegel's testimony) at 40:15–21 ("Q.  What was

11  the extent of your personal knowledge of the reference sites you found most similar to Point

12  Buckler Island here?  A.  I've been to every single one of them.  I've boated around them, I've

13  set my foot on them as was necessary, collected data at several of them, and have looked at them

14  very extensively through historical aerial photography.").  These aerial photographs are of high

15  quality.  Trial Tr., May 23, 2019 (Martel's testimony) at 349:18–21 ("The backlog of aerial

16  photography was about the best I've ever seen on a site for change detection over time.  Very

17  few sites have this much photography associated with it, such quality photography.").

18    On May 28, 2003, "while leading a research team examining the ecological

19  effects of tidal marsh restoration in the Suisun Marsh," Dr. Siegel observed and photographed

20  the northeastern portion of Point Buckler Island.  Siegel Decl. at 19:12–24; USA Exs. 4 & 242

21  (Dr. Siegel's photographs).  Dr. Siegel observed, and his 2003 photographs show, tidal channels

22  and "at least four tidal marsh plant species (as confirmed by Dr. Baye): three-square bulrush

23  (*Schoenoplectus americanus*) and cattail (*Typha* spp.) in the interior and a mix of hardstem tule

24  (*Schoenoplectus acutus*) and common reed (*Phragmites australis*) along the island perimeter."

25  Siegel Decl. at 19:27–20:4; *see also* Trial Tr.*, May 20, 2019 (Dr. Siegel's testimony) at 48:13–17

26  (Dr. Siegel "observe[d] the tidal waters entering and exiting Point Buckler Island and . . . the

27  tidal marsh vegetation on the inside of the island" "[l]ong before Sweeney had bought this

28  island"); Trial Tr. of May 28, 2019 (Dr. Baye's testimony) at 440:18–441:5.

Dr. Siegel also observed, and his 2003 photographs show, "the water to be turbid and tan and grey in color, indicating suspended fine mineral sediment in the tidal channels." Siegel Decl. at 20:5–6.  This condition is consistent with a functioning tidal marsh system.  *Id.* at 20:6–7; *see also* Trial Tr., May 20, 2019 (Dr. Siegel's testimony) at 50:6–8 ("Q.  How representative is that [2003] photo of a functioning tidal channel and marsh system in the Suisun Marsh?  A.  A hundred percent representative."); *see also* Trial Tr. of May 28, 2019 (Dr. Baye's testimony) at 440:20–25 ("You can see it's a tidal opening [in the] levee because the water is turbid and tan-brown, which is resuspended bay mud that drops out very rapidly and has to be kept up with tidal currents; otherwise, it runs either green or clear. So that is a tidally-influenced levee and tidal marsh.").  Below is an aerial photograph dated October 20, 2003, USA Ex. 255, showing tidal channels and marsh wetlands throughout Point Buckler Island, Trial Tr., May 20, 2019 (Dr. Siegel's testimony) at 50:18–52:6 (identifying features visible in this photograph)):

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19



USA Ex. No. 0255

20        In addition to aerial photographs and Dr. Siegel's observations in 2003, "maps

21 and similar sources indicate the presence of a tidal marsh system on Point Buckler Island . . . in

22 2011." Siegel Decl. at 23:1–2. For example, "[t]ule−bulrush−cattail−reed dominated marsh was

23 mapped by the California Department of Fish and Wildlife over almost all the island from its

24 first mapping effort in 1999 to 2012." Siegel Decl. at 23:3–4; *see also* Baye Decl. at 8:2–5

25 ("Maps produced by [the California Department of Fish and Game, the predecessor name of the

26 California Department of Fish and Wildlife] and the California Department of Water Resources

27 in 2000 reported the same species . . . ."). Another probative source of information appears

28

below – a National Wetlands Inventory map from the United States Fish and Wildlife Service
dated 2011, USA Ex. 241, Fig. 7(A):



More recently, Mr. Martel, with input from Dr. Baye, inspected Point Buckler
Island and collected representative plant, soil, and hydrology data.  Martel Decl. at 3:21–26;
Baye Decl. at 3:23–4:18.  They considered the criteria set forth in "[t]he Corps' [1987] Wetlands
Delineation Manual," (the "Manual")[50] under which the presence or absence of wetlands,
consistent with the Act's implementing regulations, is assessed in light of three parameters:  "(1)
prevalence of plant species typically adapted to saturated soil conditions . . . (2) hydric soil,
meaning soil that is saturated, flooded, or ponded for sufficient time during the growing season
to become anaerobic, or lacking in oxygen, in the upper part; and (3) wetland hydrology, a term
generally requiring continuous inundation or saturation to the surface during at least five percent
of the growing season in most years," *Rapanos v. United States*, 547 U.S. 715, 761–62 (2006)

---

[50] Environmental Laboratory, *Corps of Engineers Wetlands Delineation Manual* (1987),
http://www.cpe.rutgers.edu/wetlands/1987-army-corps-wetlands-delineation-manual.pdf.  The
court takes judicial notice of this document, because it is "a record of a [government] agency not
subject to reasonable dispute."  *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807
F.3d 1031, 1039 n.8 (9th Cir. 2015) (citation omitted).

1   (Kennedy, J., concurring) (citation omitted).  *See* Martel Decl. at 4:23–5:16; Baye Decl. at 3:23–

2   4:5.

3           Indicators of all three parameters are normally present in wetlands; however,

4   when, as here, unauthorized activities have impacted a site's vegetation, soils, or hydrology, the

5   Manual provides "atypical situation" procedures for experts to assess whether the three

6   parameters existed prior to alteration of the relevant area.  *See* Martel Decl. at 5:17–6:2

7   ("Different protocols apply to atypical situations, and scientists may infer the presence of

8   wetland criteria based on the best available information." (citation omitted)); *see also* Manual at

9   73 (outlining alternate protocol when unauthorized activities may have "result[ed] in removal or

10  covering of indicators of one or more wetland parameters").  In such instances, not all three

11  parameters have to be met, and "all possible evidence that may be used to characterize the

12  [characteristics] that previously occurred" should be collected and the surveyor is to "examine

13  the available data" to make a determination, if possible.  *See* Manual at 78–79 (soils), 81–82

14  (hydrology); *see also id.* at 76 ("If it is impossible to determine the plant community types that

15  occurred on the area prior to alteration, a determination cannot be made using all three

16  parameters.  In such cases, the determination must be based on the other two parameters.").

17          As provided in the Act's regulations, "normal circumstances" before the

18  discharges in question are the relevant circumstances for identifying and delineating the extent of

19  wetlands.  33 C.F.R. § 328.3(b); *see also* 33 C.F.R. § 323.2 ("Unauthorized discharges . . . do not

20  eliminate Clean Water Act jurisdiction, even where such unauthorized discharges have the effect

21  of destroying waters of the United States.").

22          Mr. Martel and Dr. Baye also considered the 2008 Regional Supplement to the

23  Manual (Arid West Region), which presents region-specific wetland indicators.  Martel Decl. at

24  4:27–5:7; Baye Decl. at 3:27–4:7.[51]  The following figure, USA Ex. 342 at 46, fig. 8, shows Mr.

25  Martel's sampling point and observation locations throughout Point Buckler Island in 2017 and

26  2018:

27

28

---

[51]  Mr. Martel contributed to the Regional Supplement.  Trial Tr., May 30, 2019 (Dr. Huffman's
testimony) at 742:20–22.



USA Ex. No. 0342.046

Throughout the island, Mr. Martel found hydric soils, Martel Decl. at 10:18–25, 12:8–11 ("I observed hydric soil across the undisturbed portions of the surface of the interior of the island"); field indicators ("physical manifestations") of pre-disturbance wetlands hydrology, Martel Decl. at 10:27–11:5 ("presence of surface water, sediment films and other sediment deposits, rafted vegetation fragments or other floating debris deposits, algal mats, salt or iron oxide films or crusts, occurrence of groundwater or soil saturation, watermarks, and oxidized root channels in the upper 12 inches of the soil profile"); Trial Tr., May 23, 2019 (Mr. Martel's

1    testimony) at 374:9–375:9 (explaining why Manual's normal protocol was not used to determine

2    hydrology); and pre-disturbance obligate wetlands vegetation, Martel Decl. at 11:20–25, 12:2–4,

3    12:10–12.  The "[p]rimary" indicator "about the condition of the site prior to the alteration" was

4    the "organic hydric soil that exists throughout the interior plain"; as Mr. Martel explains,

5    "organic soils only form under the wettest of conditions, the word is *peraquic*, basically wet all

6    the time." Trial Tr., May 23, 2019 (Mr. Martel's testimony) at 364:20–24.

7            These data show that "the entire marsh plain (other than the areas of open water in

8    the tidal channels) met the criteria for wetlands under the 'normal circumstances' that existed

9    prior to construction of the levee that began in 2014, the excavation of the drainage ditch that

10   began in 2014, and other modifications of the island since 2012, and these wetlands directly

11   abutted the tidal waters of the island's interior channels, Suisun Bay and Grizzly Bay."  Martel

12   Decl. at 12:27–13:4; *see also* Trial Tr., May 23, 2019 (Mr. Martel's testimony) at 365:15–16

13   ("You would not see soils like this in an area that was not a wetland."); USA Ex. 344[52] (wetland

14   determination data forms that Mr. Martel prepared).  Mr. Martel found:  "[V]irtually all of the

15   island consisted of tidal channels and abutting wetlands marsh prior to construction of the levee

16   and other disturbances since 2012, with the exception of uplands in approximately 0.31 acres

17   underlying the levee on the island's eastern edge, and approximately 1.649 acres with the

18   alignment of the remnant [old] levee where [Mr. Martel] could not determine the wetland status"

19   due to the area's inaccessibility.  Martel Decl. at 6:9–13; *see also id.* at 13:20–21 ("I could not

20   access and evaluate the three wetland parameters for those portions of the remnant levee that had

21   been covered with dredged material from the recent levee construction."); Trial Tr., May 23,

22   2019 (Mr. Martel's testimony) at 368:13–16 ("I tried. I couldn't. It was too thick to dig down

23   through.").     Dr. Baye observed undisturbed portions of the old levee and found that "even the

24   remnant levees, the remnant high marsh, those are all strong indicators of tidal wetlands."  Trial

25   Tr., May 28, 2019 (Dr. Baye's testimony) at 446:2–4.

26           In short, "this was . . . an obvious wetland."  Trial Tr., May 28, 2019 (Dr. Baye's

27   testimony) at 446:4; *see also* Baye Decl. at 16:4–6 ("Prior to 2012, almost all of Point Buckler

28

---

[52] Admitted as a basis for an expert opinion only.

Island was covered with fresh and brackish water wetland vegetation, directly abutting the island's tidal channels and Grizzly and Suisun Bays.").

The following figure, USA Ex. 336, illustrates the extent of tidal channels and abutting wetlands throughout Point Buckler Island (i.e., normal circumstances as of 2011):



USA Ex. No. 0336

The court credits Mr. Martel's and Dr. Baye's well-documented wetlands determination, and, for the foregoing reasons, concludes that Point Buckler Island consists of either tidal channels or wetlands within the meaning of the CWA.

2.    <u>Defendants Discharged Pollutants Into Tidal Channels and Abutting Wetlands, i.e., "Waters of the United States"</u>

The court next addresses its finding that defendants discharged pollutants directly into tidal channels and abutting wetlands.

1            A series of aerial photographs methodically annotated by Dr. Siegel show that

2    defendants filled tidal channel segments through which tidal waters had previously flowed into

3    and out of Point Buckler Island through breaches in the old levee.  Siegel Decl. at 39:1–28, 63:5–

4    12, & 64:14–71; USA Ex. 309 at 4–5, Figs. J-1, J-2, 7–9, Figs. J-4–J-6; USA Ex. 334.  Another

5    annotated aerial photograph, USA Ex. 333 (reproduced above on page 56), shows, in yellow, still

6    more areas where defendants filled channels.  Siegel Decl. at 63:7–8.

7            In approximately 10 to 15 separate locations, defendants deposited excavated soil

8    into the bottom of tidal channels and kept doing so until the soil reached the height of the new

9    levee.  Trial Tr., May 20, 2019 (Dr. Siegel's testimony) at 87:6–90:15.

10           With respect to discharges into abutting wetlands, as Mr. Martel explains, "most

11   of the new levee . . . would have been part of the continuous tidal marsh wetlands that [he]

12   observed . . . except for the tidal channel sections that were also filled."  Martel Decl. at 13:5–9.

13   In the southern portion of Point Buckler Island, where defendants constructed portions of the

14   new levee on top of remnants of the old levee, "at least some portions of the remnant levee had

15   been wetlands prior to the disturbance."  Martel Decl. at 12:22–24.

16           A comparison of USA Ex. 336, which shows where tidal channels and abutting

17   wetlands were located on Point Buckler Island before defendants' actions in 2014, with USA Ex.

18   333, which shows where defendants conducted not only their levee construction but also other

19   activities, and confirms that defendants discharged pollutants into waters of the United States.

20           Defendants have not offered any persuasive evidence to support their argument

21   that "the island interior was dry land" at the time of their conduct.  Defs.' Br. at 31 n.11.  To the

22   contrary, defendants admit that, prior to the alleged violations, Point Buckler Island had

23   "channels . . . and remnants of a former borrow ditch" and "some portion of these were open to

24   tidal inflows and outflows."  USA Ex. 11 (Answer) ¶ 43.

25           Further, defendants concede the new levee "restricted tidal flows into and out of

26   the borrow ditch and channels at the island."  *Id.* at ¶ 56; *see also* Defs.' Br. at 33:24–25

27   ("Sweeney placed dirt in" and "clos[ed] the mouth of the S-shaped channel at the north end of

28   the island").  Defendants also admit that wetland vegetation such as "bulrush" and "cattail"

"were present on the island at the time of Sweeney purchased [it]."  USA Ex. 11 (Answer) ¶ 46; *see also* USA Ex. 12 (Sweeney Dep.) at 75:9–18 (Sweeney observed tules in 2010 and buried that kind of tidal wetlands vegetation in 2014); Trial Tr., May 30, 2019 (Sweeney's testimony) at 857:10–21 (in 2012, Sweeney used a bulldozer to "knock over . . . tules"); *see also id.* at 858:15–19.

The court acknowledges Sweeney's testimony that he observed the water table to be more than 12 inches below the surface on one occasion in 2012, Defs.' Br. at 58:14–16, and "about 2, 2 and a half feet down" while operating the excavator in 2014, Trial Tr., June 3, 2019 (Sweeney's testimony) at 894:13–17; *see also* Defs.' Ex. 2243 (photograph that, according to Sweeney, purports to show groundwater elevation); Trial Tr., June 3, 2019 (Sweeney's testimony) at 893:5–894:17, 895:4–6 (discussing Ex. 2243, noting it was taken February of 2014 and he did not observe any tidal water flowing into or out of the ditch shown in Ex. 2243).  The court does not assign significant weight to this purely anecdotal report.  Similarly, the court has considered, but does not credit, Sweeney's alleged observation of the water table in 2015, *see* Defs.' Br. at 58:17–19; by that time, the newly constructed levee had likely altered the hydrology of the island to the interior of the new levee.

The court does credit the testimony of Dr. Baye, that the elevation of the water table at a given time varies with the tides.  *See* Trial Tr., May 28, 2019 at 488:5–14 ("Q. . . . So if someone went out to . . . Point Buckler and dug a pit in the interior plain, before the levee repair, and did not find water within 12 inches of the surface, that would be evidence that it wasn't a tidal marsh?  A.  No.  Once again, it would depend on what tide series during the month and the year. If it's a neap tide series, absence of water within 12 [inches of the] surface would not definitively support a conclusion that it was not a tidal wetland.  You'd have to repeat sample, or sample during a spring tide series to reject the possibility that it was a tidal marsh.").  Dr. Baye further testified that heavy equipment can be driven, and in fact is driven for ditch work and wetland enhancement work, on the surface of older tidal marshes.  This is possible because "marsh soils develop shear strength [from] the cohesion of roots and rhizomes" and "old marsh soils with dense sods, just like terrestrial sods, develop load-bearing capacity."  Trial Tr., May

28, 2019 (Dr. Baye's testimony) at 480:12–25.  In lay terms, tidal marsh soils will not necessarily "go squish-squish" when walked on when they are not saturated at the surface.  *Id.* at 480:7–11.

Defendants' expert, Dr. Huffman, did "not complete[] any analysis about whether there were any wetlands on Point Buckler Island . . . before, during, or after Sweeney's levee work."  Trial Tr., May 30, 2019 (Dr. Huffman's testimony) at 743:13–16; *see also* Martel Decl. at 14:5–11 ("Dr. Huffman and his team had access to the sample points and soil pits for their evaluation after we finished collection of data from our sample points.  I have no knowledge of any information Dr. Huffman collected or recorded at any of our sampling locations.  Similarly, I have no knowledge of analyses or conclusions from Dr. Huffman regarding the presence or absence of abutting wetlands on the island.").  Further, while Dr. Huffman's professional experience includes contributing to the development of the Act's regulatory definition of wetlands, *see* Trial Tr., May 29, 2019 (Dr. Huffman's testimony) at 702:17–23, he offered no testimony challenging the accuracy of Mr. Martel's and Dr. Baye's identification of wetlands throughout Point Buckler Island under the wetlands regulation or the wetlands indicators set forth in the Manual and the 2008 Regional Supplement to the Manual (Arid West Region).  Dr. Huffman did, however, express respect for Mr. Martel's "wetlands expertise."  Trial Tr., May 29, 2019 (Dr. Huffman's testimony) at 703:22–23 ("[A]s a professional, I respect Dan's wetlands expertise.").

### 3.  Conclusion

For these reasons, the court concludes that, because defendants discharged pollutants into open-water tidal channels and abutting wetlands, defendants discharged pollutants to "waters of the United States."

### G.  Defendants' Discharges Were Not Authorized by Permit

The United States has proven the fifth and final element of liability, that defendants' discharges are not authorized by a permit.

The Act establishes a program under which permits may be issued "for the discharge of dredged or fill material."  33 U.S.C. § 1344(a).  Not every discharge can be

1  permitted.  For example, "no discharge of dredged or fill material shall be permitted if there is a

2  practicable alternative," 40 C.F.R. § 230.10(a), or if the discharge "results in likelihood of the

3  destruction or adverse modification of a habitat which is . . . a critical habitat under the

4  Endangered Species Act," *id.* § 230.10(b)(3).  Permits that are issued typically require

5  "[c]ompensatory mitigation," "a critical tool in helping the federal government to meet the

6  longstanding national goal of 'no net loss' of wetland acreage and function."  73 Fed. Reg.

7  19,594 (Apr. 10, 2008).

8          Here, no permit authorizes defendants' discharges of dredged and fill material

9  throughout Point Buckler Island.

10          At no time prior to early 2015 did Sweeney contact, communicate with, submit

11  any written inquiry to, or request authorization from the Clean Water Act dredge-and-fill

12  permitting authority for the Suisun Marsh, the San Francisco District of the United States Army

13  Corps of Engineers, about the levee construction or other earthmoving activities on Point

14  Buckler Island.  Trial Tr., June 4, 2019 (Sweeney's testimony) at 1008:18–1009:23; USA Ex. 12

15  (Sweeney Dep.) at 172:11–14.  Sweeney did not prepare any written plans for his levee

16  construction.  Trial Tr., June 4, 2019 (Sweeney's testimony) at 1009:21–23.  Furthermore, the

17  Corps has never determined, or communicated any determination to defendants, that defendants'

18  discharges on Point Buckler Island are, or were, authorized by a CWA dredge-and-fill permit.

19  Trial Tr., June 4, 2019 (Sweeney's testimony) at 1052:5–11; Defs.' Ex. 2205 (Galacatos Dep.) at

20  27:3–7 (Ms. Kerschbaum did not have authority to approve work requests under RGP 3).

21          The only completed determination that the Corps has communicated to defendants

22  is that they are in violation of the Act.  *See, e.g.*, Defs.' Ex. 2111[53] (notice of violation).  In

23  October 2014, then-Corps staffer Alisha Kerschbaum obtained Sweeney's identity from the San

24  Francisco Bay Conservation and Development Commission.  Defs.' Ex. 2034[54] (email

25  communication between staff from the Corps and BCDC dated Oct. 9, 2014) at 1.  In or about

---

[53] Admitted for non-hearsay purposes only.

[54] Admitted for non-hearsay purposes only.

the same time frame, in September or October 2014, someone else from BCDC contacted Sweeney about Point Buckler Island.  Trial Tr., June 3, 2019 (Sweeney's testimony) at 883:5–8, 911:19–912:9.  In November 2014, individuals from BCDC inspected Point Buckler Island. Trial Tr., June 3, 2019 (Sweeney's testimony) at 911:19–912:9.

In December 2014, Ms. Kerschbaum from the Corps contacted Sweeney.  Trial Tr., June 3, 2019 (Sweeney's testimony) at 919:24–920:5.  In early February 2015, Ms. Kerschbaum met with Sweeney on Point Buckler Island, at which time Sweeney provided information on a "Regional General Permit 3" form.  Defs.' Ex. 2040 (Defs.' submittal dated 2015); Trial Tr., June 3, 2019 (Sweeney's testimony) at 921:7–11.  Although Sweeney alleges that Ms. Kerschbaum stated that, in her estimation, coverage should be approved, he acknowledges she "did not promise . . . an outcome."  Trial Tr., June 4, 2019 (Sweeney's testimony) at 1052:2–11.  Ms. Kerschbaum lacked decision-making authority concerning Regional General Permit 3.  Defs.' Ex. 2205 (Galacatos Dep.) at 27:3–7.  In June 2015, Ms. Kerschbaum resigned from the Corps and, apart from her photographs, USA Ex. 39, and Sweeney's handwritten submittal, Defs.' Ex. 2040, she left behind no documentation concerning her February 9, 2015 meeting.  Defs.' Ex. 2205 (Galacatos Dep.) at 36:11–14, 58:20–23.[55]

On October 21, 2015, Katerina Galacatos, Ph.D., the chief of the South Branch in the Regulatory Division of the Corps' San Francisco District, and EPA personnel, among others, conducted an inspection of Point Buckler Island.  Defs.' Ex. 2111[56] (notice of violation) at 1; USA Ex. 440 (EPA report of inspection); Defs.' Ex. 2205 (Galacatos Dep.) at 7:20–8:12; 86:2–87:23.  Dr. Galacatos observed newly deposited fill material in tidal channels.  Defs.' Ex. 2205 (Galacatos Dep.) at 86:2–87:23, 136:7–139:4; USA Exs. 434, 435.

The Corps also advised Sweeney to cease further unauthorized discharges.  Trial Tr., May 30, 2019 (Dr. Huffman's testimony) at 771:20–22.[57]  In March 2016, the Corps advised

---

[55] The court overrules the United States' objection to this excerpt based on lack of foundation.

[56] Admitted for non-hearsay purposes only.

[57] No party objected to this testimony at trial.

1   defendants by letter that the October 2015 visit had "confirmed the unauthorized discharge of fill

2   material into jurisdictional tidal waters of the U.S."  Defs.' Ex. 2111[58] at 1–2.  The March 2016

3   letter "again advised" defendants "not to proceed with any further dredge or fill activities."

4   Defs.' Ex. 2111[59] at 2.

5          Contrary to defendants' contention, neither Regional General Permit 3 nor

6   Sweeney's submittal dated February 9, 2015, affect defendants' liability for violations of the Act.

7   The Act provides that the Corps may issue "general permits on a State, regional, or nationwide

8   basis for any category of activities involving discharges of dredged or fill material" if, *inter alia*,

9   the activities "will cause only minimal adverse environmental effects when performed

10  separately."  33 U.S.C. § 1344(e)(1).

11         Regional General Permit 3 is one such regional permit, authorizing under certain

12  circumstances "landowners represented by the Suisun Resource Conservation District … to place

13  and maintain structures and/or perform work, and discharge dredged or fill material in areas

14  subject to Corps jurisdiction while completing the activities described [in Regional General

15  Permit 3] within the [Suisun] Marsh."  Defs.' Ex. 2031 (RGP3) at 1 (project description).  The

16  Corps acted in accordance with its regulations by not processing Sweeney's February 9, 2015

17  Regional General Permit 3 submittal.  *See* 33 C.F.R. § 326.3(e) ("Situations where no permit

18  application will be processed" include "when … enforcement litigation … has been initiated by

19  other Federal, state, or local regulatory agencies"); Defs.' Ex. 2205 (Galacatos Dep.) at 35:1–11

20  ("Q.  Did you act on that … document that had been submitted by Sweeney?  A.  No. … Q.  And

21  does the Corps have a policy not to act … after a case has been referred to EPA?  A.  I believe it

22  is in our regulations.").

23         Moreover, Regional General Permit 3 is and was, at all times relevant,

24  inapplicable to defendants' discharges.  Regional General Permit 3 does not apply when, as here,

25  the landowner seeks authorization after substantial discharges have already occurred.  The

26

27

28  [58] Admitted for non-hearsay purposes only.

    [59] Admitted for non-hearsay purposes only.

prospective nature of Regional General Permit 3 is clear on its face; it states (Defs.' Ex. 2031 at 7 (emphasis added)), *inter alia*:

> • "Landowners . . . shall *plan a project* and fill out a *work request* form, then submit the form and accompanying maps to the SRCD."
>
> • "The SRCD will then prioritize and compile the requests and submit monthly *Proposed* Work Reports describing the *proposed work* to the Corps of Engineers."
>
> • "The Corps will have 30 days to verify if *proposed work* is authorized by this Regional Permit. If *proposed work* cannot be authorized under the Regional Permit the Corps will notify the SRCD and landowner as soon as it makes its determination."
>
> • If a landowner applies directly to the Corps, "[t]he Corps will determine if the *proposed work* is in compliance with this Regional Permit and respond to the applicant no later than 45 days after receiving a complete application."

The plain language of Regional General Permit 3 aligns with its design: "to allow for the Corps to review proposed work" before it occurs.  Defs.' Ex. 2205 (Galacatos Dep.) at 81:17–20.

Regional General Permit 3 is inapplicable here for additional reasons. Defendants' discharges do not qualify for coverage due to the long-since eroded and breached condition of the old levee on Point Buckler Island.  *See, e.g.*, Defs.' Ex. 2031 (RGP 3) at 3 ("Landowners are authorized to place material on the crown and backslope of the existing levees to repair damage from storms and to counteract subsidence of levees.").  In addition, the 16,000 cubic yards of soil that defendants used to construct their new levee greatly exceed the limits set forth in Regional General Permit 3.  *See id.* ("With respect to exterior levee maintenance, permittees are authorized to place up to 1.5 cubic yards of levee material per linear foot (capped).");  *see also* Siegel Decl. at 32:7–8. (16,000 cubic yards of soil); *id.* at 42:2 (new levee is approximately 4,700 feet long).

Accordingly, defendants' discharges of dredged and fill material throughout Point Buckler Island are not authorized by any Clean Water Act permit.

1    The facts surrounding defendants' attempt to invoke Regional General Permit 3 do

2    not change this conclusion.  Defendants' February 9, 2015 submittal, as noted above, came very

3    late during the progression of defendants' discharges on Point Buckler Island.  Further, after Ms.

4    Kerschbaum's February 9, 2015 meeting with Sweeney, defendants continued to discharge

5    pollutants, and may have believed these actions were going to be covered in the permit for which

6    Sweeney had applied.  Trial Tr., June 3, 2019 (Sweeney's testimony) at 924:10–925:14

7    (describing future work on "three ponds that were to be graded out" that Sweeney included in his

8    application with Ms. Kerschbaum).  Specifically, Sweeney subsequently operated "[a]n

9    excavator and a dump truck," USA Ex. 12 at 100:1–15, to create one "crescent-shaped pond[]],"

10   and deposited the excavated material close to the bay.  USA Ex. 11 (Answer) ¶ 58; USA Ex. 292

11   (aerial photograph dated Dec. 31, 2014, showing no ponds); USA Ex. 293 (aerial photograph

12   dated Jan. 29, 2015, showing three of four ponds); USA Ex. 294 (aerial photograph dated Apr. 1,

13   2015, showing some work on fourth pond); USA Ex. 295 (aerial photograph dated Apr. 18,

14   2015, showing more work on fourth pond).

15   Thus, with respect to their conduct in question on Point Buckler Island, at no time

16   did defendants obtain from the Corps: (a) an individual permit issued under 33 U.S.C. § 1344;

17   (b) a verification of the applicability of a nationwide, general, or regional permit issued under 33

18   U.S.C. § 1344; or (c) a determination that no permit is required under 33 U.S.C. § 1344.

19       H.    Defendants' Discharges are not Exempt

20   Defendants argue that at least some of their discharges were exempt under the

21   Act, because they were made "for the purpose of maintenance, including emergency

22   reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams,

23   levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and

24   transportation structures."  33 U.S.C. § 1344(f)(1)(B).  *See* Defs.' Br. at 64.

25   Defendants bear the burden of proof regarding whether their discharges of

26   dredged and fill material qualified for as exemption as set forth in 33 U.S.C. § 1344(f).  *See N.*

27   *California River Watch v. City of Healdsburg*, 496 F.3d 993, 1001 (9th Cir. 2007).

28

1     The Act's implementation regulations provide that "[m]aintenance does not

2 include any modification that changes the character, scope, or size of the original fill design."  33

3 C.F.R § 323.4(a)(2).  Further, "[e]mergency reconstruction must occur within a reasonable

4 period of time after damage occurs in order to qualify for this exemption."  *Id.*

5     Assuming defendants could satisfy 33 U.S.C. § 1344(f)(1)(B), they must also

6 establish that their discharges were not for the purpose of bringing an area of waters of the

7 United States "into a use to which it was not previously subject" or the discharge neither

8 impaired the "flow or circulation" of waters of the United States nor reduced their reach.  33

9 U.S.C. § 1344(f)(2).

10     The court finds defendants' discharges were not for the purpose of maintaining a

11 serviceable levee; rather, defendants' actions "change[d] the character, scope, or size of the

12 original fill design."  33 C.F.R. § 323.4(a)(2) (defining "maintenance").  Defendants' new levee

13 is over 4,700 feet long.  Siegel Decl. at 42:2.  Furthermore, Defendants constructed the majority

14 of their new levee—approximately 3,300 feet—"atop the tidal marsh outside the alignment of the

15 old levee, further away from the tidal waters that surround the island and toward the island's

16 interior."  Siegel Decl. at 42:10–14; *see also* Trial Tr., May 20, 2019 (Dr. Siegel's testimony) at

17 65:19–67:8; Trial Tr., May 21, 2019 (Dr. Siegel's testimony) at 212:10–12;  USA Ex. 304 at 10,

18 fig. F-6 (path of old levee superimposed onto an aerial photograph from 2016 that shows the new

19 levee).  Less than a third, approximately 1,400 feet, roughly follows the path of the old levee

20 along the southern side of Point Buckler Island.  Siegel Decl. at 41:10–11; USA Ex. 304 at 10,

21

22

23

24

25

26

27

28

81

1   fig. F-6.   The following figure, USA Ex. 310 at 22, fig. K-1[60], illustrates the lack of alignment

2   between the new levee and its old, eroded predecessor:



15          Defendants' arguments to the contrary are unavailing.  Defendants' expert, Dr.

16   Huffman, conceded he "did not evaluate whether and to what extent there is overlap between the

17   new levee and the old levee."  Trial Tr., May 30, 2019 at 785:18–21.  In defendants' Initial Post-

18   Trial Submission, they fail to cite any evidence—or even any argument—that they confined their

19   activities to "maintenance."  *See* Defs.' Br. at 64–65.

20          For these reasons, the court concludes defendants' discharges do not qualify for

21   the exemption set forth at 33 U.S.C. § 1344(f)(1)(B).

22   V.   DEFENDANTS' REMAINING DEFENSES

23          In their initial post-trial submission, defendants argue that, on the basis of several

24   theories they assert qualify as affirmative defenses, defendants are not responsible for their

25   unpermitted, non-exempt discharges of pollutants into waters of the United States on Point

26   Buckler Island.  *See generally* Defs.' Br.  "[D]efendants bear the burden of proof on their

27

28   ───────────────

[60] Figure K-1 (listed on the United States' Final Exhibit List as figure (B)) is admitted in full.
Exhibit 310, with some exceptions, is admitted only as a basis for an expert opinion.

affirmative defenses." *Dodson v. Strategic Rests. Acquisition Co. II, LLC*, 289 F.R.D. 595, 602 (E.D. Cal. 2013) (citation omitted).

Because the court is not yet addressing the specifics of the remedial injunction, as explained further below, defendants' affirmative defenses that respond to the government's proposed injunction are not appropriate for resolution at this time. Therefore, the court does not address defendants' defenses based on substantive due process and the Excessive Fines Clause of the Eighth Amendment here.

The court addresses defendant's remaining defenses below.

A.   Defendants' Affirmative Defenses Based on the Takings Clause

Defendants argue the court should not grant the United States' requested injunction, because doing so would violate the Takings Clause of the U.S. Constitution. Defs.' Br. at 11–12. Though the court declines to reach the issue of the requested injunction here, the parties both raise a critical threshold question: whether the court has jurisdiction over defendants' Takings Clause defense.

1.   Jurisdiction under Tucker Act

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. By its very terms, the Takings Clause does not prohibit the federal government from taking privately owned property, but rather requires that any such taking is properly compensated. *See* Thomas W. Merrill, *Anticipatory Remedies for Takings*, 128 Harv. L. Rev. 1630, 1631 (citing *First English Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles*, 482 U.S. 304, 315 (1987)). Because compensation can only be awarded in a court in which the government has waived its sovereign immunity, the Supreme Court has concluded in the past that "federal courts of general jurisdiction have no authority to consider takings claims as long as an action for compensation is available elsewhere." *Id.* 1631. As a general rule, if the amount in controversy is more than $10,000, takings claims "must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." *E. Enters. v. Apfel*, 524 U.S. 498, 520 (1988) (plurality opinion). Defendant does not argue, and the

1    court cannot find, that the amount in controversy here is less than $10,000.  Moreover,

2    "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use,

3    duly authorized by law, when a suit for compensation can be brought against the sovereign

4    subsequent to a taking."  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984).

5            The Supreme Court has also, at times, considered takings claims against the

6    federal government without mentioning the Tucker Act.  Merrill, 128 Harv. L. Rev. at 1634–35

7    (citing, *inter alia, Kaiser Aetna v. United States*, 444 U.S. 164, 178–80 (1979) (finding federal

8    government could not require public access to property-owner's marina because such

9    interference with property rights would constitute a taking without just compensation)).  This

10   aspect of the jurisprudence has caused confusion over whether and under what circumstances a

11   federal district court should reach the merits of a takings claim against the United States.  *See*

12   *Bay View, Inc. on behalf of AK Native Vill. Corps. v. Ahtna, Inc.*, 105 F.3d 1281, 1285 (9th Cir.

13   1997) (describing "a common and oft-overlooked error committed by federal courts in

14   addressing the merits of takings claims against the United States" and concluding "appellants'

15   takings claim is premature until [they have] availed [themselves] of the process provided by the

16   Tucker Act.").

17           The court here looks to *United States v. Riverside Bayview Homes, Inc.*, 474 U.S.

18   121 (1985) for guidance, as it is a CWA civil enforcement action involving a takings-based

19   defense.  474 U.S. at 126–7.  In that case, the Supreme Court concluded that, even assuming

20   defendant had a ripe takings claim, "this lawsuit," meaning the enforcement action by the United

21   States Corps of Engineers against it, "is not the proper forum for resolving such a dispute: if the

22   Corps has indeed effectively taken [the violator's] property, [the violator's] proper recourse is

23   not to resist the Corps' suit for enforcement by denying that the regulation covers the property,

24   but to initiate a suit for compensation in the Claims Court."  *Id.* at 139 n.6 (citing *Williamson*

25   *County Planning Comm'n v. Hamilton Bank,* 473 U.S. 172 (1985)).

26           *Riverside Bayview Homes* cites to *Williamson County*, which the Court later

27   overruled in *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2170 (2019), but only insofar

28   as *Williamson County* held a property-owner must exhaust available remedies for just

1  compensation from a state or local government before its takings claim is ripe in federal court.

2  The overruling did not change the Court's holding that the Court of Federal Claims has exclusive

3  jurisdiction over takings claims against the federal government for over $10,000.  *See id.* at

4  2170.

5           *Williamson County* did not involve a takings claim against the federal

6  government.  Rather, it "effectively established an exhaustion requirement for § 1983 takings

7  claims when it held that a property owner must pursue state procedures for obtaining

8  compensation before bringing a federal suit."  *Knick*, 139 S. Ct. at 2173.  In *Knick*, the Supreme

9  Court did away with this exhaustion requirement, explaining: "A property owner has an

10 actionable Fifth Amendment takings claim when the government takes his property without

11 paying for it."  *Id.* at 2167.  The court went on to clarify, "[t]hat does not mean that the

12 government must provide compensation in advance of a taking or risk having its action

13 invalidated: So long as the property owner has some way to obtain compensation after the fact,

14 governments need not fear that courts will enjoin their activities."  *Id.* at 2167–68.

15          The Court has "long recognized that property owners may bring Fifth

16 Amendment claims against the Federal Government as soon as their property has been taken."

17 *Id.* at 2170.  "The Tucker Act," the Court explained, "which provides the standard procedure for

18 bringing such claims, gives the Court of Federal Claims jurisdiction to 'render judgment upon

19 any claim against the United States founded either upon the Constitution' or any federal law or

20 contract for damages 'in cases not sounding in tort.'"  *Id.* (quoting 28 U.S.C. § 1491(a)(1)).  The

21 *Knick* Court went on to explain that, if the government takes property and does not provide

22 compensation or a statutory compensation remedy, this "forc[es] the owner to bring a takings

23 suit under the Tucker Act."  *Id.* at 2170–71.

24          Further, in *Riverside Bayview Homes*, the Supreme Court instructed district courts

25 to resolve issues of liability and remedy in accordance with the Clean Water Act and its

26 implementing regulations, without taking into consideration the Takings Clause of the Fifth

27 Amendment.  The Court explained:

28                    [T]he possibility that the application of a regulatory program may
                     in some instances result in the taking of individual pieces of

85

> property is no justification for the use of narrowing constructions
> to curtail the program if compensation will in any event be
> available in those cases where a taking has occurred.  Under such
> circumstances, adoption of a narrowing construction does not
> constitute avoidance of a constitutional difficulty . . . it merely
> frustrates permissible applications of a statute or regulation.

474 U.S. at 127–28.  *Knick* reaffirmed that "[f]ederal courts will not invalidate an otherwise lawful uncompensated taking when the property owner can receive complete relief through a Fifth Amendment claim brought under the Tucker Act."  *Knick*, 139 S. Ct. at 2179.

Defendants also argue "[t]he Clean Water Act … displaces Tucker Act jurisdiction when a takings [defense] is being asserted as an affirmative defense to a Government enforcement action."  Defs.' Br. at 24.  The court finds the CWA does not displace Tucker Act jurisdiction.  "To determine whether a statutory scheme displaces Tucker Act jurisdiction, a court must 'examin[e] the purpose of the [statute], the entirety of its text, and the structure of review that it establishes.'"  *Horne v. Dep't of Agric.*, 569 U.S. 513, 527 (2013) (quoting *United States v. Fausto*, 484 U.S. 439, 444 (1988)).  "A statute must 'reflect an unambiguous intention to withdraw the Tucker Act remedy' before the courts will hold that it has done so."  *In re Nat'l Sec. Agency Telecomms. Records Litig.*, 669 F.3d 928, 932 (9th Cir. 2011) (quoting *Ruckelshaus v. Monsanto*, 467 U.S. 986, 1019 (1984)).

For example, in *Horne* the Court found a takings claim was properly before the district court, because Tucker Act jurisdiction had been withdrawn by the Agricultural Marketing Agreement Act of 1937 ("AMAA").  569 U.S. at 516–15.  The AMAA was a comprehensive statutory scheme that required some raisin growers, termed "handlers," to turn over a percentage of their crop to the United States.  *Id.* at 516.  The government argued petitioners' takings claim was "premature because the Tucker Act affords 'the requisite reasonable, certain, and adequate provision for obtaining just compensation that a property owner must pursue.'"  *Id.* at 526.  The Court rejected this argument "because the AMAA provides a comprehensive remedial scheme that withdraws Tucker Act jurisdiction over a handler's takings claim."  *Id.*  The AMAA's remedial scheme required handlers to raise any challenge to a "marketing order" issued under the

1   statute, "including constitutional challenges, in administrative proceedings."  569 U.S. at 527.

2   "As a result," the Supreme Court concluded, "there is no alternative 'reasonable, certain, and

3   adequate' remedial scheme through which petitioners (as handlers) must proceed before

4   obtaining review of their claim under the AMAA."  *Id.* at 526.

5           Defendants identify no comparable provisions within the CWA.  Defendants

6   argue the CWA's civil penalty provision, 33 U.S.C. § 1319(d), shows that "Congress plainly

7   wanted any possible defense to be considered as part of a Clean Water Act enforcement action,"

8   Defs.' Br. at 24, because that provision dictates courts are to consider "such other matters as

9   justice may require" when assessing a civil penalty against violators, 33 U.S.C. § 1319(d).  This

10  provision does not show that Congress unambiguously intended to withdraw Tucker Act

11  jurisdiction or allow courts to adjudicate takings-based allegations in the context of a CWA

12  enforcement action.

13          The United States reviews the remainder of the statute, and points out that no

14  other provision appears to unambiguously withdraw Tucker Act jurisdiction:  The Act's

15  prohibition on unpermitted, non-exempt discharges of pollutants, *id.* § 1311(a), is enforceable in

16  federal district courts through civil or criminal enforcement actions.  *See id.* § 1319(b) and (c).

17  In federal district courts, under circumstances not present here, "any citizen may commence a

18  civil action" against EPA.  *See id.* § 1365(a).  Similarly, under circumstances not present here,

19  the Act provides aggrieved persons with a right to seek review, directly in the courts of appeal,

20  of certain final actions by EPA.  *See id.* § 1369(b)(1).  None of these provisions purports to

21  address allegations of uncompensated takings, much less sets forth a procedural mechanism to

22  remedy them.  *See United States v. Bormes*, 568 U.S. 6, 12 (2012) ("The Tucker Act is displaced

23  . . . when a law assertedly imposing monetary liability on the United States contains its own

24  judicial remedies.  In that event, the specific remedial scheme establishes the exclusive

25  framework for the liability Congress created under the statute.").  Furthermore, defendants do not

26  identify any prior judicial decision holding the CWA displaces Tucker Act jurisdiction.  Indeed,

27  the weight of authority suggests otherwise.  *See, e.g.*, *Brace v. United States*, 72 U.S. Ct. Fed.

28  Claims 337 (2006) (adjudication by United States Court of Federal Claims under Tucker Act of

1  CWA violator's takings-related allegations arising out of CWA civil enforcement action), *aff'd*,

2  250 F. App'x 359 (Fed. Cir. 2007).

3  　　　　　Accordingly, so that the landscape is clear with respect to future proceedings,

4  defendants' Takings Clause defenses are not properly before the court, and they do not bar the

5  court's consideration of the government's requested injunction.  Defs.' Br. at 25.

6  　　　　　　　　2.　　Unconstitutional Condition Defense

7  　　　　　Defendants also assert the government's Clean Water Act claims against them

8  impose an "unconstitutional condition" prohibited by the Takings Clause because the

9  government refuses to grant a permit for the levee repair on Point Buckler unless defendants

10  provide mitigation payments of roughly 9 to 18 million dollars.  Defs.' Br. at 22–23.  This

11  defense is markedly different from defendants' other takings defenses.  "Extortionate demands

12  for property in the land-use permitting context run afoul of the Takings Clause not because they

13  take property but because they impermissibly burden the right not to have property taken without

14  just compensation" by denying a government benefit based on one's refusal to cede a

15  constitutional right.  *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 607 (2013).

16  　　　　　Assuming without deciding that this defense is properly before this court, the

17  court finds the defense unavailing on the merits.  Even if defendants' mitigation figures are

18  accurate, which the court does not now decide, defendants have not shown they attempted to

19  procure a permit for their activity and were either expressly denied that permit or the government

20  placed unconstitutional conditions on the acquisition of that permit.  That the government would

21  have required mitigation if defendants had properly applied for a permit before commencing

22  their violative conduct is purely speculative.  Defendants do not meet their burden of showing

23  the United States imposed an unconstitutional condition on the permit that was required here.

24  　　　　B.　　Defendants' Vindictive Prosecution and First Amendment Defenses

25  　　　　　Defendant argues the United States' claims are a result of vindictive prosecution,

26  and therefore violate the Due Process Clause of the Constitution.

27  　　　　　Vindictive prosecution arises most frequently in criminal cases and is intended to

28  serve as a constitutional check on prosecutorial discretion.  *See Bordenkircher v. Hayes*, 434

88

U.S. 357, 365 (1978).  It is premised on the idea that a person "may not be punished for exercising a protected statutory or constitutional right."  *United States v. Goodwin*, 457 U.S. 368, 372 (1982).

"Prosecutorial vindictiveness cannot, however, be inferred simply because the prosecutor's actions followed the exercise of a right."  *See United States v. Gallegos-Curiel*, 681 F.2d 1164, 1169 (9th Cir. 1982).  "Defendants must show a link between their exercise of the right and the 'penalty.'"  *United States v. Sequoia Orange Co.*, No. CV-F-83-510 OWW, 1994 WL 903688, at *2 (E.D. Cal. Mar. 14, 1994) (citing *United States v. Gutierrez*, 990 F.2d 472, 476 n.2 (9th Cir. 1993), *overruled on other grounds by United States v. Armstrong*, 48 F.3d 1508 (9th Cir. 1995)), *aff'd sub nom. United States v. Sequoia Orange Co.*, 185 F.3d 871 (9th Cir. 1999).  "In the absence of such a link, defendants' claims must rest on an improper motive other than retaliation," *id*,. which defendants do not allege here.

Similarly, a First Amendment retaliation claim requires that the asserting party establish not only that the "official harbored retaliatory animus and thus sought to induce prosecution, but also that the official succeeded—that is, that the 'prosecutor [] would not have pressed charges otherwise.'"  *Skoog v. Cty. Of Clackamas*, 469 F.3d 1221, 1234 (9th Cir. 2006) (internal citations omitted).

Defendant has not identified, nor has the court found, any authority that allows these claims to be brought as affirmative defenses in a civil context.  *See* Defs.' Br. at 51–52 ("Although First Amendment retaliation is typically asserted in a suit against a government for damages, there is no reason why it cannot be used as a defense against a government action that would establish its elements.").

Regardless, as the government argues in its motion in limine, ECF No. 111-1, defendant has not established a connection between the United States' charging decision and Sweeney's actions with respect to his legal battles with BCDC and the Regional Board.

Defendant argues the United States made its charging decision based on the EPA's referral, and the EPA referred the case with vindictive or retaliatory intent.  Defs.' Br. 51–52.  Assuming for sake of argument that the EPA's intent is relevant, defendants still have not

1  met their burden to show a causal link between the EPA's decision to refer the case and any

2  animus or a desire to retaliate on behalf of the EPA.

3          Defendants' primary evidence on this point is an excerpt from the deposition of

4  the EPA's William Lee.  Mr. Lee testified that, when EPA referred this matter to DOJ in

5  September 2016, "I don't think there was any efforts [sic] to restore the island being made at the

6  time . . . [W]e were trying to provide leverage so that everybody could come to the table . . . We

7  would hope that by us moving forward that we could encourage some settlement and restoration

8  of the island."  Defs.' Ex. 2209 (Lee Dep.) at 153:19–154:13; 154:19–156:20.[61]  Lee also

9  testified that, even if defendants resolved their dispute with the Regional Board and BCDC, the

10 EPA would still have had to decide how to proceed "based on the facts at the time."  *Id.* at

11 159:14–24.  As Lee explained: "there's still an outstanding federal violation."  *Id.* at 159:20–21.

12 Lee also testified that, ultimately, the "EPA was interested in restoration."  *Id.* at 159:6–9.  The

13 agency's inspection reports, among other evidence, corroborate this testimony.  USA Exs. 440,

14 441, 442.

15         Again, the DOJ made the ultimate decision to bring civil charges against

16 defendants, so Lee's testimony is not direct evidence of DOJ intent.  Nonetheless, the testimony

17 suggests that when the EPA asked the DOJ to prosecute this matter, the EPA was motivated by a

18 desire to settle the pending cases and restore Point Buckler.  This is not sufficient to show the

19 EPA decided to refer the case in retaliation for Sweeney's "vigorously defending himself" in the

20 BCDC and Regional Board legal disputes.  Rather, it suggests the DOJ acted commensurately

21 with its ultimate goal of achieving the restoration of Point Buckler.

22         Sweeney's arguments about the intentions of the Regional Board or BCDC are

23 irrelevant to this case.  *See United States v. Monsoor*, 77 F.3d 1031, 1034–35 (7th Cir. 1996)

24 ("The evidence that [the defendant] submitted pertained solely to the alleged vendetta of the

25 Wisconsin Department of Natural Resources.  [The defendant] presented no evidence suggesting

26 that the United States Attorney or any of her assistants harbored animus against him or acted

27

28

---

[61] As noted above, to the extent the court considers certain excerpts of Mr. Lee's deposition, it OVERRULES the United States' objections to those excerpts.

with vindictive motives in pursuing the prosecution."); *United States v. Robison*, 644 F.2d 1270, 1273 (9th Cir. 1981) (when federal prosecution follows successful defense of state claims, "the involvement of separate sovereigns tends to negate a vindictive prosecution claim.").  The court therefore GRANTS the United States' motion in *limine* regarding the evidence related to agencies other than the United States and the EPA, and those agencies' dealings with the United States and the EPA.  Mot. in Limine, ECF No. 111-1, at 7–8, 10–11.

Defendants have not met their burden to show vindictive prosecution or First Amendment retaliation here.

C.      Defendants' Void-for-Vagueness Defense

Finally, the court rejects defendants' defense that the terms "high tide line" and "wetlands" are unconstitutionally vague such that defendants did not receive "clear notice" that the Clean Water Act governed their filling activities.  Defs.' Br. at 54–59.  Because the court finds Point Buckler constitutes "wetlands" under the Clean Water Act, and does not rely on the high tide line, it need only address defendants' void-for-vagueness arguments with respect to the term "wetlands."

In the context of a civil regulation, an agency may not deprive a party of property by imposing civil liability "[i]n the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." *Ass'n of Irritated Residents v. Fred Schakel Dairy*, No. 1:05-CV-00707 OWW SMS, 2008 WL 850136, at *14 (E.D. Cal. Mar. 28, 2008) (citing *General Elec. Co. v. EPA*, 53 F.3d 1324, 1328–29 (D.C. Cir. 1995)).  "Sufficient notice is given when a 'person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited so that he may act accordingly.'"  *Id.* (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).  "There is a strong presumption that regulations are not unconstitutionally vague if the regulated party has the means of obtaining clarification either by making inquiry or through an administrative process."  *Id.* at *15.  Furthermore, "[w]here 'judicial explication' of a statute provides a defendant fair notice of the conduct prohibited, a court must reject a void-for-vagueness challenge."  *United States v. Lippold*, No. 06-30002, 2007

1   WL 3232483, at *4 (C.D. Ill. Oct. 31, 2007) (quoting *United States v. Bohonus*, 628 F.2d 1167,

2   1174 (9th Cir. 1980)).  In other words, the term "wetlands" as used in the CWA's implementing

3   regulations is not unconstitutionally vague as applied to defendants so long as the CWA, "[t]aken

4   together with administrative regulations and interpretations," "is sufficiently specific to put

5   [Defendants] on notice of what is required."  *See Botosan v. Paul McNally Realty*, 216 F.3d 827,

6   836 (9th Cir. 2000) (analyzing void-for-vagueness challenge to 42 U.S.C. § 12181(9)).

7           Under this standard, the challenged regulation is sufficiently specific.  It reads:

8   "The term wetlands means those areas that are inundated or saturated by surface or ground water

9   at a frequency and duration sufficient to support, and that under normal circumstances do

10  support, a prevalence of vegetation typically adapted for life in saturated soil conditions."  33

11  C.F.R. § 328.3(b) (1985).  The regulation provides examples that generally constitute wetlands:

12  "swamps, marshes, bogs, and similar areas."  *Id.*  Especially in light of the relevant factual

13  findings in this order, this definition is adequate to put a person of ordinary intelligence on notice

14  that much of Point Buckler consists of wetlands as that term is used in the regulation.

15          *United States v. Lucas*, 516 F.3d 316 (5th Cir. 2008), is instructive on this point.

16  There, a criminal defendant challenged his conviction for wetlands violations arguing that the

17  "CWA as applied to the regulation of wetlands is unconstitutionally vague" because "jurisdiction

18  [under the Act] continues to be determined on an ad hoc basis," *id*. at 327 (internal quotation

19  marks and citation omitted).  The Fifth Circuit rejected the argument, holding that "the

20  prevalence of wet property" along with "an area network of creeks and their tributaries leading to

21  the Gulf [of Mexico], some of which connected to wetlands on the property, should have alerted

22  'men of common intelligence' to the possibility that the wetlands were waters of the United

23  States under the CWA."  *Id*. at 328 (emphasis added).  The court also concluded the facts that

24  one of the defendant's employees told him "the property might contain wetlands" and the deed

25  for the property noted it may include wetlands, further undercut any vagueness in the law's

26  application to the defendant's conduct.  *Id*.

27          Similar facts exist here.  Prior to conducting his levee work, Sweeney learned

28  Solano County had zoned the island as "Marshland."  Trial Tr., June 4, 2019 (Sweeney's

92

1   testimony) at 1026:8–1027:1.  Sweeney would have, at some point, "received correspondence

2   from the Corps stating what [the Act] regulate[s] and that he would have needed a permit for any

3   fill discharge or work in [the Corps' regulatory] jurisdiction."  Defs.' Ex. 2205 (Galacatos Dep.)

4   at 97:4–17.  Moreover, as defendants concede,  Sweeney has experience with wetlands.  Defs.'

5   Br. at 58–59; *see also, e.g.*, Trial Tr., May 30, 2019 (Sweeney's testimony) at 800:15–803:8

6   (Sweeney has experience with wetlands mitigation banking).

7           Furthermore, defendants' vagueness challenge is undercut by defendants' "ability

8   to clarify the meaning of the regulation by [their] own inquiry, or by resort to an administrative

9   process."  *Hoffman Estates*, 455 U.S. at 498; *see also United States v. Doremus*, 888 F.2d 630,

10  634–35 (9th Cir. 1989) (rejecting void-for-vagueness challenge by defendant individuals who

11  conducted mining operations in violation of applicable regulations).  The Act's regulations allow

12  defendants and other property owners to request a "jurisdictional determination" in which the

13  Corps will "stat[e] the presence or absence of waters of the United States on a parcel" and

14  provide a map "identifying the limits of waters of the United States on a parcel."  33 C.F.R.

15  § 331.2 (definitional provision); *see also U.S. Army Corps of Eng'rs. v. Hawkes Co.*, 136 S. Ct.

16  1807, 1812 (2016).  Such a jurisdictional determination would be based on "extensive

17  factfinding . . . regarding the physical and hydrological characteristics of the property," *Hawkes*

18  *Co.*, 136 S. Ct. at 1813–14, using the regulatory standards discussed above.  A final approved

19  determination represents a legally definitive, judicially reviewable statement about Clean Water

20  Act jurisdiction in a particular case.  *See id.* at 1813–15.

21          For these reasons, defendants do not avoid liability under the CWA based on a

22  void-for-vagueness challenge.

23  VI.     RESTORATION AND OTHER REMEDIES

24          Because the court finds that none of defendants' affirmative defenses applicable

25  at this juncture are meritorious, it considers the appropriate remedy for defendants' violations.

26          The objective of the Clean Water Act is "to restore and maintain the chemical,

27  physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To remedy

28  violations, the Act authorizes "a civil action for appropriate relief, including a permanent or

temporary injunction" and provides that the court "shall have jurisdiction to restrain such violation and to require compliance."  33 U.S.C. § 1319(b).  The court may "order that relief it considers necessary to secure prompt compliance with the Act."  *United States v. Akers*, 785 F.2d 814, 823 (9th Cir. 1986) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982)).

There are "numerous precedents for restoration" as a remedy.  *United States v. Larkins*, 657 F. Supp. 76, 86 n.25 (W.D. Ky. 1987) (citations omitted), *aff'd*, 852 F.2d 189 (6th Cir. 1988).  Courts have the "authority to issue such restorative orders so as to effectuate the stated goals of the Clean Water Act 'to maintain the chemical, physical, and biological integrity of the Nation's waters.'"  *United States v. Cumberland Farms of Conn., Inc.*, 826 F.2d 1151, 1164 (1st Cir. 1987) (quoting 33 U.S.C. § 1251(a)).

"In evaluating remediation or restoration proposals, courts . . .  consider[] three factors:  (1) whether the proposal 'would confer maximum environmental benefits,' (2) whether it is 'achievable as a practical matter,' and (3) whether it bears 'an equitable relationship to the degree and kind of wrong it is intended to remedy.'"  *United States v. Deaton,* 332 F.3d 698, 714 (4th Cir. 2003) (quoting *Cumberland Farms,* 826 F.2d at 1164); *see also Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.  If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.").

The contents of the United States' proposed injunction laid out in the Restoration Plan for Point Buckler Island ("Plan"), developed by Dr. Siegel collaborating with Drs. Baye and Herbold, are set forth in USA Ex. 1 and in the Plan's longer version, USA Ex. 2.[62]  In its current form and based on the current record, the United States' Plan does not bear an equitable relationship to the degree and kind of wrong it is intended to remedy.  Although the court credits the testimony offered by the United States to show the proposal would confer environmental

---

[62] Exhibits 1 and 2 were admitted as a basis for an expert opinion only, with the exception of certain pages and figures which were admitted in full.

benefit, the court finds it does not have adequate evidence or information to decide whether the proposal would, indeed, confer "maximum" environmental benefits. *See Deaton,* 332 F.3d at 714. Furthermore, because the United States has not offered any evidence on the cost of implementing the Plan, the court lacks adequate information to conclude whether it is "achievable as a practical matter" *id.*

Conversely, defendants' proposed remedy, to order defendants to operate Point Buckler Island as a duck club, *see* Defs.' Proposed Findings of Fact at 61, does not go far enough, nor is it supported by adequate evidence showing it will remedy the environmental harms caused by defendants' CWA violations.

Without an adequate record with respect to the proposed injunction, the court declines to make a finding on the appropriate remedy at this time, and will address the remedy in a second phase of the proceedings. To that end, the court will hold a status conference on **Friday, October 2, 2020,** to discuss the remedial phase of this case. The parties SHALL file a joint status report 14 days prior to the status conference, and include a proposed briefing schedule on the remedy to be ordered.

VII.    JUDGMENT

The court enters judgment in favor of plaintiff United States of America and against defendants John Donnelly Sweeney and Point Buckler Club, LLC, jointly and severally, as set forth below.

The court declares as follows:

1.    Defendant Sweeney has violated and remains[63] in violation of the Clean Water Act, 33 U.S.C. §§ 1311 and 1344, as a result of his unpermitted, non-exempt construction of a levee and other additions of pollutants (dredged or fill material) from point sources (mechanized equipment) to waters of the United States (areas at or below the high tide line, and

---

[63] *See Ctr. for Biological Diversity v. Marina Point Dev. Assocs.*, 434 F. Supp. 2d 789, 798 (C.D. Cal. 2006) ("Violations are deemed "continuing" when the violator (1) illegally dumps fill material in wetlands or other federal waters; and (2) is in a position to remove the pollutants but fails to do so.").

which consisted of tidal channels and abutting wetlands) on Point Buckler Island as identified in this order.

2.     Defendant Point Buckler Club, LLC, has also violated and remains in violation of the Clean Water Act for actions by Sweeney after Point Buckler Club, LLC's purchase of Point Buckler Island, namely Sweeney's earthmoving activities occurred in conjunction with the creation of four small crescent basins (or ponds) interior of the new levee.

3.     Appropriate relief for defendants' Clean Water Act violations will be provided through the remedy to be ordered following a second phase of proceedings as described above, with remedy designed to protect the waters of the United States on and surrounding Point Buckler Island from further unpermitted, non-exempt discharges of pollutants.

5.     The Clean Water Act, 33 U.S.C. § 1319(d), provides that "[a]ny person who violates [33 U.S.C.] § 1311 . . . shall be subject to a civil penalty," the amount of which reflects the court's consideration of, inter alia, "the seriousness of the violation or violations." Defendants' violations of the Clean Water Act are very serious, in that their construction of a nearly mile-long levee on Point Buckler Island resulted in the loss of approximately 30 acres of tidal channels and marsh and their chemical, physical, and biological functioning.  Any civil penalty award is held in abeyance pending the resolution of the government's request for a mandatory injunction to implement restoration of Point Buckler Island and defendants' completion of that restoration.

IT IS SO ORDERED.

DATED:  September 1, 2020.

_____
CHIEF UNITED STATES DISTRICT JUDGE