UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>        v.<br><br>John Donnelly Sweeney and Point Buckler<br>Club, LLC<br><br>                    Defendants. | No. 2:17-cv-00112-KJM-KJN<br><br>ORDER |

Following a bench trial, this court found defendants John Donnelly Sweeney and Point Buckler Club, LLC (PBC) had violated, and at the time remained in violation of, 33 U.S.C. §§ 1311 and 1344 of the Clean Water Act (CWA). Prior Order (Sept. 1, 2020) at 95–96, ECF No. 180. The court declined at the time to address remedies, reserving this question for a second phase of the proceedings. Following briefing from both parties, the court held a hearing on the remedial phase. Hr'g Mins. (Sept. 30, 2021), ECF No. 207. The court has reviewed the briefing, the record in this matter, and relevant legal authorities, and good cause appearing now orders defendants to develop a restoration plan to rehabilitate Point Buckler Island's tidal channels and marsh wetlands, as explained below.

/////

1

1    I.    **FACTUAL AND PROCEDURAL BACKGROUND**

2         The court set forth its factual findings extensively in its prior order.  The court

3    summarizes relevant portions of those findings only as necessary here.

4         Point Buckler Island is a part of the Suisun March, the "largest contiguous brackish water

5    marsh remaining on the west coast of North America."  Prior Order ¶ 1.  The island is "located in

6    a heavily utilized fish migratory corridor."  *Id.* ¶ 11.  It falls within the "critical habitat" of the

7    endangered Sacramento River Winter-Run Chinook Salmon, the "threatened Delta Smelt," and

8    the Longfin Smelt protected by California's Endangered Species Act.  *Id.* ¶¶ 12, 15.

9         "Prior to and through the year 2011, almost all of Point Buckler Island supported and

10   functioned as a tidal channel and tidal marsh wetlands system."  *Id.* ¶ 19.  In other words, "tidal

11   water flowed into and out of the island's channels every day, supporting the island's tidal marsh."

12   *Id.* ¶ 20.  The tidal marshes on the island were composed of "organic soils developed over

13   thousands of years" and the island itself was "dominated by native vegetation commonly found in

14   fresh and brackish water" such as "tule, bulrush, cattail, and reed."  *Id.* ¶¶ 21–22.  As a result, the

15   island "performed ecologically important chemical, physical and biological functions, including

16   filtering pollutants, providing habitat and migratory shelter for fish, and producing and exporting

17   coarse organic matter for the estuarine aquatic food chain."  *Id.* ¶ 23.  "[T]idal marsh within the

18   Suisun Marsh performs important functions such as water quality enhancement, flood attenuation

19   and carbon sequestration."  *Id.* ¶ 17.

20        At some point before 1958, the island's prior owner built a levee around its perimeter.  *Id.*

21   ¶ 25.  Over time, the levee eroded; 1985 was the last time the levee was repaired to maintain

22   managed, nontidal wetland conditions.  *Id.* ¶¶ 25–27.  The island thus returned "naturally to tidal

23   marsh."  *Id.* ¶ 28.  In 2011, Point Buckler Island supported approximately 9,500 linear feet, or

24   slightly less than two miles, of naturally formed and man-made tidal channels, which carried

25   water into, throughout, and out of the tidal marsh.  *Id.* ¶ 37.

26        That same year, Mr. Sweeney purchased Point Buckler Island for approximately

27   $150,000.  *Id.* ¶ 44.  Over the next few years, he "made relatively minor alterations to the island's

28   tidal waters and wetlands."  *Id.* ¶ 60.  He also began acquiring equipment, including a large

2

landing craft, a small landing craft, an excavator, a dump truck, a crane, a small utility vehicle and two work boats. *Id.* ¶ 62.  Starting in 2014, Mr. Sweeney began to construct a new levee, *id.* ¶ 68, and by the end of the year, the new levee spanned over 4,700 feet "around the general perimeter of the island[,]" *id.* ¶ 71.  In that same year, Mr. Sweeney transferred ownership of Point Buckler Island to PBC, and PBC issued a promissory note in return, reflecting in part the cost of the earthmoving equipment and the levee construction.  *Id.* ¶¶ 81–82.  For the next few years, Mr. Sweeney continued to use machinery to excavate and deposit soil around the island. *Id.* ¶¶ 88–98.

In January 2017, the United States commenced this action alleging Mr. Sweeney and PBC violated and remained in violation of the CWA based on their unauthorized "construction of a levee, placement of structures, and other activities that added pollutants, consisting of dredged or fill material, from point sources, namely mechanized equipment, to waters of the United States." *Id.* at § I.A.

Following a lengthy bench trial, the court concluded Mr. Sweeney violated and remained in violation of the Clean Water Act by constructing a non-exempt and unpermitted levee on Point Buckler Island, destroying 30 acres of tidal channels.  *Id.* at § VII.1.  The court found Mr. Sweeney and PBC responsible for "fill material [that] blocked tidal exchange" into the island.  *Id.* ¶ 105.  The court further found Mr. Sweeney's illegal construction and other activities rendered the island's soil and water acidic and saline, *id.* ¶¶ 122, 126, threatened multiple fish species, *id.* ¶¶ 109–113, blocked exportation of food sources previously produced in the tidal marshlands, *id.* ¶ 114, "harmed aquatic habitat" and "water quality," *id.* ¶¶ 109, 125, and decimated the native vegetation in the area, including tules, bulrushes, and cattails, *id.* ¶¶ 116–120.  In sum, the court found defendants' conduct "caused harm to the chemical, physical and biological functioning of Point Buckler Island's pre-existing tidal channels and marsh wetlands, and that harm is ongoing."  *Id.* ¶ 130.  In addition to finding Mr. Sweeney liable, the court found defendant PBC jointly and severally liable for violating the CWA based on "actions by [Mr.] Sweeney" after PBC purchased the island.  *Id.* at § VII.2.

/////

3

1    The court entered judgment in favor of the United States on defendants' liability but

2    "decline[d] to make a finding on the appropriate remedy" until "a second phase of the

3    proceedings." *Id.* at 95. "Appropriate relief for defendants' Clean Water Act violations [would]

4    be provided through the remedy to be ordered following a second phase of proceedings . . . , with

5    [a] remedy designed to protect the waters of the United States on and surrounding Point Buckler

6    Island from further unpermitted, non-exempt discharges of pollutants." *Id.* at § VII.3.

7    The parties have fully briefed their dispute regarding the appropriate remedies. Remedy

8    Br., ECF No. 189; Response, ECF No. 198; Reply, ECF No. 202; Sur-Reply, ECF No. 203. At a

9    hearing in September 2021, this court heard oral arguments. Hr'g Mins.; Hr'g Tr., ECF No. 209.

10   Andrew Doyle appeared for the United States, with Brett Moffatt and Hubert Lee monitoring the

11   hearing. Lawrence Bazel represented Point Buckler Club and Mr. Sweeney. The court then took

12   the matter under submission. Hr'g Tr. at 28:12–13.

13   **II.     JURISDICTION**

14   Defendants argue this court lacks subject matter jurisdiction because the United States'

15   harm cannot be redressed. Resp. at 32–34. The court concludes now, as before, that it has

16   jurisdiction over this action. *See* Prior Order at 11–12 (" . . . the United States' [sic] still has

17   standing, because the United States also seeks a prohibitory injunction and declaratory relief that

18   is unrelated to defendants' ability to pay for implementation of a restoration plan, and would

19   prevent further violations of the CWA."); *see also* 33 U.S.C. § 1319(b) (authorizing "a civil

20   action for appropriate relief, including a permanent or temporary injunction"); 28 U.S.C. § 1345

21   (giving U.S. district courts "original jurisdiction over all civil actions, suits or proceedings

22   commenced by the United States, or by any agency or officer thereof expressly authorized to sue

23   by Act of Congress"); *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1187–90 (9th Cir.

24   2016) (discussing executive branch standing under Article III of the U.S. Constitution).

25   **III.    LEGAL STANDARD**

26   The objective of the Clean Water Act is "to restore and maintain the chemical, physical,

27   and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To remedy violations, the

28   Act authorizes "a civil action for appropriate relief, including a permanent or temporary

4

1    injunction" and provides the court "shall have jurisdiction to restrain such violation and to require

2    compliance."  33 U.S.C. § 1319(b).  The court may "order that relief it considers necessary to

3    secure prompt compliance with the Act."  *United States v. Akers*, 785 F.2d 814, 823 (9th Cir.

4    1986) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982)).

5         There are "numerous precedents for restoration" as a remedy.  *United States v. Larkins*,

6    657 F. Supp. 76, 86 n.25 (W.D. Ky. 1987) (collecting cases), *aff'd*, 852 F.2d 189 (6th Cir. 1988).

7    Courts have the "authority to issue such restorative orders so as to effectuate the stated goals of

8    the Clean Water Act 'to maintain the chemical, physical, and biological integrity of the Nation's

9    waters.'"  *United States v. Cumberland Farms of Conn., Inc.*, 826 F.2d 1151, 1164 (1st Cir. 1987)

10   (quoting 33 U.S.C. § 1251(a)).  "[R]ehabilitation of disturbed wetlands is the CWA's 'preferred

11   remedy.'"  *United States v. Brace*, No. 17-0006, 2020 WL 956460, at *2 (W.D. Penn. Feb. 27,

12   2020) (quoting *United States v. Bedford*, No. 07-0491, 2009 WL 1491224, at *14 (E.D. Va.

13   May 22, 2009)), *aff'd*, 1 F.4th 137 (3d Cir. 2021).  As a result, "courts frequently order

14   restoration of damaged or destroyed wetlands as injunctive relief."  *United States v. Smith*,

15   No. 12-0498, 2014 WL 3687223, at *5 (S.D. Ala. July 24, 2014) (citing *United States v. Deaton*,

16   332 F.3d 698, 714 (4th Cir. 2003); *Cumberland Farms*, 826 F.2d at 1164–65).

17        "The district court has considerable discretion to fashion appropriate injunctive relief,

18   particularly where the public interest is involved."  *Akers*, 785 F.2d at 823 (citing *Va. Ry. Co. v.*

19   *Sys. Fed'n No. 40, etc.*, 300 U.S. 515, 552 (1937)).  "In evaluating remediation or restoration

20   proposals, courts . . . consider[] three factors: (1) whether the proposal 'would confer maximum

21   environmental benefits,' (2) whether it is 'achievable as a practical matter,' and (3) whether it

22   bears 'an equitable relationship to the degree and kind of wrong it is intended to remedy.'"

23   *Deaton*, 332 F.3d at 714 (quoting *Cumberland Farms*, 826 F.2d at 1164); *see also Amoco Prod.*

24   *Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature,

25   can seldom be adequately remedied by money damages and is often permanent or at least of long

26   duration, *i.e.*, irreparable.  If such injury is sufficiently likely, therefore, the balance of harms will

27   usually favor the issuance of an injunction to protect the environment.").

1    **IV.   ANALYSIS**

2         **A.      Availability of Relief**

3         Before considering what remedies are appropriate in this case, the court addresses the

4    parties' threshold disputes, including whether the court has already denied the relief the

5    government seeks.

6         Neither party raised the possibility that relief had been foreclosed when the parties

7    stipulated to a briefing schedule on remedies.  Now, however, defendants contend the court has

8    effectively entered judgment against the government on its request for remedies.  *See* Resp. at 7

9    ("At the end of trial, plaintiff United States . . . rested, and in its Order the Court found that the

10   Government had not proved its case on [remedies[1]].").  Defendants therefore argue the court

11   should consider no further evidence and impose no remedy.  Resp. at 7; Sur-Reply at 13–14.

12        Defendants' position rests on an inadvertent ambiguity in the court's previous order,

13   which the court now corrects on its own motion.  *See* Fed. R. Civ. P. 60(a) ("The court may

14   correct a clerical mistake or a mistake arising from oversight or omission whenever one is found

15   in a judgment, order, or other part of the record.  The court may do so on motion or on its own,

16   with or without notice . . . ."); *see also Tattersalls, Ltd. v. DeHaven*, 745 F.3d 1294, 1297 (9th

17   Cir. 2014) (explaining Rule 60(a) is properly invoked to correct "blunders in execution" that

18   prevented an order or judgment from achieving "what the court originally intended to do"

19   (citations, quotation marks, and emphasis omitted)).

20        The court's previous order bifurcated this action into two phases, a liability phase and a

21   remedies phase, as other district courts have done in similar cases.  Prior Order at 96; *see, e.g.*,

22   *Brace*, 2020 WL 956460, at *1 (addressing "remedy stage" of matter); *Leslie Salt Co. v. United

23   States*, 820 F. Supp. 478, 483–84 (N.D. Cal. 1992) (same), *aff'd*, 55 F.3d 1388 (9th Cir. 1995).

24   The court did not intend for its previous order to award or preclude remedies to any party or to

25   close the case.  It intended only to find Mr. Sweeney and PBC jointly and severally liable for

26   violations of the CWA.  *See* Prior Order at 95–96.  To the extent the prior order suggests

---

[1] *See* Sur-Reply at 13–14 (correcting an erroneous reference to "liability").

1    otherwise, the court clarifies it has not previously found or held that the United States is entitled

2    to no remedy for defendants' CWA violations.

3            **B.        Proffered Evidence**

4            The parties disagree whether further evidence is admissible or necessary at this stage.  The

5    government understood the court's previous order as inviting evidentiary proffers.  Remedy Br. at

6    5–6; Hr'g Tr. at 5:13–23.  Accordingly, the government filed declarations about Point Buckler

7    Island's current conditions from three experts who testified at trial.  *See* Siegel Decl., ECF No.

8    190; Baye Decl., ECF No. 191; Herbold Decl., ECF No. 198.  Defendants object to these

9    declarations, arguing they are inadmissible post-trial evidence.  Resp. at 14–15.

10           As explained in the remainder of this order, the trial record suffices to determine what

11   remedies are appropriate.  No party requested an evidentiary hearing.  *See* Hr'g Tr. at 8:22–9:4.

12   The court need not and does not consider the government's post-trial evidence.  The court orders

13   the appropriate remedies based solely on the trial record and the post-trial briefing.

14           **C.        Defendants' Objections to Expert Opinions**

15           Defendants also reiterate their objections to the government's expert testimony admitted

16   at trial under Rule 702.  Resp. at 19–23.  The court overruled the objections at trial, *see* Trial Tr.

17   at 36:4–37:17, 549:5–17, ECF No. 168, and confirms the overruling here.  The United States

18   tendered Dr. Stuart Siegel as an expert in six related fields: functional assessment of natural and

19   restored tidal channel and marsh systems; harm resulting from human or natural events to the

20   functions of tidal channel and marsh systems; restoration design, planning, and construction of

21   tidal channel and marsh systems; analysis of reach of tides; interpreting aerial photographs in

22   support of first four fields; and overseeing the technical work of others in support of foregoing

23   work. *See id.* at 36:4–37:17.  Dr. Siegel's qualifications in these six fields are supported by his

24   curriculum vitae, his declaration, his expert reports and his testimony at trial.  *See id.*; *see also*

25   Siegel Direct Expert Testimony, ECF No. 132; USA Ex. 452.

26           Defendants also object to the government's experts' testimony regarding restoration,

27   including on the basis that no testimony shows how "each new channel, pond, and breach" in the

28   government's proposed plan has "a rigorous, objectively verifiable reason."  Resp. at 22.  The

1    court overrules these objections.  Extensive trial testimony explains the experts' conclusions, *see*

2    Trial Tr. at 100:2–105:3, 118:15–132:13, 446:5–455:8, 582:11–587:15, and the proposed plan is

3    supported by extensive scientific research, *see generally* USA Ex. 2; Original Restoration Plan,

4    Siegel Direct Expert Testimony, ECF No. 132.[2]  Dr. Siegel has designed "four restoration

5    projects now in Suisun Marsh itself."  Trial Tr. at 128:10–11.  Moreover, as explained below in

6    discussing the plan's maximum environmental benefits, each action in the proposed restoration

7    plan is supported by the record, including by expert testimony.  Lastly, defendants claim a "side-

8    by-side comparison" of the government's original restoration plan proposed at trial and the

9    revised plan proffered with the government's remedy brief shows inconsistencies.  Resp. at 22.

10   The court does not reach this argument because it does not rely on or consider the government's

11   proffered evidence, including the revised restoration plan.

12        **D.     Remedies**

13        The United States seeks injunctive relief ordering defendants to restore the tidal channel

14   and tidal marsh wetlands ecosystem of Point Buckler Island.  Remedy Br. at 12–15.  The

15   government requests mandatory and prohibitory injunctions to effect restoration, compliance-

16   assurance provisions, as well as a civil penalty award held in abeyance pending defendants'

17   satisfaction of the mandatory injunction.  *Id.*  The government also seeks four types of declaratory

18   relief: two related to these injunctions, a third for the civil penalty held in abeyance, and a fourth

19   regarding an injunction to effectuate compensatory mitigation, which would be held in abeyance.

20   *Id.* at 11–12.

21        Specifically, the United States' proposed relief would take the form of a mandatory

22   injunction requiring defendants to retain a qualified consultant to develop an "acceptable

23   restoration plan" and, with the consultant's guidance, to monitor, maintain and manage the

24   restored island for a period of time.  *Id.* at 2.  As an example of a "substantive guide," the United

25   States proposes a restoration plan developed by Dr. Siegel.[3]  *Id.* at 2; Original Restoration Plan;

---

[2] The original restoration plan begins on page 80.

[3] The court accepted Dr. Siegel as an expert in "restoration design, planning and construction of tidal channels and marsh systems" in its prior order.  Prior Order at 4.

1  USA Exs. 1, 2; *see also* Revised Restoration Plan at 2, Dr. Stuart Siegel Decl., ECF No. 190-1.[4]

2  The United States also seeks a prohibitory injunction to enjoin defendants from "engaging in any

3  further earthmoving activities" without advance approval from federal regulators. *Id.* at 3.  In its

4  reply, the United States clarifies it has no objection to defendants' conducting "recreational

5  activities that could not . . . interfere with restoration" such as hunting, hiking, walking, and

6  kiteboarding.  Reply at 33.  It is unclear whether the government requests a permanent prohibitory

7  injunction or one that would instead last for the ten-year monitoring and maintenance period.

8      Defendants object to the proposed restoration plan on multiple grounds.  First, they object

9  generally to the government's proposal as improperly broad.  Resp. at 36–41.  Similarly, they

10  contend the island will return to its previous state by natural processes.  *Id.*  Second, they contend

11  the court should issue no injunction because the government has not shown its proposal would

12  "confer maximum environmental benefits."  *Id.* at 48–50.  Third, they argue the plan is not

13  "achievable as a practical matter."  *Id.* at 23–34.  Fourth, they contend the plan does not "bear an

14  equitable relationship to the degree and kind of wrong it is intended to remedy."  *Deaton*, 332

15  F.3d at 714; *see* Resp. at 34–48.  They propose the court instead allow natural processes to restore

16  the tidal marshlands or allow them to operate the island as a "duck club," i.e., a membership-

17  based, for-profit entity for hunting ducks.  *See* Trial Tr. 888:19–889:9 (" . . . people kept the clubs

18  for private use for the rich people from San Francisco . . . ."), 985:8–24 (" . . . we could still

19  manage it as a duck club and sell memberships[.]"); Resp. at 51–57.  Fifth, they advance broader

20  arguments against injunctive relief, including under the Eighth and Thirteenth Amendments. Resp.

21  at 10–12, 28–30.  Sixth, defendants object to the proposed prohibitory injunction, civil

22  /////

---

[4] The court notes the existence of the revised restoration plan, which was drafted in light of the post-trial conditions on Point Buckler Island, observed in October 2020.  Specifically, the plan makes changes taking account of (1) natural levee breaches, which have re-introduced tidal activity, (2) soil decomposition and lost old root structure, affecting the use of regular earth-moving equipment, and (3) an increase in the quantity of invasive plants.  Because the court does not admit the government's proffered evidence, it does not consider the merits of the revised restoration plan in evaluating the appropriate remedy.  At the same time, the court passes no judgment on the revised plan, which the parties may use as a template consistent with the provisions of this order.

1   penalty and declaratory relief.  *Id.* at 57–60.  Lastly, they argue PBC should not be enjoined, but

2   rather Mr. Sweeney only.  *Id.* at 15–18.  The court takes each argument in turn.

3                           **1.      Purposes and the Necessity of an Injunction**

4              The court concludes restoration is an appropriate goal, and an injunction is necessary to

5   achieve it.  Defendants committed "very serious" violations of the CWA when they constructed a

6   "nearly mile-long levee on Point Buckler Island [which] resulted in the loss of approximately 30

7   acres of tidal channels and marsh and their chemical, physical, and biological functioning."  Prior

8   Order at 96.  District courts have the "authority to issue such restorative orders so as to effectuate

9   the stated goals of the Clean Water Act," and as noted above other courts have found restoration

10  is the "preferred remedy."  *Cumberland Farms*, 826 F.2d at 1164 (citation omitted).  Here, an

11  injunction requiring defendants to restore Point Buckler Island and remedy their CWA violations

12  is appropriate.

13             Defendants argue no injunction is needed because restoration "will soon happen

14  naturally."  Resp. at 44.  The evidentiary record does not support this conclusion at this point, but

15  this order does not necessarily preclude defendants from ultimately showing no action is

16  necessary because data show natural processes will achieve the goals of the restoration plan, as

17  the government recognizes is possible at least in part.  *See* Original Restoration Plan at 103 ("If,

18  when, and as conditions on the ground change (e.g., native tule, bulrush, and cattail tidal marsh

19  plants unexpectedly reappear and expand without the need for replanting), restorations actions

20  can and should be fine-tuned."); Hr'g Tr. at 7:4–11 ("[I]f the Court were to enter the proposed

21  judgment that we had proffered at the time of trial, defendants then would have the opportunity to

22  submit their opening restoration proposal to the United States.  And we encourage them to take

23  account of on-the-ground facts at that time.").

24             Defendants also claim the proposed restoration plan would create "a new island that never

25  existed," and would create channels, ponds, and breaches that were not there before.  Resp. at 36,

26  41.  They contend the government seeks "enhancement," not restoration.  Sur-Reply at 20.  In

27  reply, the United States argues its proposed plan aims to restore the tidal channels and marsh

28  functions, rather than "simply re-engineer[] Point Buckler Island to how it looked in 2011" before

                                                        10

1    defendants' CWA violations.  Reply at 12.  Based on the record, the court finds the plan

2    appropriately focuses on restoring the island's tidal channels and marsh wetlands ecosystem.  As

3    the United States points out, the injunction's goal is to restore hydrology through daily channel

4    and periodic overbank tidal action, replace invasive species with native tidal marsh wetlands

5    vegetation, rebuild the soil's lost structural integrity, and reestablish breaches and channels for

6    fish movement and exportation of fish food.  *Id.*

7            Defendants have cited no evidence to show it is feasible to restore the island to its

8    physical form circa 2011.  More importantly, they have not pointed to evidence to show re-

9    creating the island's prior physical form would restore its tidal marsh wetlands.  *See* Hr'g Tr. at

10   10:16–18.  Nor does the evidence suggest re-creating the island's prior physical form would

11   confer maximum environmental benefits in the sense that matters here.  In fact, as explained in

12   greater depth in the next section, defendants' own expert witness, Dr. Peter Baye,[5] agreed the

13   government's proposed plan provides the best way to restore the island's tidal channels and

14   marsh wetlands.  Dr. Siegel's explanation of the proposed plan at trial supports this conclusion.

15   He explained that seeking to restore the island to its 2011 condition might be more expensive than

16   otherwise needed because doing so would require an additional 1,000 feet of channel excavation

17   and more earthwork.  *See* Trial Tr. at 130:15–132:7.  As he testified, the proposed plan aims "to

18   achieve a length of channel that is the minimum necessary to accomplish that same amount of

19   [tidal] exchange," *id.* at 130:20–21, and to breach the levee to re-create "hydrologic exchange

20   without moving as much levee as nature had done to the old levee," *id.* at 132:12–13.

21          The record demonstrates affirmatively that if a restoration plan focused solely on

22   returning the island to its prior physical form, it would not restore the tidal marsh wetlands.  High

23   soil salinity and acidity currently prevent native marsh plants from thriving on the island, and so

24   interior regrading, flooding and recirculation must be implemented before replanting.  *See*

---

[5] The United States tendered, and the court accepted, Dr. Baye as an expert in:
(1) identification of wetlands vegetation, including in tidal environments where human activities
have impacted the vegetation; (2) wetlands impact assessment, including harm resulting from
human disturbances of wetlands, including tidal marsh wetlands; and (3) restoration and
management of coastal wetlands, including tidal channel and marsh ecosystems in the Suisun
Marsh.  Prior Order at 5–6 (citing Trial Tr. at 404:24–406:7).

1   Original Restoration Plan at 91; Trial Tr. at 120:1–122:5.  As the court found in its prior order,

2   "[t]he soils no longer support tules, bulrushes and cattails, . . . which require low salinity and

3   year-round soil saturation."  Prior Order ¶ 123.  Further, simply breaching the levee would not

4   restore the tidal marsh and wetlands either.  The tidal marsh ecology is sensitive to the

5   relationship between marsh ground surface elevation and the elevation range of the tides.  *See*

6   Original Restoration Plan at 94; Trial Tr. at 123:24–126:18.  As a result, it is necessary to manage

7   the island's interior as a diked perennial wetland before breaching the levee.  *Id.*  Indeed, quickly

8   returning the island to how it looked before defendants' CWA violations might further degrade

9   the island.  Defendants' emphasis on physical form over function would thus frustrate restoration

10  and miscomprehends the purpose of the government's requested injunction.  The mandatory

11  injunction would not require defendants to enhance Point Buckler Island; it requires them to

12  restore the island's tidal channels and marsh wetlands.

13          The government's proposed plan is comprised of eight restoration steps.  At trial,

14  Dr. Siegel described the steps and the reasoning behind them:

15          (1)     Preparing the island's soils for planting, *see id.* at 101:17–102:22;

16          (2)     Controlling weeds, *see id.* at 102:22–105:3;

17          (3)     Reestablishing and creating tidal channels, expanding and creating ponds, and

18                  filling part of defendants' newly-excavated borrow ditch so as to divert tidal

19                  waters to the reestablished or new channels, *see id.* at 119:1–121:9, 304:17–25,

20                  305:1–306:15, 307:15-20;

21          (4)     Flooding and circulating water to reduce the salinity of the soils, and lower the

22                  acidity of the soils closer to a neutral value, *see id.* at 121:10–122:5;

23          (5)     Installing native tidal marsh wetlands plants through seedlings or sod, *see id.*

24                  at 122:8–123:21;

25          (6)     Managing water levels until plants are established, *see id.* at 123:24–124:21;

26          (7)     Lowering and breaching the levee, and depositing the removed soil into the

27                  defendants' borrow ditch, *see id.* at 124:22–126:18; and

1        (8)      Monitoring, maintaining, and adaptively managing the island according to

2                 performance criteria for ten years, *see id.* at 126:19–127:15.

3    Although each step is aimed at restoring the island's disturbed wetlands, this order's injunction

4    does not require defendants to implement the government's proposed plan.  Instead, the plan will

5    serve as a substantive guide, establishing goals and showing defendants how to restore the island

6    based on its pre-trial conditions.  Now, taking into account the island's current conditions,

7    defendants will have the opportunity to present a restoration plan to the government.  *See* Original

8    Restoration Plan at 104; Hr'g Tr. at 7:4–11.  This flexibility emphasizes the focus on function,

9    rather than form, because it ensures restoration will be tailored to the island's current state.

10        In sum, the government has shown that the restoration called for by the CWA must focus

11   on the functions of tidal channels and tidal marsh wetlands, not simply appearances and

12   topographical considerations.  *See* Original Restoration Plan at 98–102; *see also* Hr'g Tr. at

13   11:20–25 (citing 33 U.S.C. § 1251(a)).

### 2.        Maximum Environmental Benefits

15        After careful review of the trial record and the parties' remedies briefs, the court expressly

16   finds the government's proposed restoration plan would confer "maximum environmental

17   benefits."  *Deaton*, 332 F.3d at 714 (quoting *Cumberland Farms*, 826 F.2d at 1164).  The plan

18   would restore Point Buckler Island's tidal channels and tidal marsh wetlands ecosystem, which

19   was disturbed by defendants' CWA violations.

20        The restoration plan's structure maximizes environmental benefits.  *See* Original

21   Restoration Plan at 80–103.  The plan has three phases.  First, defendants would prepare,

22   rehydrate and revegetate the island.  *Id.* at 80.  Second, defendants would manage the interior as a

23   diked perennial wetland until a minimum amount of vegetation is re-established.  *Id.* at 84.

24   Lastly, defendants would breach the levee and control the weeds.  *Id.* at 85.  These phases are

25   further broken down into specific steps: (1) "prepare the island interior" to remove impediments

26   to tidal marsh growth, (2) "control weeds" to advance the native marsh revegetation, (3) "conduct

27   interior earthwork" to restore "interior geomorphic . . . features," (4) remediate acidic and saline

28   soils, (5) revegetate the island to ensure "recovery of native wetland plants," (6) manage "diked

1  perennial marsh" to ensure re-establishment of "planted native marsh vegetation," (7) lower the

2  perimeter and breach levee to reconnect Point Buckler Island to the tides, and (8) "control weeds"

3  to ensure invasive wetland weeds do not re-emerge.  *Id.* at 80–85.

4          These actions will remedy the specific harms caused by defendants' violations of the

5  CWA, which the court detailed in its previous order.  "[N]early 30 acres of Point Buckler Island

6  no longer function as a tidal channel and marsh ecosystem."  Prior Order ¶ 108.  "[D]efendants

7  harmed aquatic habitat."  *Id.* ¶ 109.  Their "new levee blocked virtually all access by fish."  *Id.*

8  ¶ 110.  It also "blocked exportation of food sources produced in the tidal marsh wetlands to the

9  tidal water bodies" surrounding the island.  *Id.* ¶ 114.  "The once-dominant native fresh and

10  brackish water tidal marsh wetlands vegetation, including tules, bulrushes, and cattails, has either

11  completely died or been reduced to very sparse, stunted shoots."  *Id.* ¶ 117.  "Almost the entirety

12  of the below-ground roots and shoots of the wetland plants have died and lost their potential for

13  regrowth from buds at any time of year."  *Id.* ¶ 118.  "[T]he island's soil has become extremely

14  acidic and saline."  *Id.* ¶ 122.  As a result, "[t]he soils no longer support tules, bulrushes, and

15  cattails, . . . which require low salinity and year-round soil saturation . . . ."  *Id.* ¶ 123.  "[T]he

16  levee also harmed water quality."  *Id.* ¶ 125.  Because of the new levee, "Point Buckler Island's

17  waters contained extensive algae, [and] were stagnant, and bright green in color . . . ."  *Id.* ¶ 127.

18  Taken together, "[d]efendants' actions have caused harm to the chemical, physical and biological

19  functioning of Point Buckler Island's pre-existing tidal channels and marsh wetlands, and that

20  harm is ongoing."  *Id.* ¶ 130.  "If the harm defendants have caused to Point Buckler Island's soil,

21  vegetation, tidal marshland, fish habitat and fish species, as well as the areas surrounding the

22  Island, is not mitigated, the Island's native vegetation is likely to be lost permanently and the

23  Island is likely to subside significantly."  *Id.* ¶ 131.

24          The government's proposed plan is supported by the trial record.  At trial, Dr. Siegel

25  explained the plan's purpose, *see* Trial Tr., at 100:15–23; 264:13–15; 326:1–8, and described the

26  reasoning behind each step of the plan, as detailed in the prior section.

27  These actions, taken together, are geared to maximize environmental benefits by remedying the

28  harms caused by defendants' CWA violations impairing the soil, vegetation, water quality and

1  tidal flow.  As Dr. Siegel testified, the plan distills "technical analysis . . . to stop the harm that

2  has been going on and . . . to begin the process to reverse that harm."  *Id.* at 100:21–22.

3          Some parts of the plan are not fully detailed at this time.  But because the plan is adaptable

4  to conditions on the ground, it may require "a few adjustments," as Dr. Siegel testified.  *Id.* at

5  123:20.  The less detailed, general provisions previously gave the court pause, but upon further

6  review of the record and the parties' briefs, and considering the parties' arguments at hearing, the

7  court concludes that flexibility is an advantage.  It allows the plan to conform to conditions at the

8  time of implementation, which will take place in the future now.  *See* Original Restoration Plan at

9  104; Hr'g Tr. at 7:4–11.

10         The plan is supported by more than just Dr. Siegel's testimony.  It is also supported by the

11 trial testimony of the government's other experts, as well as defendants' expert, as noted.

12 Dr. Baye's testimony confirms the government's restoration plan maximizes environmental

13 benefits by restoring the island's soil and vegetation.  Dr. Baye testified the plan's steps are

14 necessary to restore the tidal channels and marsh wetlands ecosystem.  Trial Tr. at 446:20–

15 448:24.  He explained how controlling the weeds is a necessary initial step "to give the less

16 competitive seedlings and juvenile starts of tules, cattails, and other native dominant vegetation

17 an opportunity to establish and spread."  *Id.* at 447:2–4.  He further testified the current soil

18 conditions are "some of the most extreme acid sulphate" he has observed, so it is "necessary to

19 flush out the salts and allow the acids to either convert back to other biogeochemical forms or be

20 buffered by sea salts," so that "native vegetation" can grow.  *Id.* at 447:13–22.  Addressing the

21 proposed revegetating of the interior plain and managing it, he noted the load of active

22 revegetation was chosen because of the decline of the "founder population of surviving tule,

23 cattail, and bulrush."  *Id.* at 448:8–9.  Because this decline requires more active vegetation to

24 offset it, Dr. Baye explained the need to manage the interior like a diked wetland prior to

25 breaching the levee "to stabilize and buffer the acids and to enhance the flooding and draining,

26 flushing of salts . . . and the establishment of new vegetation."  *Id.* at 448:21–24.

27 /////

28 /////

15

1    In addition, Dr. Bruce Herbold's testimony supports the conclusion the restoration plan

2    will maximize environmental benefits by improving tidal flow and restoring fish populations.[6]

3    He explained young salmonids use tidal channels on Point Buckler for daytime refuge, and so

4    reestablishing tidal connection would offer spaces for "feeding and hiding from predators." *Id.* at

5    582:25.  Dr. Herbold also testified that connecting the island's exterior to its interior channels

6    would benefit longfin smelt by reestablishing tidal connection and offering many acres of

7    "suitable spawning habitat." *Id.* at 583:9–10.  This tidal connection would also benefit delta

8    smelt, Dr. Herbold explained, because tidal flow would wash food from the interior to the

9    exterior, *id.* at 583:19–25, in the form of "coarse organic matter (detrital)," Siegel Direct Expert

10   Testimony.  Moreover, the proposed tidal marsh pools would benefit fish species in and around

11   the island because these pools are "excellent little hot pots for producing food."  Trial Tr. at

12   584:17–18.

13   The government's proposed plan is also efficient.  The defense's own expert, Dr. Terry

14   Huffman,[7] admitted on cross-examination that the plan is the quickest way to restore the island.

15   *Id.* at 726:12–15 ("Q. . . . You are of the opinion, are you not, that the government's proposed

16   restoration plan is efficient in terms of restoring the island the quickest?  A.  Yes.").  In turn, he

17   acknowledged a quicker restoration is more beneficial to the environment.  *See id.* at 727:7–10

18   ("Q.  Okay.  So, with [the objective of restoring it to a tidal channel and marsh system], let me

19   just ask you again, you acknowledge that it's more beneficial to the environment to do it quicker?

20   A.  Yes.").  A quicker restoration would also result in less temporal loss of waters and wetlands.

21   *See id.* at 727:17–20 ("Q.  You would agree, Dr. Huffman, would you not, that the quicker you

---

[6] The United States tendered, and the court accepted, Dr. Herbold as an expert in: (1) fish species and their biology, ecology, habitats and movements in tidal water bodies and tidal marshes, including those surrounding and in proximity to Point Buckler Island; (2) protected fish species and their designated critical habitat in the San Francisco Estuary and encompassing Point Buckler Island; and (3) water sampling and assessment of the water sampling results as they relate to ability of tidal marsh and disturbed marsh to support fish.  Prior Order at 6 (citing Trial Tr. 548:17–549:17).

[7] Defendants tendered, and the court accepted, Dr. Huffman as an expert in three limited areas of opinion only regarding land use, tidal debris and restoration.  Prior Order at 6 (citing Trial Tr. at 704:1–705:16).

1   restore, the less temporal loss of waters and wetlands?  A.  The quicker you restore, yes.").  In

2   short, even one of the defense's expert witnesses agreed at trial that the plan maximizes

3   environmental benefit if the objective is to restore the island's tidal channels and marsh wetlands

4   ecosystem.

5           Defendants argue the government's plan would not confer maximum environmental

6   benefits and say that a duck club instead would offer greater environmental benefits.  Resp. at 19,

7   48–49; *see* Def. Initial Post-Trial Submission (DIPS) at 26–32, ECF No. 172.  As evidence for a

8   duck club's conferring maximum environmental benefits, defendants point to a "chapter in a book

9   edited by Dr. Peter Moyle, a highly esteemed fish scientist . . . ," as well as the Suisun Marsh

10  Protection Plan prepared by California environmental agencies to explain how duck clubs are

11  "vital" for waterfowl.  DIPS at 26–32.  Defendants also put forward exhibits admitted by

12  stipulation.  Resp. at 55–56 (citing Def. Exs. 2164 and 2169).

13          One of the exhibits is a blog post by Drs. Durand and Moyle, who collected and evaluated

14  data from another tidal restoration project.  *See* Def. Ex. 2169.  In a few pages, the doctors

15  concluded the restoration project was sub-optimal.  *See id.*  They did not discuss duck clubs.  In

16  the other exhibit, Dr. Durand explains he had been examining regions of the San Joaquin River

17  Delta, including Suisun Marsh, to compare other, preexisting restoration sites with duck clubs and

18  other restoration projects.  Def. Ex. 2164.  He contrasted a duck club named "Luco Pond" with a

19  restoration site called "Blacklock" and found the duck club is "dominated by native species."  *Id.*

20  However, he also concluded he did not know "how to calibrate it [and] . . . d[id not] know how to

21  adjust it or how to tweak it to maximize it."  *Id.*

22          Defendants' arguments and exhibits do not rebut the government's extensive evidence,

23  which is more thorough, particularized to Point Buckler Island and tested over nine days of trial.

24  A few studies contrasting some duck clubs do not show this proposed restoration plan would be

25  inferior to a duck club.  Further, defendants' argument suffers from a more fundamental flaw.

26  The court's prior order found defendants violated and remain in violation of the CWA for

27  disturbing tidal channels and abutting wetlands on Point Buckler Island.  Prior Order at 95–96.

28  To remedy this harm, a plan must restore those tidal channels and marsh wetlands.

1       Creating a duck club would not restore the tidal channels and the marsh wetlands.  To the

2    contrary, as Mr. Sweeney testified, it would further degrade the island's native vegetation,

3    channels, and marsh.  Mr. Sweeney explained creating a duck club would require adding a second

4    or third tide gate, *see* Trial Tr. at 977:21–23, further disturbing the tidal flows. [8]  He would aim to

5    eliminate all tidal activity on the island.  *See id.* at 986:3–5 ("[L]evees provide you with water

6    control.  And so if you're tidal, it's not the preferred habitat for ducks.").  In addition, on cross-

7    examination, Dr. Herbold confirmed duck clubs are not tidal marsh wetlands and clarified duck

8    clubs do not provide the fish-related benefits of tidal channels and marshland.  *See id.* at 656:3–

9    657:1.  Nor would a duck club restore the island's vegetation.  Mr. Sweeney explained creating a

10    duck club would mean "get[ting] rid of all the tules and the cattails," *id.* at 978:16–17, further

11    eliminating the native vegetation, *see id.* at 814:14–18 ("A. . . . on [duck] clubs that you can't get

12    on top of because they're too wet, they typically aerial spray [with pesticides] the property one

13    year, and then the next year you go out with drip torches that are a mixture of diesel and kerosene,

14    and you back-burn the property until there is no vegetation left.").  In short, a duck club would

15    not remedy the harm caused by defendants' CWA violations, and therefore, such a use would not

16    maximize environmental benefits given the other options available.  Rather, creation of a duck

17    club would exacerbate the harm caused by the CWA violations, inhibiting any remaining tidal

18    flows and eradicating any remaining native vegetation.

19       In contrast, the government's proposed restoration plan is designed to restore and

20    rehabilitate the tidal channels and marsh wetlands on Point Buckler Island.  *See* Restoration Plan

21    Explanation, USA Ex. 2; Siegel Direct Expert Testimony at 3–4.  As a result, the court finds the

22    government's proposed restoration plan satisfies the first factor.

23               **3.**      **Achievable as a Practical Matter**

24       After further review of the trial record and the remedy briefs, the court finds the

25    government has carried its burden in demonstrating the restoration plan is "achievable as a

---

[8] Although it is true that tide gates might allow water to flow into the interior of the island, as Dr. Siegel explained, the movement of water alone "does not equate to restoration of function," *see id.* at 311:6–7, nor does it create tidal flow, *see id.* at 314:17–20.

1    practical matter." *Deaton*, 332 F.3d at 714 (quoting *Cumberland*, 826 F.2d at 1164).  The

2    restoration plan is likely to be both time- and resource-intensive.  However, even the defense's

3    expert witness, Dr. Huffman, testified the plan is "feasible."  Trial Tr. at 724:9–22 ("Q.  . . . what

4    you mean by feasible is that the plan can be implemented and should be successful if proper

5    monitoring and maintenance occurs over time?  A.  Based on that plan, yes.").  There is no

6    evidence in the record showing the plan could not be implemented.

7          Defendants' primary objection to the achievability of the plan is their "inability to pay."

8    Resp. at 23.  The record does not support that claim.  First, defendants state "John Sweeney has

9    no money" in their brief, *see id.* at 26; however, the evidentiary record suggests the opposite.

10   Defendants put forward no evidence showing Mr. Sweeney is unable to pay.  That omission is

11   decisive.  *See United States v. Bailey*, 571 F.3d 791, 805 (8th Cir. 2009) ("Bailey argues that there

12   is no evidence in the record that he had the means to restore the wetland, but . . . [if] Bailey had

13   wished to contest this factor, he should have submitted evidence to the district court.").  The

14   government also refuted defendants' inability-to-pay claim at trial.  Mr. Daniel Leistra-Jones

15   testified[9] that, based on an income and expense analysis and a balance sheet analysis, *see* Trial Tr.

16   1157:12–21, "Mr. Sweeney individually can pay approximately $864,000 for the financial

17   obligations of a judgment in this matter without experiencing undue financial hardship," *id.* at

18   1110:17–20.  Defendants' criticisms of this conclusion are unsupported by evidence, except for

19   brief remarks by Mr. Sweeney.  *See id.* at 983:25–984:6 ("[Q.  C]an you afford to pay either [$2-3

20   million] or whatever you think the government's restoration plan might cost?  A.  At this time, I

21   cannot, now that we've gone to court. . . . [A]t this point I can no longer do anything out there.").

22   Those brief self-serving statements do not rebut the government's expert testimony presented at

23   trial.

24   /////

25   /////

_____

          [9] The United States tendered, and the court accepted, Mr. Leistra-Jones as an expert in
financial analysis and assessing an individual's and a company's ability to meet the financial
requirements of a judgment.  Prior Order at 7 (citing Trial Tr. at 1106:15–1110:8).

1         Second, defendants' proposal to create a duck club contradicts their claims of financial

2    frailty.  *See* Resp. at 51 (requesting order "to operate Point Buckler Island as a duck club").

3    Creating and operating a duck club would take significant resources, and defendants admit as

4    much.  They would need to: (1) install one or two gates, (2) maintain the levees, (3) excavate as

5    necessary, and (4) operate and maintain the lounge, deck, dock, helipads and facilities needed to

6    attract duck club members.  *Id.* at 51.  Anticipating this line of reasoning, defendants raise two

7    counterarguments, but neither is persuasive.  First, they speculate they could "potentially" raise

8    money for a duck club, whereas it would not be possible to raise money to restore the island's

9    tidal channels and marsh wetlands.  *Id.* at 56.  Second, they characterize the costs of a duck club

10   as "low."  *Id.*  Nothing in the record supports either claim.  They also provide no further

11   information on these points in their briefing.  They do not provide information on income that

12   could be generated if the island were converted to a duck club.  Defendants' request for an

13   injunction ordering them to operate a for-profit business on the island, which would require long-

14   term capital investments, implies defendants are not as penniless as they claim.

15        Third, defendants rely on a cost estimate for the restoration plan submitted by the

16   government during the second phase of these proceedings.  As discussed above, the court does

17   not accept the government's proffered evidence and therefore does not consider this estimate nor

18   defendants' related arguments.

19        Fourth, even if Mr. Sweeney has less than $864,000 to spend on the proposed restoration

20   plan, the plan would not be unachievable.  Courts have considered both a plan's costs and its

21   flexibility when assessing whether it is achievable as a practical matter.  *Brace*, 2020 WL 956460,

22   at *3 (citing *United States v. Ciampitti*, 615 F. Supp. 116, 123–24 (D.N.J. 1984)).  Because

23   defendants own some machinery capable of doing earthwork—the most expensive part of

24   restoration—and other restoration actions, they could reduce their costs by undertaking the work

25   themselves or allowing others to use the equipment they do own to avoid the cost of renting

26   equipment.[10]  *See* Trial Tr. 129:3–4.  Therefore, even without precise information about "the

----

[10] Mr. Sweeney did make a passing statement that he "sold the equipment" during his
direct testimony.  Trial Tr. at 984:6.  However, it is unclear what equipment he was referring to,

1  financial resources of defendants and an estimate of the cost of the restoration plan," the plan is

2  achievable because of its "indefiniteness."  *Ciampitti*, 615 F. Supp. at 124–25 ("Defendants, so

3  long as they are faithful to the goals of the plan, will have considerable independence and will be

4  able to do what they feel is desirable to minimize the cost of restoration.").

5        Moreover, the plan is achievable as a practical matter in part because it is a substantive

6  guide, not a definitive roadmap.  When courts order defendants to restore wetlands and

7  marshlands after finding CWA violations, they sometimes give defendants an opportunity to

8  present a restoration plan, using the government's proposed plan as a guide, instead of issuing an

9  injunction requiring defendants to follow the government's plan to the letter.  *See, e.g.*, *Brace*,

10  2020 WL 956460, at *2; *United States v. Van Leuzen*, 816 F. Supp. 1171, 1184 (S.D. Tex. 1993).

11  The court adopts this approach here.  Considering the duration of time since the trial, this

12  approach ensures restoration will be achievable as a practical matter.  Current conditions on the

13  island may allow for less restoration work or for less expensive methods of restoration.

14  Defendants contend the island is returning to its natural tidal channels and marshlands ecosystem,

15  which if true would further reduce costs.  Mr. Sweeney's current finances may have changed over

16  the past several years, which in turn might inform the methods used to optimally restore the

17  island.  In addition, the government points out that technical changes to the plan could result in

18  reducing costs, for example using agitation dredging or hydraulic displacement, instead of

19  traditional interior excavation work.  Reply at 19.  In short, the court's providing for defendants'

20  ability to reduce costs by proposing or agreeing to a less-expensive yet as-effective plan

21  undercuts their argument they cannot afford to restore Point Buckler Island.

22        In sum, the government's proposed plan is achievable as a practical matter.  The plan's

23  flexibility confirms its feasibility: using the government's plan as a substantive guide, taking into

24  account Point Buckler Island's current conditions, less costly and more efficient ways to achieve

25  the plan's goals are within the realm of possibility.

---

and no evidence shows Mr. Sweeney sold all his equipment and would thus be unable to
undertake some of the work himself or allow others to use whatever equipment he owns.

1           **4.      Equitable Relationship to Harms**

2           Fourth, the restoration plan bears "an equitable relationship to the degree and kind of

3    wrong it is intended to remedy." *Deaton*, 332 F.3d at 714 (quoting *Cumberland*, 826 F.2d at

4    1164). Here, "the conceptual plan bears an equitable relationship to the harm caused . . . [as its]

5    main thrust is to reverse the damage done" by defendants. *Brace*, , 2020 WL 956460, at *1. As

6    noted above, defendants committed "very serious" violations of the CWA when they constructed

7    a "nearly mile-long levee on Point Buckler Island [which] resulted in the loss of approximately 30

8    acres of tidal channels and marsh and their chemical, physical, and biological functioning."

9    Order at 96. Defendants' CWA violations destroyed habitats of endangered fish, devastated

10   native vegetation, tampered with soil acidity and altered waters of the United States. Ordering

11   defendants to restore the tidal marshlands is equitable.

12          Moreover, "[i]ntentional conduct on the part of a defendant eviscerates any equitable

13   arguments against restoration[,]" *Smith*, 2014 WL 3687223, at *6 (collecting cases), and the

14   construction of the levee was undisputedly intentional. *See also United States v. Cundiff*,

15   555 F.3d 200, 216 (6th Cir. 2009) (affirming restoration order in which district court found

16   "intentional, flagrant, egregious, and openly defiant" violations of CWA "militate[d] against any

17   equitable considerations"). Restoration is thus equitable given the harms of degrading Point

18   Buckler Island.

19          The defense's equitable arguments misstate the court's prior order and attempt to re-

20   litigate defendants' liability. *See* Resp. 34–47. Defendants claim the plan is unsupported by the

21   record because it does not seek to restore the island's tidal channels and marsh wetlands. As

22   discussed at length in the prior section, the court finds otherwise. The plan and each of its

23   restoration actions are supported by the record. As Mr. Siegel explained on cross-examination,

24   "[t]he purpose of the restoration plan is restore the preexisting tidal marsh and tidal channel

25   system functions that existed prior to Mr. Sweeney's work." Trial Tr. at 326:1–3. The defense's

26   repeated arguments that restoration is not needed, that channels are not needed to restore pre-

27   existing tidal functions, and that Mr. Sweeney is not responsible for the weeds and loss of native

28   vegetation, *see* Resp. 34–47, are unsupported by the record and fail to accept the court's prior

1  findings.  The court has found defendants liable for disturbing and degrading Point Buckler
2  Island's tidal channels and marshlands ecosystem.  *See, e.g.*, Prior Order ¶ 131 ("If the harm
3  defendants have caused to Point Buckler Island's soil, vegetation, tidal marshland, fish habitat
4  and fish species, as well as the areas surrounding the Island, is not mitigated, the Island's native
5  vegetation is likely to be lost permanently and the Island is likely to subside significantly."), § VII
6  ("The court enters judgment in favor of plaintiff United States of American and against
7  defendants John Donnelly Sweeney and Point Buckler Club, LLC, jointly and severally . . . .").

8        Defendants also argue the proposed restoration plan would be inequitable because it
9  would arbitrarily force them to take actions they could undo immediately, such as "re-excavate
10  the borrow ditch after complying with an order to fill it in," and "cutting down and carrying off
11  the very weeds that the Government wants this Court to order Sweeney to nurture."  Resp. 45, 46.
12  This argument rests on the incorrect assumption that the injunctions the court enters and approves
13  here require simply that defendants comply with other generally applicable laws.  These
14  directives require more, however.  They also establish a decade-long monitoring and maintenance
15  period, *see* Original Restoration Plan at 97, intended to protect the island's tidal channels and
16  marsh wetlands ecosystem, *see id.* at 98–103.  This order also includes a prohibitory injunction
17  forbidding actions that would prevent the island's required restoration, as discussed further
18  below.

19        In sum, the proposed plan bears an equitable relationship to the degree and kind of wrong
20  it is intended to remedy.

21              **5.      Other Defense Arguments**

22        Defendants make several additional arguments against a restoration injunction.  Many are
23  very weak, if not verging on the frivolous.[11]  This order does not and need not address these
24  arguments in full.  *Cf. Malbon v. Pa. Millers Mut. Ins. Co.*, 636 F.2d 936, 939 n.8 (4th Cir. 1980)
25  /////

---

[11] Exercising its discretion with restraint, the court merely notes at this time that some of
defendants' arguments contradict the record or binding precedent and raise questions about
whether Federal Rule of Civil Procedure 11 has been adhered to faithfully.

1   ("An argument to which sub silentio treatment is accorded may be simply deemed not to have

2   required specific reference.").

3          First, defendants claim the restoration injunction would contravene the Thirteenth

4   Amendment because such an injunction would compel them to perform involuntary manual labor.

5   Resp. at 29; Sur-Reply at 35.  "The Thirteenth Amendment to the U.S. Constitution enshrines the

6   principle that people may not be bought and sold as commodities." *Coyote Pub., Inc. v. Miller*,

7   598 F.3d 592, 603 (9th Cir. 2010).  The Amendment does not protect people from being ordered

8   to remedy the harms they have caused due to their unlawful action.  Defendants here are not

9   being forced to perform manual labor.  It is an option they can choose, if they want to reduce

10  costs.  Defendants do not point to any precedent applying the Thirteenth Amendment to a

11  mandatory injunction related to a CWA violation, and the court is aware of none.

12         Second, defendants argue the injunction would violate the Eighth Amendment because it

13  would effectively impose an excessive fine.  An injunction is not a fine.  *See Kim v. United*

14  *States*, 121 F.3d 1269, 1276 (9th Cir. 1997) ("[A]n excessive fine prohibited by the Eighth

15  Amendment . . . [is a] cash or in kind payment directly imposed by, and payable to, the

16  government."); *see also Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 770 (7th

17  Cir. 2019) ("Because an injunction isn't a fine, the permanent injunction doesn't implicate the

18  Excessive Fines Clause.").

19         Third, defendants argue the proposed remedy violates the Due Process Clause because

20  Mr. Sweeney "lacks the ability to comply with the order."  Resp. at 28.  Defendants claim, in

21  transparent overreach, Mr. Sweeney could not pay "even one dollar" toward restoration, nor

22  could PBC.  *Id.*  But, as discussed above, defendants have not asked for an evidentiary hearing on

23  Mr. Sweeney's current financial status, nor have they put forward evidence of his financial status.

24  The only relevant evidence is the opinion of the government's financial expert, Mr. Leistra-Jones,

25  who concluded "Mr. Sweeney individually can pay approximately $864,000 for the financial

26  obligations of a judgment in this matter without experiencing undue financial hardship."  Trial Tr.

27  at 1110:17–20.  As discussed above, the government proposes ordering defendants to submit a

28  restoration plan using the government's plan as a substantive guide; Mr. Sweeney puts forward no

1    evidence that he cannot submit such a plan.  The proposed plan, as a result, cannot violate the

2    Due Process Clause because there is no evidence Mr. Sweeney cannot comply with it.

3                            **6.**        **Prohibitory Injunction**

4        The government requests a prohibitory injunction to prevent defendants from engaging in

5    further earthmoving activities on Point Buckler Island, with exceptions for certain locations and

6    activities.  Remedy Br. at 3.  Under the CWA, this court has "jurisdiction to restrain [violations of

7    the CWA] and to require compliance." 33 U.S.C. § 1319(b).  District courts exercise equitable

8    discretion in ordering relief that will achieve compliance with the CWA.  *Cumberland Farms*,

9    826 F.2d at 1164; *see also Weinberger*, 456 U.S. at 318–20.

10       The court construes the request for a prohibitory injunction to be a part of the

11    government's broader request for a restoration order to remedy defendants' CWA violations.  In

12    that context, the court finds a prohibitory injunction is appropriate here because, at the time the

13    court issued the order finding liability, defendants remained in violation of the CWA, *see* Prior

14    Order at 95; enjoining defendants from further harmful action will help restore Point Buckler

15    Island's tidal channels and marsh wetlands ecosystem.  The prohibitory injunction is necessary to

16    achieve compliance with the CWA in the face of defendants' persistent position that they should

17    be allowed to engage in activities that the record shows will interfere with restoration or

18    otherwise further disturb the island's tidal channels and wetlands.  *See* Prior Order at 96

19    (declaring appropriate relief includes a remedy "designed to protect . . . [against] further

20    unpermitted, non-exempt discharges of pollutants").

21       The government does not specify whether its proposed prohibitive injunction would be

22    permanent or temporary.  The court declines to enter a permanent injunction at this time.

23    "[B]efore the Court could enter such an order, the Government would have to show the likelihood

24    of a *future* CWA violation by [defendants]."  *Smith*, 2014 WL 3687223, at *4 (emphasis in

25    original) (collecting cases).  As the government has offered no evidence regarding potential future

26    violations, the court issues a prohibitory injunction that will terminate at the same time as the

27    mandatory injunction, as provided for at the end of this order.  But this order does not preclude a

28    prospective motion to impose a prohibitory injunction, if justified in light of future developments.

1    Defendants object to the requested prohibitory injunction for three reasons.  First, they

2    claim it only would require them to follow the law, not enjoin unlawful conduct.  Resp. at 58; *see*

3    *Perez v. Ohio Bell Tel. Co.*, 655 F. App'x 404, 411 (6th Cir. 2016) (unpublished) ("Most of the

4    circuits that have addressed [injunctions that compel nothing more than obedience to existing

5    law] have adopted a rule against them.") (collecting cases).  This claim is erroneous because, as

6    the government points out, *see* Reply at 24–25, the requested prohibitory injunction is broader

7    than the CWA.  The injunction prevents defendants from engaging in any earthwork or other on-

8    the-ground activity on Point Buckler Island, with certain location and activity exemptions, as well

9    as a procedure for obtaining authorization.  Because this prohibitory injunction is broader than the

10    CWA, it does not run afoul of Rule 65(d).  In addition, as defendants acknowledge, *see* Resp. at

11    58, the Ninth Circuit has not adopted a rule against so-called "obey the law injunctions," *F.T.C. v.*

12    *EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012) (citing *United States v. Miller*, 588 F.2d

13    1256, 1261 (9th Cir. 1978), *cert. denied*, 440 U.S. 947 (1979)).  The requested prohibitory

14    injunction is not an obey-the-law injunction, and even if it were, that aspect of its provisions

15    would not render it improper.

16    Second, defendants are concerned the prohibitory injunction is, essentially, too vague

17    because it applies to any earthwork or other on-the-ground activity.  This concern is unavailing.

18    Defendants are prohibited from engaging in any activity on the island's grounds, unless it is

19    outside the prohibited area or comprises a minimally intrusive recreational activity, for example,

20    hunting, hiking, walking, launching kiteboards from the Island's dock and shoreline, and

21    spreading out sails on the ground to allow them to dry.  Defendants thus have clear notice about

22    what they may and may not do.  If any ambiguity arises, or if defendants are uncertain whether an

23    activity is proscribed, then they need only ask.  In light of defendants' serious and intentional

24    CWA violations, a result in part of their not seeking approval before disturbing the island's tidal

25    wetlands, the prohibitory injunction prevents defendants from interfering with restoration; it is not

26    vague.

27    Lastly, defendants argue the injunction improperly delegates the court's authority by

28    authorizing the government to approve activities that otherwise would violate the injunction.

26

1   Here as well defendants are incorrect.  The injunction does not authorize the government to

2   excuse violations or modify the terms of the injunction.  The court does not delegate its authority,

3   but instead is creating an opportunity for the parties to resolve disputes about implementation of

4   court orders informally.  The court retains jurisdiction to decide unresolved disputes and enforce

5   the court's orders and judgments.

6                        **7.      Civil Penalty**

7           Under the CWA, a person found in violation of section 1311, among other provisions,

8   "shall be subject to a civil penalty not to exceed $25,000 per day for each violation."  33 U.S.C.

9   § 1319(d).  Both Mr. Sweeney and PBC violated section 1311.  Prior Order at 95.  The

10  government requests the civil penalty claim be held "in abeyance pending restoration."  Reply at

11  33.

12          The Ninth Circuit has held that civil penalties are "mandatory" under the CWA.  *Leslie*

13  *Salt Co. v. United States*, 55 F.3d 1388, 1396–97 (9th Cir. 1995); *see also Nat. Res. Def. Council*

14  *v. Sw. Marine, Inc.*, 236 F.3d 985, 1001–02 (9th Cir. 2000).  As the Circuit has explained, if

15  Congress intended for civil penalties to be discretionary, then it would have said a civil penalty

16  may be imposed on violators, not that violators shall be subject to a civil penalty.  *Leslie Salt Co.*,

17  55 F.3d at 1397.  To determine the amount of a civil penalty, district courts must consider (1) the

18  seriousness of the violation, (2) any economic benefit received from the violation, (3) any history

19  of violations, (4) any good-faith efforts to comply with applicable requirements, (5) the economic

20  impact of the penalty on the violator, and (6) "such other matters as justice may require."

21  33 U.S.C. § 1319(d).  "District courts retain broad discretion to set a penalty commensurate with

22  defendant's culpability," including a penalty of "only a nominal amount."  *Leslie Salt Co.*,

23  55 F.3d at 1397.  Although a penalty is mandatory, the CWA does not impose a deadline for

24  imposing or paying a penalty.

25          The court defers its decision on the amount of the civil penalty because determining it

26  now would risk unjust results.  On the one hand, if the court imposed a large civil penalty due

27  immediately, it would frustrate the CWA's purpose because it would likely reduce the funds

28  available for the restoration of Point Buckler Island.  On the other hand, a nominal penalty

                                        27

1   imposed now would be inappropriate because the defendants' CWA violations were serious and

2   intentional.  A nominal penalty could be appropriate if defendants studiously comply with the

3   injunction and have only limited ability to pay when the injunction expires.  The court thus will

4   determine the amount of the civil penalty at the appropriate time, which may be upon a party's

5   filing a motion seeking a determination.

6                           **8.      Declaratory Relief**

7          The government seeks four declarations: (1) a declaration that the appropriate relief

8   includes the mandatory injunction the court is issuing here, (2) a declaration that the appropriate

9   relief includes the prohibitory injunction also issued here, (3) a declaration that the appropriate

10  relief includes a mandatory injunction to effectuate compensatory mitigation for the loss of tidal

11  resources and functioning on Point Buckler Island, held in abeyance pending timely and complete

12  satisfaction of the restoration order, and (4) a declaration that the appropriate relief includes a

13  civil penalty award also held in abeyance until the timely and complete satisfaction of the

14  restoration order.  Remedy Br. at 11–12.  In response, defendants claim the first three declarations

15  relate only to past violations and thus are beyond the court's jurisdiction to order declaratory

16  relief.  Resp. at 59.

17         The Declaratory Judgment Act gives this court the power "to declare the rights and other

18  legal relations of any interested party seeking such declaration[.]"  28 U.S.C. § 2201.  The Act

19  "confer[s] on federal courts unique and substantial discretion" to decide the scope of any such

20  declaration.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995).  "Declaratory relief should be

21  denied when it will neither serve a useful purpose in clarifying and settling the legal relations in

22  issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced

23  by the parties."  *United States v. State of Washington*, 759 F.2d 1353, 1357 (9th Cir. 1985)

24  (en banc) (per curiam) (collecting authorities).

25         The declaratory relief the government requests addresses only past violations.  Because

26  defendants remained in violation of the CWA at the time the court issued the order finding

27  liability, the relief requested addresses ongoing violations.  The court nevertheless declines to

28  award declaratory relief.  The first, second and fourth declarations are redundant of the mandatory

1    and prohibitory injunctions and the civil penalty.  *Cf. Hollins v. Reconstrust, N.A.*, No. 11-945,

2    2011 WL 1743291 (C.D. Cal. May 6, 2011) ("[A] claim for declaratory relief is improper where,

3    as here, the claim merely replicates other substantive causes of action asserted in the pleading.").

4    They will not clarify or settle the parties' relationships or afford relief.  The declarations would

5    not serve a useful purpose.  These requests thus are denied.

6            The third declaration the government requests is for a mandatory injunction to effectuate

7    compensatory mitigation.  Remedy Br. at 11–12.  In the government's prior briefing, it indicated

8    such an injunction would offset the temporal loss of waters of the United States.  *Cf.* U.S.

9    Proposed Findings of Fact & Conclusions of Law at 150, ECF No. 176 ("Ordinarily, when there

10   will be at least a temporal loss of waters of the United States, as is the case here, courts will

11   consider an injunction requiring Defendants to effect compensatory mitigation commensurate

12   with that which could be required under a dredge-and-fill permit.").  The briefing currently before

13   the court does not address whether there will, in fact, be a temporal loss of waters of the United

14   States if defendants ultimately fully comply with the restoration order.  Further, unlike the

15   mandatory and prohibitory injunctions, which form the order of restoration here and will

16   accomplish rehabilitation of Point Bucker Island's tidal channels and marsh wetlands, the

17   government has not shown whether and how a mandatory injunction for compensatory mitigation

18   is supported by the record.  The court declines to issue this form of declaratory relief at this time.

19   *State of Washington*, 759 F.2d at 1356 ("[T]he court may, after a full consideration of the merits,

20   exercise its discretion to refuse to grant declaratory relief because the state of the record is

21   inadequate to support the extent of relief sought.").  The government's request for declaratory

22   relief is accordingly denied, without prejudice.

23           **9.     PBC's Liability and Remedies**

24           Defendants argue PBC should not be enjoined because it was not responsible for the levee

25   work which took place between February 2014 and November 2014.  Resp. at 15–18; *see* Prior

26   Order at 50.  Although it is true PBC did not build the levee, PBC nevertheless violated the CWA

27   and remains in violation of the CWA for actions taken by Mr. Sweeney after PBC's purchase of

28   the island, including Mr. "Sweeney's earthmoving activities [that] occurred in conjunction with

1   the creation of four small crescent basins (or ponds) interior of the new levee."  Prior Order at 96.

2   In other words, Mr. "Sweeney's violations after [PBC] purchased the island in October 2014 are

3   [PBC's] violations; [PBC's] violations are Sweeney's violations; for these post-October 27, 2014

4   violations, defendants are jointly and severally liable." *Id.* at 51.

5           Neither party has suggested a way to bifurcate remedies or to appropriately limit PBC's

6   exact liability or limit its remedial obligations.  The government suggests an alternative form of

7   injunction for PBC focused on cooperation with an injunction placing primary responsibility with

8   Mr. Sweeney could be appropriate, although it does not offer parameters for the injunction, nor

9   explain the practical difference.  *See* Reply at 32.  The court declines to undertake a line-drawing

10  exercise.  Because Mr. Sweeney and PBC are jointly and severally liable for violations of the

11  CWA after PBC took title to the island, they both are ordered to comply with the mandatory and

12  prohibitory injunctions.  This order does not bar one defendant from seeking clarification or relief

13  related to the obligations of the other defendant, if that proves necessary in the future.

14          **E.      Appointment of a Special Master**

15          Post-trial special masters may be appointed under Rule 53(a)(1)(C) to assist the court in

16  "framing and enforcing complex decrees" and similar matters.  *See, e.g.*, *Wishtoyo Found. v.*

17  *United Water Conservation Dist.*, No. 16-3869, 2018 WL 7571315, at *5 (C.D. Cal. Dec. 1,

18  2018), *aff'd*, 795 F. App'x 541 (9th Cir. 2020) (appointing special master to monitor defendant's

19  compliance with permanent injunction following its operation and maintenance of dam violating

20  Endangered Species Act).  While special master appointments are rare, district courts have

21  discretion to appoint special masters to enforce judicial decrees in appropriate cases.  *See, e.g.*,

22  *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 774–75 (9th Cir. 1990) (upholding

23  decision by district court to appoint special master to determine question of fishing rights); *City of*

24  *Long Beach v. Monsanto Co.*, No. 16-3493, 2020 WL 7060140, at *5 (C.D. Cal. Nov. 25, 2020)

25  (appointing special master in case involving complex consent decree monitoring environmental

26  injunction).

27          Having carefully considered the matter, the court is prepared to appoint U.S. Magistrate

28  Judge Jeremy D. Peterson to serve as special master to oversee the mandatory and prohibitory

1    injunctions over PBC and Mr. Sweeney.  In the court's view, Magistrate Judge Peterson's

2    professional background and tenure as a judge of this court support his identification as a well-

3    qualified Special Master.  The parties will be provided an opportunity to (1) show cause why

4    Magistrate Judge Peterson should not be appointed as special master, and (2) submit a joint

5    proposal prescribing the special master's role and duties for the court's consideration.  The court

6    anticipates adopting a formal dispute resolution process going forward.  This process would

7    involve a determination by the Special Master in the first instance and an opportunity for a

8    limited appeal to this court.  The parties may include a proposed process for dispute resolution,

9    including any limitations on appealing the Special Master's decisions to this court.

10   **V.     CONCLUSION AND ORDER**

11       **A.     Clarification**

12       As discussed above, *see supra* section IV.A., the court on its own motion under Rule 60(a)

13   clarifies it has not reopened the case or evidentiary record, but rather has conducted this action in

14   two phases: (1) a liability phase, in which the parties developed an evidentiary record in a bench

15   trial, and in which the court entered a judgment in favor of the United States on defendants'

16   liability, and (2) a remedies phase, in which the parties were permitted to present arguments on an

17   appropriate remedy, which the court has now considered.

18       **B.     Special Master and Dispute Resolution**

19       The court plans to appoint U.S. Magistrate Judge Jeremy D. Peterson to serve as special

20   master for the mandatory and prohibitory injunctions over PBC and Mr. Sweeney.  The parties

21   are directed to (1) show cause why Magistrate Judge Peterson should not be appointed as special

22   master, and (2) submit a joint proposal prescribing the special master's role and duties for the

23   court's consideration in the event the court appoints Judge Peterson as special master.

24       **The parties must show cause no later than 14 days after the date of this order.  They**

25   **must submit their joint proposal within 21 days of this order.**

26       **C.     Civil Penalty**

27       A civil penalty is mandatory for Mr. Sweeney and PBC because they violated section

28   1311.  *See* 33 U.S.C. § 1319(d); *Leslie Salt Co.*, 55 F.3d at 1397.  The court defers its decision on

1    the amount of the civil penalty.  At the appropriate time in the future, the court will conduct

2    further proceedings and order defendants to pay a civil penalty, which could range from a large

3    civil penalty to a nominal penalty, depending on defendants' compliance with this order.

4              **D.       Mandatory Injunction**

5              Defendants shall restore the tidal channel and tidal marsh wetlands ecosystem of Point

6    Buckler Island, consistent with the United States' Restoration Plan for Point Buckler Island as a

7    substantial guide.  *See* Original Restoration Plan; USA Exs. 1 & 2.  The objective of this

8    injunctive relief is to recover the loss of approximately 30 acres of tidal channels and tidal marsh

9    underneath and interior of the unlawfully constructed levee on Point Buckler Island and the

10   chemical, physical, and biological functioning of those waters of the United States.

11             **Within 30 days of this judgment**, defendants **shall**, through professional(s) with the

12   requisite qualifications, **propose to the United States a detailed submission** including a

13   schedule and plan for implementing the United States' Restoration Plan for Point Buckler Island,

14   taking into account the current state of the Island and how that may affect the plan.  The United

15   States shall, within 30 days of service, provide defendants with its comments.  If the United States

16   does not provide comments, defendants shall file their submission with the Special Master and

17   comply with it.  If the United States provides comments, defendants shall: (i) within 14 days of

18   service, revise their submission consistent with those comments and file the revised submission

19   with the Court; and (ii) comply with the revised submission. [12]  For modest extensions of time on

20   /////

---

[12] If defendants have objections to the United States' comments, then defendants must communicate them in writing to the United States within seven days.  If the parties are unable to resolve their dispute, defendants may within 14 days of service of the United States' comments, file a motion before the Special Master articulating defendants' objections and their bases.  On any such motion, defendants shall bear the burden of persuading the Special Master that the United States' comments are unreasonable in light of the court's order and judgment, the evidence adduced at trial, or the objective of this injunctive relief.  In that scenario, defendants shall file and comply with the schedule and plan that accords with the Special Master's decision.  Defendant's filing of a motion does not automatically stay any obligation set forth in this order.  The parties must either stipulate in writing to a stay, or defendants must specifically request a stay.  Lastly, if defendants do not file a motion for review, then they will waive any such objections.

1   any of these deadlines, the parties may stipulate in writing or, if contested, seek and obtain leave

2   from the Special Master for good cause.

3        Within 30 days of filing of the controlling restoration action schedule and plan, as

4   provided for above, defendants shall, through professional(s) with the requisite qualifications,

5   propose in writing to the United States a detailed submission including a schedule and plan for

6   implementing the monitoring, performance criteria, and adaptive management tasks as described

7   in pages 9 through 13 of United States Exhibit 1.  *See* USA Ex. 1 at 9–13; *see also* Original

8   Restoration Plan at 96–101.  Defendants' submission shall include a schedule for filing status

9   reports with the Special Master and the required content for those reports.  The United States

10  shall, within 30 days of service, provide defendants with its comments.  If the United States does

11  not provide comments, defendant shall file their submission with the Special Master and comply

12  with it.  If the United States provides comments, defendants shall: (i) within 14 days of service,

13  revise the submission consistent with those comments and file the revised submission with the

14  Special Master; and (ii) comply with the revised submission.  For modest extensions of time on

15  any of these deadlines, the parties may stipulate in writing or, if contested, seek and obtain leave

16  from the Special Master for good cause.[13]

17        **E.   Prohibitory Injunction**

18        Except for activities required to be undertaken by the mandatory injunction set forth in

19  this Order, and except for minimally intrusive recreational activities such as hunting, hiking,

20  walking, launching kiteboards, and spreading out kiteboarding sails on the ground to allow them

---

[13] If defendants have objections to the United States' comments, then defendants must communicate them in writing to the United States within seven days.  If the parties are unable to resolve their dispute, defendants may within 14 days of service of the United States' comments, file a motion before the Special Master articulating defendants' objections and their bases.  On any such motion, defendants shall bear the burden of persuading the Special Master that the United States' comments are unreasonable in light of the court's order and judgment, the evidence adduced at trial, or the objective of this injunctive relief.  In that scenario, defendants shall file and comply with the schedule and plan that accords with the Special Master's decision.  Defendant's filing of a motion does not automatically stay any obligation set forth in this order.  The parties must either stipulate in writing to a stay, or defendants must specifically request a stay.  Lastly, if defendants do not file a motion for review, then they will waive any such objections.

1   to dry, defendants are enjoined from engaging in any earthwork, excavation, grading, or other on-

2   the-ground disturbance activity in any area of Point Buckler Island (except for an area located on

3   the Island's eastern edge and comprising approximately 0.31 acre as shown in the figure admitted

4   into evidence as USA Ex. 359 at 4, an area which does not consist of waters of the United States)

5   or to the tidal waters surrounding Point Buckler Island unless, before initiating any such activity,

6   defendants: (1) provide complete information about the proposed activity to the person(s)

7   identified as contacts by the government for Region 9 of the United States Environmental

8   Protection Agency (EPA) and the San Francisco District of the United States Army Corps of

9   Engineers (Corps) in writing, with a copy to the U.S. Department of Justice, Environmental and

10  Natural Resources Division, on any communications; (2) obtain verification from EPA that the

11  proposed activity is consistent with restoring Point Buckler Island to a functioning tidal marsh

12  ecosystem; and (3) obtain from the Corps an individual permit, a verification of the applicability

13  of a nationwide, general, or regional permit, or a determination that no permit is required for the

14  proposed activity under Section 404 of the CWA, 33 U.S.C. § 1344.  If defendants request and

15  are denied verification of such an activity, then defendants may file a motion before the Special

16  Master articulating defendants' objections and explaining why the proposed activity is consistent

17  with restoring Point Buckler Island to a functioning tidal marsh ecosystem.  The objective of this

18  injunctive relief is to protect the waters of the United States on and surrounding Point Buckler

19  Island from further unpermitted, non-exempt discharges of pollutants.

20      **F.**    **Compliance-Assurance for Mandatory and Prohibitory Injunctions**

21  To ensure defendants comply with the terms of the injunctions above, and to facilitate the

22  government's responsibility in monitoring the implementation of the injunctions, the court also

23  orders the following:

24  First, any representative of the United States, including any contractor, consultant, or

25  other person the United States believes would be of assistance, shall have the right to access Point

26  Buckler Island, at all reasonable times, with reasonable advance notice, in order to assess

27  compliance with this order.

28  /////

34

Second, within thirty (30) days of this order, defendants shall record a true and complete copy of this order with the recorder's office for Solano County, California, linking such record with Assessor Parcel Number 0090-020-010, and file proof of compliance with this court within seven (7) days of recording.

Third, absent the approval of the Special Master in the first instance, subject to appeal to the presiding District Judge, no transfer of ownership or control of Point Buckler Island, of any portion of Point Buckler Island, including any less-than-fee-simple interest in Point Buckler Island or a portion thereof (such as an easement or lease), shall relieve defendants of their obligation to comply with all aspects of this judgment. As a condition of any such transfer, defendants shall reserve all rights necessary to comply with all aspects of this judgment. Prior to any such transfer, defendants shall provide a true and complete copy of this judgment to the intended transferee, obtain the intended transferee's written acknowledgement thereof, and file proof of compliance with the Special Master.

### G.  Termination

The injunctive relief provided for in this order is not at this time permanent. If the restoration actions have been successful, and all performance criteria have been met for ten (10) consecutive years, then the management actions and prohibitions will terminate. If the parties agree all termination criteria have been met, defendants may file an unopposed notice of termination of the mandatory and prohibitory injunctions. However, if the parties are unable to agree all termination criteria have been met, then defendant may file a motion before the Special Master articulating their position and bases. On any such motion, defendants bear the burden to show the termination criteria have been met by a preponderance of the evidence.

Alternatively, if the government determines temporary injunctive relief is insufficient to maintain the island's tidal channels and marsh wetlands ecosystem, then it may file a motion before the Special Master in the first instance seeking to make the injunction(s) permanent. On any such motion, the government bears the burden to show permanent injunctive relief is necessary and supported by evidence, including showing a risk of future CWA violations.

1    **H.      Retention of Jurisdiction**

2          The court retains jurisdiction to resolve disputes and enforce the court's orders and

3    judgments resolving this matter.

4          This order resolves ECF No. 189.

5          IT IS SO ORDERED.

6    DATED:  December 8, 2022.

7

8                                    _____
                                     CHIEF UNITED STATES DISTRICT JUDGE