LAWRENCE S. BAZEL (114641)
BRISCOE IVESTER & BAZEL LLP
235 Montgomery Street, Suite 935
San Francisco, CA 94104
Tel (415) 402-2700
lbazel@briscoelaw.net

Attorneys for Defendants
JOHN DONNELLY SWEENEY and POINT BUCKLER CLUB, LLC

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

        Plaintiff,

v.

JOHN DONNELLY SWEENEY and POINT BUCKLER CLUB, LLC,

        Defendants.

No.  2:17-cv-00112-KJM-KJN

**CORRECTED
NOTICE OF SUPPLEMENTAL AND AMENDED  MOTION AND MOTION TO AMEND FINDINGS AND FOR NEW TRIAL, OR TO ALTER OR AMEND JUDGMENT OR FOR RELIEF FROM JUDGMENT, AND**

**FOR A STAY OF THE PROCEEDINGS BEFORE JUDGE PETERSON;**

**MEMORANDUM OF POINTS AND AUTHORITIES**

**(FRCP RULES 52(B), 59(A), 59(E), AND 60(B))**

Date:  January 26, 2024
Time:  10:00 a.m.
Courtroom:  3
The Honorable Kimberly J. Mueller

Trial:  May 20 to June 5, 2019

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ......................................................................5

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................6

I.  INTRODUCTION ..............................................................................................6

II.  BACKGROUND ................................................................................................7

III.  APPLICABLE LAW ON POST-TRIAL MOTIONS ........................................8

    A.  Motion To Amend Findings (Rule 52(b)).................................................8

    B.  Motion For New Trial (Rule 59(a)) ........................................................10

    C.  Motion To Alter Or Amend Judgment (Rule 59(e)) And For Relief From Judgment (Rule 60(b)) ...........................................................................11

IV.  THE ORDER SHOULD BE AMENDED ........................................................11

    A.  The *Sackett* Decision...............................................................................11

    B.  This Court's Order Does Not Comply With *Sackett* .................................12

    C.  The 2020 Order Should Be Amended To Be Consistent With *Sackett* .....................13

        1.  Point Buckler Island is not *indistinguishable* from surrounding waters..........13

        2.  The restoration-plan process should be stopped ...............................19

        3.  The old levee, old borrow ditch, and small channels are not regulated waters ...........21

        4.  Judgment should be entered in favor of defendants........................23

V.  CONCLUSION ................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*Allah v. Superior Court of State of Cal., Los Angeles County* 871 F.2d 887 (9th Cir. 1989)............. 8

*Brown v. Wright*, 588 F.2d 708 (9th Cir. 1978)........................................................................... 10

*Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008) ...................................... 9

*Cecala v. Newman*, 2007 WL 9724853 (D. Ariz., June 20, 2007) ..................................................... 10

*Coopers & Lybrand v. Livesay*, 437 U.S. 463 (1978)........................................................................ 9

*CPC Patent Technologies Pty Ltd. v. Apple, Inc.,* 34 F.4th 801 (9th Cir. 2022)................................. 9

*Dannenberg v. Software Toolworks Inc.*, 16 F.3d 1073 (9th Cir. 1994) ............................................. 9

*Duarte v. Bardales*, 526 F.3d 563 (9th Cir. 2008) ........................................................................ 10

*Environmental Protection Agency*, 8 F.4th 1075 (9th Cir. 2021)....................................................... 20

*Foster Poultry Farms, Inc. v. Suntrust Bank*, 2008 WL 1970823 (E.D. Cal., May 5, 2008) ............... 8

*Gibbons v. Ogden*, 9 Wheat. 1 (1824) ........................................................................................... 23

*Horne v. Flores*, 557 U.S. 433 (2009) ......................................................................................... 11

*Idlewild Bon Voyage Liquor Corp. v. Epstein*, 370 U.S. 713 (1962) .................................................. 9

*Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014)............................................................................. 10

*Pate v. Seaboard R.R., Inc.*, 819 F.2d 1074 (11th Cir. 1987) ........................................................ 10

*Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996) ................................................................. 9

*Rapanos v. U.S.*, 547 U.S. 715 (2006) .................................................................................. passim

*Sackett v. Environmental Protection Agency* 598 U.S. 651 (2023) ............................................. passim

*Sackett v. U.S. Environmental Protection Agency*, 8 F.4th 1075 (9th Cir. 2021)............................ 11

*Snodgrass v. Provident Life & Acc. Ins. Co.*, 147 F.3d 1163 (9th Cir. 1998) .................................. 9

*Turner v. Burlington N. Santa Fe R. Co.*, 338 F.3d 1058 (9th Cir. 2003) ........................................ 10

*U.S. v. Weems*, 49 F.3d 528 (9th Cir. 1995) ............................................................................... 10

*United States v. Carlisle,* 18 F.3d 752 (9th Cir.1994) .................................................................. 10

*United States v. Pitner,* 23 F.3d 1497 (9th Cir.1994) .................................................................. 10

*United States v. Ratzlaf,* 16 F.3d 1078 (9th Cir.1994)................................................................... 10

## Rules

Federal Rules of Appellate Procedure, Rule 4(a)(4)......................................................................... 8

Federal Rules of Civil Procedure, Rule 52(b) ................................................................................. 8

Federal Rules of Civil Procedure, Rule 54(a) ................................................................................. 8

Federal Rules of Civil Procedure, Rule 54(b) ................................................................................. 9

Federal Rules of Civil Procedure, Rule 58(a) ................................................................................. 8

Federal Rules of Civil Procedure, Rule 59(a)(1)(B)........................................................................ 10

Federal Rules of Civil Procedure, Rule 59(a)(2) ............................................................................ 10

Federal Rules of Civil Procedure, Rule 59(b)................................................................................. 11

Federal Rules of Civil Procedure, Rule 59(e) ........................................................... 11

Federal Rules of Civil Procedure, Rule 60(b) .......................................................... 11

### Regulations

33 Code of Federal Regulations §328.3 ................................................................... 12

33 Code of Federal Regulations §328.4 ................................................................... 13

40 Code of Federal Regulations §120.2 ................................................................... 12

88 Federal Register 61968-69 ................................................................................. 12

Supplemental And Amended Motion To Amend Findings                NO. 2:17-cv-00112-KJM-KJN

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on January 26, 2024, at 10:00 am, or as soon after as the matter may be heard in the above-entitled court, located at 501 I Street, Sacramento, CA 95814, defendants JOHN DONNELLY SWEENEY and POINT BUCKLER CLUB, LLC will supplement and amend their previous motion, and also independently move, and hereby do supplement and amend and independently move to amend findings and for new trial, or to alter or amend judgment or for relief from judgment, and for a stay of the proceedings before Magistrate Judge Jeremy Peterson.  This motion is brought in accordance with Federal Rules of Civil Procedure ("FRCP") Rules 52(b), 59(a), 59(e), and 60(b), as discussed in more detail below.

Counsel certifies that meet-and-confer efforts have been exhausted.  Counsel for the parties discussed the requests in this motion in an exchange of e-mails and have reached an impasse.

The parties are not discussing settlement.

The motion will be based on this notice, the memorandum of points and authorities below, and the pleadings and papers filed in this case.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.      INTRODUCTION

3
      The Supreme Court's decision in *Sackett v. Environmental Protection Agency*

4
(598 U.S. 651 (2023)) dramatically changed the law applicable to this case.  Before *Sackett*,

5
wetlands "in the same neighborhood as" traditionally navigable waters were regulated under the

6
Clean Water Act.  (*Id.* at 662.)  After *Sackett*, the only regulated wetlands are those that pass the

7
*indistinguishable* test.  They must be "indistinguishable from… a relatively permanent body of water

8
connected to traditional interstate navigable waters…[with a] continuous surface connection…,

9
making it difficult to determine where the 'water' ends and the 'wetland' begins." (*Id.* at 678-679.)

10
Here, the wetlands on Point Buckler Island were not regulated because they were not

11
indistinguishable from the surrounding waters:  There is no difficulty determining where the water

12
ended and the wetlands began when John Sweeney repaired the levee in 2014.  The island had

13
sharply defined edges, and in any case the water ended far from the dry land where defendant John

14
Sweeney placed the excavated dirt at issue here.  Mr. Sweeney drove a bulldozer and an excavator

15
across and around the island and never saw any sign of water on the surface other than in the old

16
borrow ditch and small channels.  These observations are confirmed by both ground-level aerial

17
photographs showing dry land.  There was no sign of water on the island, much less a continuous

18
surface connection between (non-existent) water on the island and the surrounding waters.  Although

19
dry land can be classified as wetlands, and this Court concluded that Point Buckler Island consisted

20
mostly of wetlands, those wetlands are not wetlands *subject to regulation under the Clean Water Act*

21
because they are not indistinguishable from the surrounding waters.  Mr. Sweeney therefore did not

22
violate the act when he excavated dirt from a borrow ditch and placed it on the dry wetlands.

23
      Nor did Mr. Sweeney violate the act when he placed dirt on the old levee, in the old borrow

24
ditch, or in short sections of small channels on the island.  Although the Government claimed these

25
areas were "waters" rather than wetlands, they are not waters regulated by the Clean Water Act

26
because they are not "bodies of water… that are described in ordinary parlance as 'streams, oceans,

27
rivers, and lakes.'"  (*Id.* at 671.)

28
      Because the restoration-plan proceedings before Magistrate Judge Jeremy Peterson are

1  directed at restoring wetlands that are no longer regulated under the Clean Water Act, those

2  proceedings should be stayed while the Court is considering this motion, and then terminated.

3      The motion should be granted and judgment entered in favor of defendants.

4  ## II.    BACKGROUND

5      This case arises from John Sweeney's repair of the levee surrounding Point Buckler Island in

6  2014.  He used an excavator to take dirt from a borrow ditch just inside the levee and place it on the

7  old levee or, where the old levee was eroded away, on dry land.  (*See* ECF 180 ("2020 Order") at 33,

8  ECF 168-6 at 27:5-28:10.)

9      The Government filed this case in January 2017 and alleged that he and the Club had violated

10  the Clean Water Act by discharging "pollutants" (the dirt) into regulated waters or wetlands.  The

11  matter was referred to Magistrate Judge Kendall J. Newman for settlement.  Although settlement

12  discussions extended for nearly a year in 2017-2018, the case did not settle.  The case was tried in

13  May-June 2019.  The parties submitted post-trial briefing during August-October 2019.  (ECF 172-

14  173, 176-177.)  In September 2020 this Court issued the 2020 Order resolving the factual issue

15  relevant here:  It found that the island consisted almost entirely of "wetlands abutting tidal waters"

16  and "tidal-water channels".  (2020 Order 65:9-11 (citing to numbers at top of page).)

17      The Court rejected the Government's proposed remedy, however, and initiated a "second

18  phase of proceedings" to determine the appropriate remedy.  (Order at 96:7-10, 95-10-15)[1]  The

19  parties submitted additional briefing and, a year later in September 2021, the Court held a hearing on

20  the issues raised in the briefs.  (ECF 207.)  More than a year after that, in December 2022, the Court

21  issued an order ("2022 Order") that included language requiring Mr. Sweeney and the Club to

22  comply with a mandatory injunction related to a restoration plan for Point Buckler Island.  (ECF 210

23  at 32:4-35:16.)  This language was highly unusual, however, because it did specify what Mr.

24  Sweeney and the Club were required to do to restore the island; the content of the injunction was to

25  be determined in the future by a special master.  (*Id.*)  The 2022 Order also required the parties to

26  "submit a joint proposal prescribing the special master's role and duties for the court's

27

28  [1] Although the Order asserts that it "enters judgment" (Order at 95:17), the parties stipulated and the Court confirmed that it was not a judgment (ECF 183).

1  consideration".  (ECF 210 at :31:22-23.)

2    The parties submitted that joint proposal in January 2023, but disagreed on the role of the

3  special master.  (ECF 215.)  The Court responded with an order effectively rescinding the referral to

4  a special master and instead "refer[red] the identification of a restoration plan to Magistrate Judge

5  Jeremy Peterson" for "a recommendation to this court regarding the details of the restoration plan for

6  purposes of achieving injunctive relief as ordered by the court."  (ECF 223 at 3:28-4:1, 4:14-15.)

7    Meanwhile, defendants filed a motion for a new trial.  (ECF 216.)  In February 2023 the

8  Court issued an order partly denying the motion and partly "stay[ing] the motion pending the

9  resolution of the matters referred to Magistrate Judge Jeremy Peterson."  (ECF 230 at 1:21-22.)[2]

10   **III. APPLICABLE LAW ON POST-TRIAL MOTIONS**

11 **A. Motion To Amend Findings (Rule 52(b))**

12   Rule 52(b) specifies that on a party's motion, "the court may amend its findings—or make

13 additional findings—and may amend the judgment accordingly."  A Rule 52(b) motion may

14 accompany a motion for a new trial.  (*Id*.)  Here Mr. Sweeney and the Club move for amended and

15 additional findings.  "[R]ecognized grounds for such a motion include…a change in the law."

16 (*Foster Poultry Farms, Inc. v. Suntrust Bank*, 2008 WL 1970823 (E.D. Cal., May 5, 2008, No. 104-

17 CV-5513 OWW SMS) at *2.)  Here the *Sackett* decision indisputably changed the law.

18   A Rule 52(b) motion may be filed "no later than 28 days after the entry of judgment".  (*Id*.)

19 Here judgment has not yet been entered notwithstanding the filing of an appeal.  For a start, Rule

20 58(a) specifies that "[e]very judgment and amended judgment must be set out in a separate

21 document"[3] and here there is no separate document.  Nor has the Court "direct[ed] entry of a final

22

---

23 [2] Mr. Sweeney and the Club also filed a notice of appeal.  (ECF 217.)  The appeal is being held in

24 abeyance pending this Court's resolution of the motion for a new trial, as specified in Rule 4(a)(4) of the Federal Rules of Appellate Procedure.

25 [3] The separate document must be "distinct from any opinion or memorandum", according to the

26 notes to the 1983 amendment.  The separate document "recites the terms of the judgment without offering additional explanation or citation of authority", according to the notes of the 2002

27 amendment.  "A sheet containing the judgment, usually prepared by the clerk, must be distinct from any opinion or memorandum."  (*Allah v. Superior Court of State of Cal., Los Angeles County* 871

28 F.2d 887, 890 (9th Cir. 1989), quotation marks omitted.)  Although Rule 54(a) provides that the word "judgment" can refer to "any order from which an appeal lies", case law makes clear that an order is not appealable if it is not "final".  See text.

judgment as to one or more, but fewer than all, claims or parties", which is allowed by Rule 54(b) "only if the court expressly determines that there is no just reason for delay." If a partial judgment has not been entered, any order or decision may be revised at any time until there is a judgment adjudicating *all* claims and *all* rights and liabilities:

> any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

(Rule 54(b).) When all claims and all rights and liabilities have not been adjudicated, the decision is not a "final" decision that can be appealed:

> A "final" decision is one "that places the parties effectively out of [federal] court.' " *Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087, 1094 (9th Cir. 2008) (quoting *Idlewild Bon Voyage Liquor Corp. v. Epstein*, 370 U.S. 713, 715 (1962) (per curiam))… This test is satisfied when "the district court disassociates itself from the case entirely, retaining nothing of the matter on the federal court's docket." *Snodgrass v. Provident Life & Acc. Ins. Co.*, 147 F.3d 1163, 1166 (9th Cir. 1998) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 7 (1996)); …*see also Dannenberg v. Software Toolworks Inc.*, 16 F.3d 1073, 1074 (9th Cir. 1994) ("A final [decision]… is 'a decision by the District Court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978)).

(*CPC Patent Technologies Pty Ltd. v. Apple, Inc.,* 34 F.4th 801, 805–806 (9th Cir. 2022), parallel citations omitted.)

The 2022 Order could conceivably have been a final order when it was issued. It includes an injunction, although a very strange one: a figurative blank page enjoining defendants to comply with terms to be filled in later by a special master. (See section II above.) Because of that uncertainty, Mr. Sweeney and the Club filed a protective appeal. But that uncertainty no longer remains. The Court has effectively rescinded the provisions relating to a special master (*id*.) and has since confirmed that it would make the final decision after receiving Judge Peterson's report:

> [D]efendants correctly acknowledge the scope of the restoration order depends on whether further action is needed. The court will make that determination after Magistrate Judge Peterson concludes his work. Because implementation of the mandatory injunction cannot occur until after the scope of the injunction is determined, the court defers ruling on defendants' motion for a stay at this time.

(ECF 230 at 6:3-7.) Because this Court will be making the final decision on "whether further action

is needed"—whether the mandatory injunction will issue—in the future, the 2022 Order was not final, judgment has not been entered, and this motion is timely.

To the extent the Court disagrees with this analysis, it should consider this motion as an amendment to defendants' previous motion for a new trial, ECF 216, which was timely filed under any analysis.  "[A] district court may, in its discretion, allow an amendment to a timely motion for a new trial prior to its decision on the merits of the motion and that the court may consider new grounds raised in the amended motion."  (*Pate v. Seaboard R.R., Inc.*, 819 F.2d 1074, 1084 (11th Cir. 1987); *accord Cecala v. Newman*, 2007 WL 9724853 (D. Ariz., June 20, 2007) at *1.)  Here defendants' previous motion is still pending.  (Section II above.)

## B.   Motion For New Trial (Rule 59(a))

Rule 59(a)(1)(B) specifies that "[t]he court may, on motion, grant a new trial on all or some of the issues…after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court."  Among these reasons is a "manifest error of law".  (*Brown v. Wright*, 588 F.2d 708, 710 (9th Cir. 1978), citing superseded version of Rule 59.)  When a Supreme Court decision invalidates the law a court had relied on when issuing an order, that court would make a manifest error of law if it continued to apply the invalidated law.  The common practice of the Ninth Circuit, after a Supreme Court decision substantially changing the law, is to remand to the district court for a new trial.  (*See U.S. v. Weems*, 49 F.3d 528, 530 (9th Cir. 1995) (in the cases following a Supreme Court decision changing the law, "we have simply remanded for new trial"), citing *United States v. Pitner,* 23 F.3d 1497 (9th Cir.1994); *United States v. Carlisle,* 18 F.3d 752 (9th Cir.1994); *United States v. Ratzlaf,* 16 F.3d 1078 (9th Cir.1994).)  Moreover, a court can alter a judgment when "there is an intervening change in controlling law".  (*Duarte v. Bardales*, 526 F.3d 563, 567  (9th Cir. 2008), abrogated on other grounds by *Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014); *accord, Turner v. Burlington N. Santa Fe R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003).)

Rule 59(a)(2) specifies that "After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment."  Here defendants move for amend findings of fact and conclusions of law and a new judgment in their favor.

A motion for a new trial may be filed "no later than 28 days after the entry of judgment." (Rule 59(b).)  Here judgment has not yet been entered.  (Section III.A above.)

## C.   Motion To Alter Or Amend Judgment (Rule 59(e)) And For Relief From Judgment (Rule 60(b))

If the Court decides that judgment in this case has already been entered, then Mr. Sweeney and the Club hereby amend their previous motion for amending that judgment and relief from judgment to include the arguments made here.  This amendment is timely because the initial motions were timely and are still pending.

A Rule 59 motion may be granted on the ground of an intervening change in controlling law. (Section III.B above.)  Rule 60(b) authorizes relief on several grounds, including "(6) any other reason that justifies relief."  Here relief is justified by a change in the law.  "The party seeking relief bears the burden of establishing that changed circumstances warrant relief,  but once a party carries this burden, a court abuses its discretion "when it refuses to modify an injunction or consent decree in light of such changes."  (*Horne v. Flores*, 557 U.S. 433, 447 (2009), citation omitted.)

## IV.   THE ORDER SHOULD BE AMENDED

### A.   The *Sackett* Decision

On May 25, 2023, the Supreme Court answered "a nagging question about the outer reaches of the Clean Water Act".  (*Sackett v. Environmental Protection Agency*, 598 U.S. 651, 657 (2023).) The Supreme Court held that only some wetlands—those that are "indistinguishable from waters of the United States—are regulated by the Clean Water Act:

> we hold that the CWA extends to only those wetlands that are as a practical matter indistinguishable from waters of the United States.  This requires the party asserting jurisdiction over adjacent wetlands to establish first, that the adjacent body of water constitutes 'waters of the United States,' (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins.

(*Id*. at 678–679, cleaned up.)

This decision overruled the Ninth Circuit, which had held that "[w]e therefore apply Justice Kennedy's 'significant nexus' inquiry to evaluate whether EPA has jurisdiction".  (*Sackett v. U.S. Environmental Protection Agency*, 8 F.4th 1075, 1091 (9th Cir. 2021), *reversed and remanded*, 598

U.S. 651 (2023).  As the Supreme Court noted, the "significant nexus" test is extremely broad:

> [EPA and the Corps] maintain that the significant-nexus test has been and remains sufficient…  And by the EPA's own admission, "almost all waters and wetlands" are potentially susceptible to regulation under that test.

(*Sackett*, 598 U.S. at 669.)  Justice Kennedy, when setting out the significant-nexus test, rejected the "indistinguishable" test:  "the plurality is wrong to suggest that wetlands are '*indistinguishable*' from waters".  (*Rapanos v. U.S.*, 547 U.S. 715, 772 (2006).)  *Sackett*, therefore, dramatically changed the law.  Before *Sackett*, almost every wetland was regulated under the Clean Water Act.  After *Sackett*, only wetlands that are "indistinguishable from waters" are regulated.

This "indistinguishable" test envisions a very different kind of wetland than those previously considered regulated by the Clean Water Act.  It conceives of a wetland as a dense growth of "emergent" plants—plants rooted below the water surface but growing above it—that obscure where the water ends and land begins.  Before *Sackett*, dry land readily distinguishable from water could be classified as a wetland.  After *Sackett*, it cannot.

On September 8, 2023, EPA published a conforming rule "to amend aspects of the definition [of 'waters of the United States'] as needed to conform to the Supreme Court's interpretation of the Clean Water Act in *Sackett*."  (88 FR 61964.)  EPA adopted both parts of the "indistinguishable" test quoted above:  wetlands regulated by the Clean Water Act must be adjacent to "[r]elatively permanent, standing or continuously flowing bodies of water", and to be "adjacent" those wetlands must have " a continuous surface connection".  (88 FR 61968-69, to be codified at 33 CFR §§328.3(a)(1)(iii)(3), (a)(1)(iii) (4)(ii), and (c)(2), and 40 CFR §§120.2(a)(1)(iii)(3), (a)(1)(iii) (4)(ii), and (c)(2).)

**B.    This Court's Order Does Not Comply With *Sackett***

The new regulations are very different from those in effect at the time John Sweeney repaired the Point Buckler levee in 2014.  Now:

> *Adjacent* means having a continuous surface connection.

(33 CFR §328.3(c)(2).)  Then:

> The term *adjacent* means bordering, contiguous, or neighboring.  Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are ''adjacent wetlands.''

12

(33 CFR §328.3(c) (2014).)  In 2014, the act extended to "the limit of adjacent wetlands":

> (b) … (2) When adjacent non-tidal waters of the United States are present, the jurisdiction extends to the limits identified in paragraph (c) of this section.
>
> (c) … (2) When adjacent wetlands are present, the jurisdiction extends beyond the ordinary high water mark to the limit of the adjacent wetlands.

(33 CFR §328.4(b)(2), (c)(2) (2014).)

This Court relied on these 2014 definitions when it issued the 2020 Order:

> [T]he term "waters of the United States" covers area beyond tidal waters and their high tide line to encompass adjacent wetlands. 33 C.F.R. § 328.4(b)(2)…
>
> The court finds that…at the time defendants initiated their activities, Point Buckler Island consisted almost entirely of tidal-water channels and marsh wetlands abutting tidal waters, except for a 0.31-acre area on the island's eastern edge"

(2020 Order at 65:1-2 and 9-11.)

After *Sackett*, the Court's finding that Point Buckler island abutted tidal waters is no longer enough to establish that the island is regulated by the Clean Water Act.  The Court must apply the "indistinguishable" test .

**C.      The 2020 Order Should Be Amended To Be Consistent With *Sackett***

**1.      Point Buckler Island is not *indistinguishable* from surrounding waters**

In concluding that the island consisted almost entirely of wetlands, the Order relied principally on the testimony of the Government's expert witnesses Daniel Martel, who assessed three wetland parameters (plant species, hydric soil, and wetland hydrology), and on the testimony of the Government's expert witness Peter Baye.  (2020 Order at 69:15-73:23.)  Neither expert opined on whether the Point Buckler wetlands were indistinguishable from the surrounding waters.

Ordinary, the absence of any testimony on what has become the key issue would call for a new trial.  Here, however, the 2020 Order can be amended without a new trial because the evidence submitted at trial conclusively establishes that the boundary between the island and its surrounding waters is *not* indistinguishable.

For a start, there was indisputable evidence that the island (other than the channels and old borrow ditch) was dry land.  That fact was not dispositive because under the old test dry land could be classified as wetlands as long as there was "a water table [i.e. groundwater] 12 inches…or less

below the soil surface during the growing season at a minimum frequency of five years in ten". (ECF 168-2 at 107:13-23.)  At Point Buckler Island, Mr. Martel's test pits did not have water within 12 inches of the surface (ECF 168-2 at 114:14-22) and John Sweeney testified that water table was 2-3 feet down when he was working on the island (ECF 168-6 at 24:10-17).  That testimony should have been enough to conclude that the island *was not* wetlands.

Mr. Martel nevertheless concluded that most of the island *was* wetlands.  He reviewed a photograph taken in May 2012, when John Sweeney drove bulldozers across the island…



Exhibit 2026 Page 1

and conceded that "groundwater is not at the surface" in the photograph—that is, the island was dry. (ECF 168-2 at 120:16-121:6, Ex. 2026 p.1 cropped.)  That did not matter, Mr. Martel testified, and it would not matter if someone drove bulldozers "all over this island and didn't see any water and didn't sink into the muck".  (ECF 168-2 at 123:6-15.)  He did not need to determine the depth of groundwater, he said, because the presence of sediments on the surface was enough to satisfy the test even if "groundwater was normally deep but there was a flood one day".  (ECF 168-2 at 112:21-25.) In fact, there was a flood in January 2017, long after the levee was repaired in 2014 but before Mr. Martel first visited the island in May 2017.  (ECF 128 at 3:21-22; see flood photo below.)  In *Sackett*, the Supreme Court referred incredulously to the fact that agencies have "'asserted jurisdiction over…lands that are covered by floodwaters once every 100 years.'" (*Sackett* at 706, quoting *Rapanos* 722.)  Here, the Government's expert opined that Point Buckler was wetlands because it had flooded, without knowing or caring whether that flooding occurred once in 100 years.

14

Under the old regulations, therefore, dry land could be and was classified as wetlands subject to the Clean Water Act.

There is no doubt that the island was dry.  For a start, the photograph above, in which the vegetation is being mowed, shows that the island was dry—and easily distinguishable from the waters that can be seen in the distance.  Moreover, John Sweeney testified that he worked on dry land:  "I decided to stay inside the high tide line" (ECF 168-6 at 28:6-7), which was identifiable by a "debris line" (*id.* 14:21-25).  The debris line is the white line on the aerial photographs.  (*Id.*, 29:20-30:1.)  He never saw any water on the surface:

> Q.  … when you were driving around Point Buckler in 2012, did you see any sign of wet soils or water anywhere near the surface at Point Buckler in the interior, except for the old borrow ditch and channels?
>
> A.  No, I just saw the -- the old channel.
>
> Q.  When you were doing the repair work in 2014, did you see any sign of water near the surface or wet soils in the interior of Point Buckler, anywhere other than the borrow ditch and the channels?
>
> A. No, I did not.

(ECF 168-5 at 135:1-10.)  He provided the following photograph, which he took on the first day of his repair:



(Exhibit 2243 at 1.)  This photograph shows *why* the land was dry:  The water table was about 2 feet to 2½ feet down, according to Mr. Sweeney, and was generally between 2 and 3 feet down when he was digging.  (ECF 168-6 at 24:10-17.)  The Court dismissed this photograph as "anecdotal".  (2020

Order 75:6-13.)  But it is much more than that.  It is the only ground-level photographic evidence of what conditions on the island were like at the time of the levee repair.  And it shows that the water level at the island was well below the surface—an issue that Mr. Martel did not contest because it did not make any difference to his opinion.

The ground-level photographs showing dry land are confirmed by aerial photographs.  This aerial photograph taken in February 2014, shortly before Mr. Sweeney started working, shows that the island was completely dry except for the water in the channels and old borrow ditch:



(Ex. 2117 p.18 cropped.)  This photograph also shows that the island had a distinct edge.  A black line can be seen around the northern edge of the island, where the elevated land is throwing a shadow on the water.  Along the southern edge the white debris line can be seen.

16

1       An aerial photo taken in March 2014 shows that he was working on a dry island:



(Ex. 2117 p.20 cropped.)  In this photo the water in the new borrow ditch (along the southern edge of the island) is readily apparent, as is the water in the channels and part of the old borrow ditch—but there is no ponding or signs of surface water anywhere on the island.  Moreover, the Government has not identified any ponding or other water on the surface of the island in any aerial photographs taken before Mr. Sweeney started work or during the time he was working.

The two aerial photographs above starkly contrast with an aerial taken in January 2017, when the island flooded:



(ECF 132 at 58.)  Here it is obvious that the island is wet.  Government expert Stuart Siegel, who presented this photograph, directed the reader to "[n]ote extensive amount of interior ponding".  (*Id.*)  Because none of the aerial photographs from the time of the alleged violations show anything like this, the only legitimate conclusion is that the island was dry before and during the levee repair.[4]

As noted above, *Sackett* held "that the CWA extends to only those wetlands that are as a practical matter indistinguishable from waters of the United States" and  that wetlands regulated under the act must have "a continuous surface connection with [a relatively permanent body of water connected to traditional interstate navigable waters], making it difficult to determine where the

---

[4] The 2020 Order concludes that "Defendants have not offered any persuasive evidence to support their argument that 'the island interior was dry land'…  To the contrary, defendants admit that, prior to the alleged violations, Point Buckler Island had 'channels . . . and remnants of a former borrow ditch' and 'some portion of these were open to tidal inflows and outflows.'"  (Order at 74:20-24.) The 2020 Order misunderstood this argument, which was that the island interior *other than the channels and part of the borrow ditch* were dry land.

SUPPLEMENTAL AND AMENDED MOTION TO AMEND FINDINGS                    NO. 2:17-cv-00112-KJM-KJN

1   'water' ends and the 'wetland' begins."  (Section IV.A above.)

2       Because the Government must prove that Point Buckler Island is regulated by the Clean

3   Water Act, it has the burden of proving indistinguishability.  Mr. Martel opined that the island

4   consisted almost entirely of wetlands, but that opinion is no longer sufficient.  To prevail the

5   Government must establish that it is "difficult to determine where the 'water' ends and the 'wetland'

6   begins."  But Mr. Sweeney's unchallenged testimony and the aerial photographs established that the

7   island was dry land.  Because the island was dry, the wetlands on the island were dry—the phrase

8   "dry wetlands" may seem oxymoronic, but it encapsulates the Government's position that the island

9   was wetlands notwithstanding its obvious dryness.  The dry wetlands did not have a "continuous

10  surface connection" with the surrounding waters, and there was no difficulty determining "where the

11  'water' ends and the 'wetland' begins."[5]

12      Even if there were a few feet of wetlands at the edge of Point Buckler Island that were truly

13  indistinguishable from the surrounding waters, that would not be enough for the Government to

14  prevail because Mr. Sweeney did no work—and therefore did not "discharge" a "pollutant" (*see*

15  2020 Order at 48:16-22)—where there was a wetland that was indistinguishable from waters.  As

16  noted above, he worked only in dry areas above the debris line.  It does not matter, therefore, exactly

17  where the surrounding waters "ended":  The waters ended somewhere outside of the area in which

18  he worked.[6]

19      The Court should therefore modify the 2020 Order to make clear that Point Buckler Island is

20  not a wetland regulated under the Clean Water Act.

21      **2.    The restoration-plan process should be stopped**

22      *Sackett* overruled the Ninth Circuit, which had held that "Justice Kennedy's concurrence

23  [in *Rapanos*] provides the controlling rule of law" and that "[w]e therefore apply Justice Kennedy's

24

---

25  [5] Even assuming that the channels were regulated waters, there is no indeterminacy about their
26  borders because they have vertical sides that cast a distinct shadow and can be readily identified in
    aerial photos.  (See 2014 photos above.)

27  [6] This point is reinforced by *Sackett's* conclusion that "EPA's interpretation gives rise to serious
    vagueness concerns in light of the CWA's criminal penalties" and that "[d]ue process requires
28  Congress to define penal statutes with sufficient definiteness that ordinary people can understand
    what conduct is prohibited".  (*Sackett* at 680, quotation marks omitted.)

'significant nexus' inquiry to evaluate whether EPA has jurisdiction". (*Sackett v. U.S. Environmental Protection Agency*, 8 F.4th 1075, 1088, 1091 (9th Cir. 2021), *reversed and remanded*, 598 U.S. 651 (2023), citing *Rapanos v. U.S.*, 547 U.S. 715, 715 (2006).) "This 'significant nexus' inquiry would turn on whether the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" (*Id.* at 1088, quotation marks omitted.) The plurality in *Rapanos* strongly criticized Justice Kennedy's concurrence: "[W]hat possible linguistic usage would accept that whatever (alone or in combination) *affects* waters of the United States *is* waters of the United States?" (*Rapanos* at 755.)

The plurality made clear that the Clean Water Act *is not* a wetland-protection act:

> Respondents and many *amici* admonish that narrowing the definition of "the waters of the United States" will hamper federal efforts to preserve the Nation's wetlands. … In any event, a Comprehensive National Wetlands Protection Act is not before us, and the wisdom of such a statute is beyond our ken. What is clear, however, is that Congress did not enact one when it granted the Corps jurisdiction over only "the *waters* of the United States."

(*Id.* at 745–746, quotation marks and citation omitted.)[7] When *Sackett* concluded that "the *Rapanos* plurality was correct" and when it held that "the [Clean Water Act] does not define the EPA's jurisdiction based on ecological importance", it adopted the plurality's conclusion that the Clean Water Act is not a wetlands-protection act. (*Sackett* at 671, 683.) In this way too, *Sackett* profoundly changed the law.

The mandatory injunction imposed by the 2022 Order, however, depends entirely on the concept that the Clean Water Act protects wetlands and their "functioning":

> Defendants shall restore the tidal channel and tidal marsh wetlands ecosystem of Point Buckler Island… The objective of this injunctive relief is to recover the loss of approximately 30 acres of tidal channels and tidal marsh underneath and interior of the unlawfully constructed levee on Point Buckler Island and the chemical, physical, and biological functioning of those waters of the United States.

(2022 Order 32:5-10.) Because the island interior is not regulated by the Clean Water Act, and because that act is a not a wetlands-protection statute, this injunction exceeds the Court's authority.

---

[7] *See also Rapanos* at 749 ("[t]he dissent's exclusive focus on ecological factors, combined with its total deference to the Corps' ecological judgments, would permit the Corps to regulate the entire country as 'waters of the United States'").

1   The restoration-plan process should be terminated, and the 2022 Order rescinded.

2       **3.**       **The old levee, old borrow ditch, and small channels are not regulated waters**

3       The 2020 Order adopted the Government's key exhibit, which distinguished fill placed in

4   wetlands (which was colored a shade of green) from fill in what it called "Navigable Waters/Waters

5   of the U.S." (which was colored in yellow; see orange arrows):



USA Ex. No. 0333

(2020 Order at 57, arrows added.)  The figure also shows excavation in "Navigable Waters/Waters

of the U.S." in a shade of blue (see blue arrows), and "Fill in Waters of the U.S.-Wetland Status not

Determined" in a shade of green (see green arrows).  The Government may argue that *Sackett* did

not affect the regulation of these "waters".  But it did.

*Sackett* asks, sarcastically, whether the Clean Water Act applies to "ditches, swimming pools, and puddles" (*Sackett* at 659) and concludes that it does not:

> [T]he CWA's use of "waters" encompasses "only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic[al] features' that are described in ordinary parlance as 'streams, oceans, rivers, and lakes.' "

(*Id*. at 671, quoting *Rapanos* at 739.) The Government's figure identifies five areas as non-wetland "waters".  None of these is a "water of the United States" regulated by the Clean Water Act:

1.    *The eastern section of the old borrow ditch*.  Remnants of the old borrow ditch consist of eastern (right orange arrow), southern (blue arrow) and western (left orange arrow) segments. Aerial photographs shows that the eastern section was dry.  (See section IV.C.1 above; Trial ex. 2117.)  Because under *Sackett* only "relatively permanent, standing or continuously flowing bodies of water" are regulated, the eastern section is not a regulated water.

2.    *The southern section of the old borrow ditch*.  This section was *excavated*, not filled (except for the westernmost tip of this section, which is yellow).  Because excavation is not an activity regulated by the Clean Water Act (ECF 177 at 28:26-29:11), the status of this section is irrelevant.  Even assuming that the Court were to conclude that there was fill, then this section is not a water for the same reason that the western section is not.

3.    *The western section of the old borrow ditch*.  The remnant of an old ditch is not a "body" of water "described in ordinary parlance as 'streams, oceans, rivers, and lakes'".

4.    *The levee*.  The light-green lines on the figure above show where dirt was placed on the old levee.  The levee was not a "body" of water.

5.    *The small channels*.  In the figure above several short yellow lines cross the medium-green line that shows the new levee.  The black arrow shows the most significant of these, the S-shaped channel.  (See aerial photographs in Section IV.C.1 above.)  The other two sizeable channels flow into the borrow ditch on the south side of the island; since there was no fill placed in them, they are irrelevant to this analysis.  The Government has identified several other channels so small they can barely be seen on aerial photographs.  (Compare *id*. with photograph above.)  These small channels are not regulated waters because they are too small to be "bodies" of water "described in ordinary parlance as 'streams, oceans, rivers, and lakes.'"  A garden hose, if left running, will

generate a small flow of water that will move downhill, perhaps through a small cut like a rill or gully, that may flow into a traditionally navigable water.  The small channels on the island, like rills and gullies, are small cuts rather than "bodies" of water even if they carry a garden hose's flow. They are therefore not regulated by the Clean Water Act.

*Sackett*'s definition of "waters" is consistent with the act's regulation of *navigable* waters:

> This reading also helps to align the meaning of "the waters of the United States" with the term it is defining: "navigable waters." … Although we have acknowledged that the CWA extends to more than traditional navigable waters, we have refused to read "navigable" out of the statute, holding that it at least shows that Congress was focused on "its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made."  At a minimum, then, the use of "navigable" signals that the definition principally refers to bodies of navigable water like rivers, lakes, and oceans.
>
> More broadly, this reading accords with how Congress has employed the term "waters" elsewhere in the CWA and in other laws.  The CWA repeatedly uses "waters" in contexts that confirm the term refers to bodies of open water. … The use of "waters" elsewhere in the U. S. Code likewise correlates to rivers, lakes, and oceans. …
>
> *SWANCC* went even further, repeatedly describing the "waters" covered by the Act as "open water" and suggesting that "the waters of the United States" principally refers to traditional navigable waters. … Ever since *Gibbons v. Ogden*, 9 Wheat. 1 (1824), this Court has used "waters of the United States" to refer to similar bodies of water, almost always in relation to ships.

(*Sackett* at 672–673, some citations omitted.[8])  The significance of the word *navigable* provides additional support for the concept that small non-navigable features are not "waters".

Here, neither the small channels nor any of the other "waters" identified in the figure above is "navigable in fact or which could reasonably be so made".  They are not waters regulated by the Clean Water Act.[9]

### 4.   Judgment should be entered in favor of defendants

Because the evidence shows that Point Buckler Island has neither wetlands nor waters regulated by the Clean Water Act, John Sweeney's placement of dirt on the island (and any work

---

[8] In his concurrence, Justice Clarence Thomas noted that *Sackett* "does not determine the extent to which the CWA's other jurisdictional terms—'navigable' and 'of the United States'—limit the reach of the statute", and concluded that "Congress chose to tether federal jurisdiction under the CWA to its traditional authority over navigable waters".  (*Id*. at 685, 710.)

[9] The Government's figure above also identifies "structures" as fill, i.e. regulated pollutants.  But the Court held that structures were not pollutants regulated by the Act.  (2020 Order at 60-61.)

23

done by Point Buckler Club) was not a violation of that act.  The Court should find that defendants are not liable and enter judgment in their favor.  If the Government were to offer evidence raising a substantial doubt about this conclusion, defendants request a new trial.  While the Court is considering the substance of this motion, it should stay the proceedings before Judge Peterson.

## V.    CONCLUSION

The motion should be granted, the 2020 and 2022 Orders rescinded, the proceedings before Judge Peterson terminated, and judgment entered in favor of defendants.  In the interim, the proceedings before Judge Peterson should be stayed.

DATED:  December 8, 2023                    BRISCOE IVESTER & BAZEL LLP

By: _____

Lawrence S. Bazel
Attorneys for Defendants JOHN D. SWEENEY
and POINT BUCKLER CLUB, LLC