1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,              Case No.  2:17-cv-00112-KJM-SCR

12                Plaintiff,                 **FINDINGS AND RECOMMENDATIONS**

13          v.                              REGARDING IDENTIFICATION OF A
                                            RESTORATION PLAN
14   JOHN DONNELLY SWEENEY, *et al.*,
                                            ECF No. 223
15                Defendants.
                                            OBJECTIONS DUE IN FOURTEEN DAYS
16

17

18          Following a bench trial, the district judge found that defendants John Donnelly Sweeney

19   and Point Buckler Club, LLC ("PBC") violated the Clean Water Act ("CWA") by constructing an

20   unpermitted levee that harmed tidal channels on Point Buckler Island in the greater San Francisco

21   Bay.  During a bifurcated remedies phase, the district judge imposed a mandatory injunction

22   requiring defendants to restore the island's tidal marsh wetlands, and referred the identification of

23   a restoration plan to the undersigned.  The parties have submitted additional briefing, and, after

24   reviewing the record, I recommend adopting the government's restoration implementation plan to

25   the extent discussed below.

26

27

28

                                            1

**Background**

A.      **Relevant Facts and Procedural History**

The district judge previously summarized the relevant factual findings and trial proceeding as follows:

> Point Buckler Island is a part of the Suisun Marsh, the "largest contiguous brackish water marsh remaining on the west coast of North America." [ECF No. 180] ¶ 1.  The island is "located in a heavily utilized fish migratory corridor." *Id.* ¶ 11.  It falls within the "critical habitat" of the endangered Sacramento River Winter-Run Chinook Salmon, the "threatened Delta Smelt," and the Longfin Smelt protected by California's Endangered Species Act. *Id.* ¶¶ 12, 15.

> "Prior to and through the year 2011, almost all of Point Buckler Island supported and functioned as a tidal channel and tidal marsh wetlands system." *Id.* ¶ 19.  In other words, "tidal water flowed into and out of the island's channels every day, supporting the island's tidal marsh." *Id.* ¶ 20.  The tidal marshes on the island were composed of "organic soils developed over thousands of years" and the island itself was "dominated by native vegetation commonly found in fresh and brackish water" such as "tule, bulrush, cattail, and reed." *Id.* ¶¶ 21-22.  As a result, the island "performed ecologically important chemical, physical and biological functions, including filtering pollutants, providing habitat and migratory shelter for fish, and producing and exporting coarse organic matter for the estuarine aquatic food chain." *Id.* ¶ 23. "[T]idal marsh within the Suisun Marsh performs important functions such as water quality enhancement, flood attenuation and carbon sequestration." *Id.* ¶ 17.

> At some point before 1958, the island's prior owner built a levee around its perimeter. *Id.* ¶ 25.  Over time, the levee eroded; 1985 was the last time the levee was repaired to maintain managed, nontidal wetland conditions. *Id.* ¶¶ 25-27.  The island thus returned "naturally to tidal marsh." *Id.* ¶ 28.  In 2011, Point Buckler Island supported approximately 9,500 linear feet, or slightly less than two miles, of naturally formed and man-made tidal channels, which carried water into, throughout, and out of the tidal marsh. *Id.* ¶ 37.

> That same year, Mr. Sweeney purchased Point Buckler Island for approximately $150,000. *Id.* ¶ 44.  Over the next few years, he "made relatively minor alterations to the island's tidal waters and wetlands." *Id.* ¶ 60.  He also began acquiring equipment, including a large landing craft, a small landing craft, an excavator, a dump truck, a crane, a small utility vehicle and two work boats. *Id.* ¶ 62. Starting in 2014, Mr. Sweeney began to construct a new levee, *id.* ¶ 68, and by the end of the year, the new levee spanned over 4,700 feet "around the general perimeter of the island[,]" *id.* ¶ 71.  In that same year, Mr. Sweeney transferred ownership of Point Buckler Island to PBC, and PBC issued a promissory note in return, reflecting in part the cost of the earthmoving equipment and the

1  | levee construction.  *Id.* ¶¶ 81-82.  For the next few years, Mr.
   | Sweeney continued to use machinery to excavate and deposit soil
2  | around the island.  *Id.* ¶¶ 88-98.

3  | In January 2017, the United States commenced this action alleging
   | Mr. Sweeney and PBC violated and remained in violation of the
4  | CWA based on their unauthorized "construction of a levee,
   | placement of structures, and other activities that added pollutants,
5  | consisting of dredged or fill material, from point sources, namely
   | mechanized equipment, to waters of the United States."  *Id.* at
6  | § I.A.

7  | Following a lengthy bench trial, the court concluded Mr. Sweeney
   | violated and remained in violation of the Clean Water Act by
8  | constructing a non-exempt and unpermitted levee on Point Buckler
   | Island, destroying 30 acres of tidal channels.  *Id.* at § VII.1.  The
9  | court found Mr. Sweeney and PBC responsible for "fill material
   | [that] blocked tidal exchange" into the island.  *Id.* ¶ 105.  The court
10 | further found Mr. Sweeney's illegal construction and other
   | activities rendered the island's soil and water acidic and saline, *id.*
11 | ¶¶ 122, 126, threatened multiple fish species, *id.* ¶¶ 109-113,
   | blocked exportation of food sources previously produced in the
12 | tidal marshlands, *id.* ¶ 114, "harmed aquatic habitat" and "water
   | quality," *id.* ¶¶ 109, 125, and decimated the native vegetation in the
13 | area, including tules, bulrushes, and cattails, *id.* ¶¶ 116-120.  In
   | sum, the court found defendants' conduct "caused harm to the
14 | chemical, physical and biological functioning of Point Buckler
   | Island's pre-existing tidal channels and marsh wetlands, and that
15 | harm is ongoing."  *Id.* ¶ 130.  In addition to finding Mr. Sweeney
   | liable, the court found defendant PBC jointly and severally liable
16 | for violating the CWA based on "actions by [Mr.] Sweeney" after
   | PBC purchased the island.  *Id.* at § VII.2.

17

18  ECF No. 210 at 2-3.

19      On September 1, 2020, the district judge entered judgment in favor of the United States on

20  defendants' liability, but declined to make a finding on the appropriate remedy until a second

21  phase of the proceedings.  *See* ECF No. 180 at 94-97.

22      **B.    Remedy Order**

23      Following additional briefing and a hearing addressing the question of remedies, on

24  December 9, 2022, the district judge issued an order (the "Remedy Order") stating, in relevant

25  part, that defendants' very serious violations of the CWA warranted an injunction requiring

26  defendants to restore the tidal channels and marsh wetlands ecosystem on Point Buckler Island.

27  *See* ECF No. 210 at 10-11, 32.  The Remedy Order specifies that the injunction's aim is to

28  "restore hydrology through daily channel and periodic overbank tidal action, replace invasive

species with native tidal marsh wetlands vegetation, rebuild the soil's lost structural integrity, and reestablish breaches and channels for fish movement and exportation of fish food." *Id.* at 11.

In determining that an injunction to restore the island is appropriate, the district judge considered the United States' Restoration Plan for Point Buckler Island developed in 2018 by its main expert witness, Dr. Stuart Siegel (referred to as the "2018 Plan").[1]  The 2018 Plan establishes the following restoration goals: (1) restore tidal exchange conditions to the interior of the island at least to 2011 conditions; (2) re-establish dominant native wetland vegetative cover on the marsh plain; (3) reduce abundance of non-native invasive species and promote physical conditions that minimize their future abundance; (4) ensure fish access onto and off the island; (5) promote interior island channel conditions suitable for native fish foraging, refuge, and spawning; (6) eliminate artificially increased mortality risk for small fish; (7) promote off-site movement of fish food items into neighboring waters; and (8) remove risks to water quality from structures and related supplies and materials.  *See* ECF No. 242-1 at 4-5.

To achieve these goals, the 2018 Plan outlines three phases of work, each divided into specific restoration actions.  *See* ECF No. 132 at 80-87; *see also id.* at 79 (Figure 1 "Tidal Marsh Restoration Plan Elements").[2]  As summarized below, Phase 1 consists of five actions (referred to as Actions R1 through R5), which are designed to prepare, rehydrate, and revegetate the island:

- Action R1: "Prepare Island Interior."  ECF No. 132 at 81.  The purpose of this step is "[t]o remove impediments to tidal marsh recovery and to remove [the] potential for ongoing adverse impacts to water quality[.]"  *Id.*  Listed activities include: removing all non-natural materials from the island interior; and disking the compacted dirt road running through the island center to 6 inches. *Id.*

- Action R2: "Control Weeds Pre-Vegetation and Pre-Breach."  *Id.* at 82.  The aim of this restoration action is "[t]o control weed

---

[1] The district judge accepted Dr. Siegel as an expert in six related fields, including "restoration design, planning and construction of tidal channel and marsh systems."  *See* ECF No. 180 at 5.

[2] The district judge found that each action in the 2018 Plan was supported by the record, in particular the testimony of the government's experts, Dr. Siegel, Dr. Peter Baye, and Dr. Bruce Herbold.  *See* ECF No. 210 at 8, 14-16.

4

populations on the levee and in the marsh interior in advance of and concurrent with native marsh revegetation efforts (Action R5) to minimize weed re-establishment after restoration." *Id.* Activities include: scraping soils on the levee to eradicate weeds and depositing scraped soils in the borrow ditch; using mechanical control measures (cutting or mowing) for weed removal in the marsh interior, and if needed, applying herbicides by a licensed herbicide applicator. *Id.*

- Action R3: "Conduct Interior Earthwork Pre-Revegetation." *Id.* This step's purpose is "[t]o construct all interior geomorphic restoration features and bury scraped levee soils containing remnant perennial pepperweed." *Id.* Activities include: excavating new interior channels to certain dimensions; excavating three new channel-head pools at the head of new channels; repurposing three of the crescent ponds to channel-head pools; excavating one new interior marsh pool; repurposing one crescent pond to a marsh pool; backfilling the borrow ditch using soils from the levee; removing the two culverts crossing the access roads; and removing the existing tide gate. *Id.* at 82-83.

- Action R4: "Remediate Acid and Saline Soils Pre-Revegetation." *Id.* at 83. The goal of this restoration action is to raise the pH of the soil and water and "reduce salinity closer to ambient conditions at the unimpacted adjacent tidal marsh reference site on island." *Id.* This step includes the following activities: managing flood-up and routine circulation of the island interior using the tide gate and a temporary pump, and draining the interior for revegetation after acidity and salinity reach target levels. *Id.* at 84.

- Action R5: "Revegetate Island Interior Pre-Breach." *Id.* Under this step, the goal is to promote the recovery of native wetland plants while avoiding a large, unvegetated interior subject to wind-wave erosion. *Id.* The following activities are listed: in the channel bank marsh zone, manually transplanting sod fragments or plugs of tules and cattails along the banks of all interior channels and ditches at certain intervals; in the interior marsh plain, manually or mechanically transplanting sod fragments or plugs of tules, cattails, and bulrushes to achieve target density for levee breaching. *Id.* at 84-85.

Phase 2 involves managing water levels within the levee while native plant communities take root and grow, and includes the sixth restoration action:

- Action R6: "Manage Diked Perennial Marsh Until [] Minimum Vegetation Re-establishment." *Id.* at 85. The purpose of this action

5

is to ensure the re-establishment of planted native marsh vegetation, which would protect the island interior against erosion. *Id.* The listed activities include: selecting a suitable perennial diked wetland management regime to promote native wetland vegetation establishment; maintaining a temporary fish screen on the tide gate in fully operational condition for the duration of its use; installing and operating a temporary pump as needed to supplement flooding and draining through the tide gate; in the event that the levee overtops, temporarily removing fish screens to allow fish to exit the island interior and replacing the screens after water levels return to target levels; and controlling invasive vegetation as needed following best practices for target species. *Id.*

Phase 3 involves breaching the levee and controlling weeds, and consists of the following:

- Action R7: "Lower Perimeter Levee and Breach Levee." *Id.* at 86. This action aims to reconnect the island to the tides by excavating breaches at eleven locations after completing the interior preparation and the establishment of native vegetation. *Id.* at 86. To achieve this result, the levee is to be lowered from the southeast corner clockwise around the island to the northeast side as follows: eighty percent of the levee lowered to the elevation of the exterior marsh; and the remaining twenty percent of the levee lowered to specified variable elevations. After all of the interior earthwork and revegetation work is completed, excavation of eleven levee breaches will take place, and the "spoils" are to be placed in the borrow ditch. *Id.*

- Action R8: "Control Weeds Post-Breach." *Id.* The purpose of this step is to ensure that invasive wetland weeds do not re-emerge, and involves spot-treating any perennial pepperweed or common reed patches with aquatic formulation herbicide. *Id.*

*See* ECF No. 132 at 77-78, 80-86.

The 2018 Plan specifies the timing and "expertise requirements" for each restoration action, and also includes a ten-year period of monitoring, maintaining, and adaptively managing the island according to performance criteria with respect to vegetation, hydrology and geomorphology, and fish and wildlife. *See* ECF No. 132 at 80-86, 96-101.

Applying the standard set forth in *United States v. Deaton*, 332 F.3d 698, 714 (4th Cir. 2003), the district judge concluded that the 2018 Plan's structure "maximizes environmental benefits" by efficiently remedying the harms to the island's tidal channel and marsh ecosystem caused by defendants' CWA violations. ECF No. 210 at 13-16. The district judge further

1   determined that the 2018 Plan was "achievable as a practical matter" because, although it would

2   likely be time- and resource-intensive, there was no evidence indicating that it could not be

3   implemented, and that the plan was equitably related "to the degree and kind of wrong if it

4   intended to remedy." *Id.* at 18-19, 22.[3]

5        The Remedy Order, however, does not require defendants to implement the government's

6   proposed plan. Instead, the district judge granted defendants an opportunity to present a

7   restoration plan based on the island's current conditions, while using the 2018 Plan as a

8   "substantive guide" for achieving the restoration goals. *Id.* at 13. The Remedy Order explains

9   that "[t]his flexibility emphasizes the focus on function, rather than form, because it ensures

10  restoration will be tailored to the island's current state," and that this may allow for less

11  restoration work or for less expensive restoration methods. *Id.* at 13, 21. Additionally, while the

12  district judge found no evidentiary support for defendants' argument that injunctive relief was not

13  warranted because restoration will happen naturally over time, the Remedy Order states that

14  defendants are not precluded "from ultimately showing no action is necessary because data show

15  natural processes will achieve the goals of the restoration plan." *Id.* at 10.

16       Based on the foregoing, the Remedy Order imposed a mandatory injunction, providing in

17  pertinent part:

18  > Defendants shall restore the tidal channel and tidal marsh wetlands
    > ecosystem of Point Buckler Island, consistent with the United
19  > States' Restoration Plan for Point Buckler Island as a substantial
    > guide. The objective of this injunctive relief is to recover the loss
20  > of approximately 30 acres of tidal channels and tidal marsh
    > underneath and interior of the unlawfully constructed levee on Point
21

22

---

23       [3] The district judge considered defendants' argument that the 2018 Plan was not
    achievable because of their "inability to pay" and rejected the argument as unsupported by the
24  evidence. ECF No. 210 at 19. Even if defendant Sweeney's finances were less than the amount
    established at trial, the district judge determined, the 2018 Plan remained achievable. *Id.* at 19-20
25  (noting that the government's expert testified that, based on a financial analysis, defendant
    Sweeney could pay "approximately $864,000 for the financial obligations of a judgment in this
26  matter without experiencing undue financial hardship"). Citing the fact that defendants owned
    machinery capable of doing "expensive" earthwork, the district judge observed that defendants
27  could reduce costs by undertaking the work themselves or by lending their equipment to others,
    thus minimizing equipment rental costs. *Id.* at 21.
28

Buckler Island and the chemical, physical, and biological functioning of those waters of the United States.

Within 30 days of this judgment, defendants shall, through professional(s) with the requisite qualifications, propose to the United States a detailed submission including a schedule and plan for implementing the United States' Restoration Plan for Point Buckler Island, taking into account the current state of the Island and how that may affect the plan . . . .

Within 30 days of filing of the controlling restoration action schedule and plan, as provided for above, defendants shall, through professional(s) with the requisite qualifications, propose in writing to the United States a detailed submission including a schedule and plan for implementing the monitoring, performance criteria, and adaptive management tasks as described in [the 2018 Plan].

ECF No. 210 at 32-33 (emphasis removed and citations omitted).

**C.      The Referral Order**

The district judge referred the task of identifying a restoration plan to the undersigned.

ECF No. 223.  The referral order provides:

On the one hand, the court's prior order imposed a mandatory injunction requiring defendants to "restore the tidal channel and tidal marsh wetlands ecosystem of Point Buckler Island, consistent with the United States' Restoration Plan for Point Buckler Island as a substantial guide."  [ECF No. 210] at 32.  This order's implementation could be carried out and supervised by a special master subject to reporting to the court.  On the other hand, the court acknowledged defendants might be able to show no action is necessary if natural processes will achieve the goals of the restoration plan, *see id.* at 10; and the court ordered defendants to submit a detailed submission to the United States including a schedule and plan for restoring the Island, *see id.* at 32-33.  As a result, some factfinding might be needed to clarify the contours of the injunction or whether the injunction need remain in force.

Because a detailed restoration plan has not been finally identified, the court defers the appointment of a special master at this time. Instead, the court refers the identification of a restoration plan to Magistrate Judge Jeremy Peterson under 28 U.S.C. § 636(b)(3). Judge Peterson may hold hearings as he deems necessary to determine the proper parameters of the plan, as consistent with the procedure specified in this court's prior order and with section 636. Judge Peterson will make findings and recommendations to this court as necessary to clarify the injunction's contours.  The court will review any findings and recommendations subject to the applicable standard of review.  The court does not refer to Judge Peterson the making of any final determinations at this stage.

ECF No. 223 at 3-4 (emphasis removed).

8

**D.      Defendants' Original Proposed Plan**

In January 2023, defendants submitted a restoration plan that proposed a "natural restoration" approach, which they stated could be implemented "immediately by allowing nature to take its course, and if necessary by some added shovelwork."  ECF No. 224-1 at 64.  The United States subsequently sent a letter to defendants objecting to the proposed plan because it lacked supporting relevant data and did not exhibit the basic elements of a restoration plan.  ECF No. 229-1.

**E.      The Government's May 2023 Update**

In May 2023, the United States filed an update concerning what restoration actions are needed based on Point Buckler Island's current state, along with a technical report prepared by Dr. Siegel and other experts that presented and analyzed new data collected between February and April 2023.  *See* ECF Nos. 242, 242-1.  The May 2023 update notes that a partial breach had formed on the levee's southern section, but that the breach was undersized, in that it re-introduced only a limited degree of tidal exchange to parts of the island's interior and did not allow the island to drain with each low tide.  The May 2023 update also reports that the island's water quality remained poor; the interior peaty soils had weakened and were on the verge of collapse, and red-brown iron oxide films were present on marsh soil surfaces; the island continued to fail to support aquatic life; and the limited tidal flows had resulted in "less productive types of native tidal marsh vegetation" and extensive areas of either weeds, sparse vegetation, or barren soils.  *Id.* at 2-4, 31; *see also* ECF No. 242-1 at 6-7.

Based on these changed conditions, the government recommended modifications to the 2018 Plan, such as reducing the scope of interior earthwork to focus on extending interior channels; blocking (instead of removing) culverts to reduce diversions of water through the borrow ditch; eliminating the restoration actions requiring the management of water levels within the levee and requiring the lowering of the perimeter levee; reducing the number of required levee breaches to a total of seven (including the partial breach); deepening and widening the partial breach; using herbicides for weed control; and timing re-vegetation efforts to occur during full tidal exchange.  *See* ECF No. 242 at 5-6; ECF No. 242-1 at 6-7, 32-35.

1

      **F.    Defendant's Revised Plan**

2

      On June 30, 2023, defendants submitted a revised restoration plan consisting of the

3

following elements: (1) using part of the island for kiteboarding to generate funds for restoration;[4]

4

(2) enhancing tidal exchange by widening and deepening the existing breach and creating at least

5

two additional breaches; and (3) repairing and moving the crane to another location.  ECF No.

6

248 at 48-52.  Defendants specify that one of the new breaches would be located at the mouth of a

7

particular channel, referred to as "the S-shaped channel."  *Id.* at 50.  The other new breach would

8

be excavated at the location of the tide gate where, defendants assert, "there was also a pre-

9

existing breach."  *Id.*  Defendants state:

10

11

12

> The S-shaped channel would be fed by the breach at its mouth, just
> as it was before the levee repair.  The two channels on the south
> side of the island would be fed through the borrow ditch by two
> breaches, just as they were before the levee repair.  In this way, the
> three breaches would re-create the pre-existing conditions.

13

*Id.*[5]

14

      Defendants also challenge the restoration actions identified in the government's May 2023

15

update, arguing, among other things, that the government's own data show that tidal exchange has

16

already been sufficiently restored, that applying herbicides would cause environmental harm, that

17

removing structures would be impractical and unnecessary, and that blocking culverts is not

18

necessary to aid tidal circulation.  Additionally, defendants attach documents concerning

19

restoration projects at other locations—Blacklock and Wings Landing—and draw comparisons

20

with these projects in an attempt to show that, contrary to the government's position, Point

21

Buckler Island's pre-existing conditions were in fact toxic to fish.  *See id.* at 8-11, 25-48; ECF

22

Nos. 248-2, 248-4.

23

24

              ————————————————

25

26

    [4] Defendants stated that their revised plan was contingent on the outcome of then-pending bankruptcy proceedings, in particular the approval by the bankruptcy court of their reorganization plan.  ECF No. 248 at 6, 50.  On July 10, 2023, the bankruptcy action was dismissed.  *See* United States Bankruptcy Court for the Eastern District of California, Case No. 23-20755, ECF No. 59.

27

28

    [5] Defendants appear to minimize their unlawful conduct by using the phrase "levee repair" to refer to their unpermitted levee construction that harmed the island's tidal marsh ecosystem.  *See* ECF No. 180 at 96.

In a letter to defendants, the United States responded that the revised restoration plan again fails to comply with the requirements of the Remedy Order, as defendants' submission lacks sufficient detail, is not consistent with the 2018 Plan, and is not supported by the opinion of a qualified professional.  ECF No. 249-1.

### G.    Government's October 2023 Restoration Implementation Plan

On August 3, 2023, following a status conference, I issued an order stating that the government's 2018 Plan and May 2023 update "should be supplemented to provide additional details concerning the work that the government believes is necessary to restore Point Buckler Island," along with any "additional details that would assist the court in defining the parameters of the restoration plan."  ECF No. 252.  The order specified that the government "shall, to the extent reasonably practical, (1) identify with greater specificity tasks that should be performed to achieve restoration, (2) provide an approximate timeline or timelines for completing proposed tasks, and (3) provide metrics, measurables, or deliverables that should be utilized to assess achievement of the goals identified in its proposed plan."  *Id.*

In compliance with this order, on October 13, 2023, the United States filed a Restoration Implementation Plan ("RIP") that consists of four tasks that adhere to the goals of the 2018 Plan, based on site conditions observed during February to September 2023.[6]  ECF No. 255-1 at 12.  At the outset, the RIP sets forth a "conditions update" concerning vegetation, water quality, and fish, that notes the following environmental changes: (1) widespread, tall, and dense growth of invasive reed requires updated control methods; (2) declining growth of invasive pepperweed may eliminate the need for treatment; (3) increased growth of native marsh vegetation may eliminate the need for planting; (4) the island's interior waters show high iron oxide concentrations, which is an indicator that the water quality is poor for fish; and (5) fish access is limited to the partial south levee breach, which does not facilitate safe fish passage during lower tides.  ECF No. 255-1 at 8-10.

---

[6] The cover page of the Restoration Implementation Plan indicates that it was prepared by Seigel Environmental, Peter Baye, Bruce Herbold, and Northgate Environmental Management, with input from Hanford ARC.  ECF No. 255-1 at 1.

1    The RIP specifies that implementation "must be constructed and overseen by . . .

2  'professional(s) with the requisite qualifications' to ensure that the Plan is implemented as

3  designed regardless of what entity performs the physical work.  This requirement applies to

4  qualifications of construction contractor(s) . . . and of the independent professional overseeing the

5  contractor's work."  ECF No. 255-1 at 12.  The RIP continues with a detailed description of each

6  task and provides a timeframe for each task's implementation, while also including a "field fit"

7  element to "allow [for] flexibility at the time of implementation based upon ongoing changes at

8  the island which may inform an increase or decrease in the scope of each task."  *Id.*

9    Task 1 involves preparing Point Buckler Island for the upcoming construction activities

10  necessary for its restoration, and is divided into four sub-tasks: Task 1.1, controlling invasive reed

11  on the levees by mowing or burning combined with ground spraying, and possible aerial

12  spraying, depending on the conditions; Task 1.2., making temporary repairs to ensure the level is

13  in "passable condition" for construction equipment to carry out earthwork activities, including

14  repairing the partial breach, installing a tide gate at the site of the partial breach, filling small

15  sections of the levee crest that are eroded, and having the contractor inspect the existing tide gate

16  through the levee to ensure maximum tidal exchange during construction; Task 1.3, removing the

17  crane atop the northeast portion of the levee to facilitate construction access; and Task 1.4,

18  establishing staging areas for the mobilization of construction equipment and the removal of

19  material.  ECF No. 255-1 at 15-17.

20    Task 2 involves various construction activities to restore the interior of Point Buckler

21  Island, and includes seven sub-tasks: Task 2.1, limit interior dewatering to only when necessary

22  during construction to avoid harming the growth of native wetland vegetation; Task 2.2, removal

23  of trailers, shipping containers, shipping flats, and other artificial materials from the island; Task

24  2.3, excavation of four sections of small channels to promote tidal exchange and circulation,

25  using appropriate construction equipment for channels at levee breaches and challenges away

26  from levee breaches; Task 2.4, construction of six ditch blocks to restore tidal channel habitats for

27  native fish and promote full tidal drainage; Task 2.5, modification of ditch banks with an

28  irregular, continuous series of slump blocks along the base to mid-height of the bank to support

native marsh vegetation and provide habitat complexity for native fish; Task 2.6, control invasive

reed in the island's interior, exterior, and on the levee prior to tidal restoration, by mowing or

burning combined with ground or aerial spraying of the herbicide glyphosate, while control of

pepperweed can be assessed at the time of implementation because of declining growth; and Task

2.7, promote tidal exchange through levee breaches instead of planting, as increased tidal

flooding is supporting the increased spread of native wetland vegetation.  ECF No. 255-1 at 15-

28.

Concerning ditch blocks, Task 2 presents two alternative approaches for ditch block

design that vary in complexity and have different ecological recovery timelines, while the design

objectives for both are the same: (1) to focus tidal flows at breaches to interior channels as

opposed to the borrow ditch, and to promote tidal channel habitat for native fish and effective

tidal drainage of the interior marsh; (2) to establish native fish-friendly habitats at breach-side

banks; (3) to allow tidal exchange at higher tides into the borrow ditch to minimize the

opportunity for adverse water quality conditions (such as excessive algae, elevated acidity, high

temperatures, and low dissolved oxygen); (4) to promote the rapid establishment of native

wetland vegetation on ditch block surfaces; and (5) to allow native fish to escape from the borrow

ditch on outgoing tides.  *Id.* at 21, 23-24 (*see* Task 2.4.6 and Task 2.4.7 setting forth detailed

specifications for ditch block design alternatives).

Task 3 involves the final construction step: breaching the levee at five locations to

reconnect Point Buckler Island to the tides, following the completion of all interior preparation

work.  The RIP specifies two options of construction methods: excavators working from the

levee, or excavators working from a barge.  Soils excavated from the breaches are to be deposited

in the borrow ditch, atop the levee, or on the interior marsh.  *Id.* at 28.

Task 4 involves conducting "as-built" surveys of the completed interior and levee

earthwork and the levee breaches to provide baseline documentation of conditions after the

completion of construction.  The RIP provides alternative methods for the surveys: UAV-Based

Photogrammetry or LiDAR, which is most cost-effective approach and requires exposed ground

surfaces; or ground-based RTK GPS (at lower tides) and bathymetric surveys (at higher tides) if

1    sufficient exposures for the interior earthwork cannot be timed suitably with dewatered ditch

2    block construction prior to breaching or low tides after breaching.  *Id.* at 29.  This task also

3    requires collecting new aerial images that are geo- or ortho-rectified, and in both natural color and

4    infrared, to align with existing aerial imagery to permit accurate geospatial comparison.

5           Lastly, the RIP includes a section outlining monitoring and adaptive management

6    strategies to assess the progress of restoration goals and to identify potential problems requiring

7    corrective actions for a ten-year period.  This section is structured into subsections focusing on

8    invasive weeds, native vegetation, aquatic life, and water quality, and provides that annual reports

9    presenting all data must be submitted United States Department of Justice by March 31 of each

10   calendar year.  ECF No. 255-1 at 29-36.  In particular, subsection 1 involves detecting and

11   controlling invasive, non-native weeds, by monitoring for the target weeds during April, May,

12   and June each year for ten years.  If re-emergence or new emergence of the weeds is observed,

13   the weeds are to be spot-treated with herbicides applied via backpack or UAV, depending on

14   access considerations and the extent of the re-emergence.  *Id.* at 30.

15          Subsection 2 concerns monitoring native vegetation establishment to determine site-wide

16   patterns and rates of native marsh vegetation recovery.  ECF No. 255-1 at 30.  This involves the

17   following approach to be conducted annually in the fall for the first five years after construction

18   and then in years seven and ten: collect high-resolution (3" pixel resolution or finer) natural color

19   and color infrared georectified aerial imagery from fixed-wing aircraft or UAV; develop

20   preliminary vegetation map with GIS software and using prior-year mapping as a guide; create

21   "ground-truth" preliminary vegetation map by accessing site interior where possible and using

22   UAV to access other areas; and calculate the extent of each vegetation type and quantify the

23   extent of change from the prior year.  *Id.*

24          Subsection 3 concerns monitoring fish and aquatic productivity to assess the island's

25   functioning to support target native fish species and to produce and export aquatic productivity.

26   ECF No. 255-1 at 30.  This involves obtaining water samples from ebbing tides at each breach

27   site and comparing phytoplankton and zooplankton composition and abundance to samples from

28   outside the levee, and is to be carried out on a quarterly basis for the first year following

1    construction, and then repeated until the phytoplankton and zooplankton in the island are higher

2    than in the surrounding open waters of Grizzly Bay.  This subsection also requires monitoring

3    Mosquitofish and juvenile Chinook Salmon survival and condition in comparative bioassays.  *Id.*

4    at 31-32.

5          Subsection 4 focuses on hydrogeomorphic and water quality monitoring for the purpose of

6    assessing tidal exchange, water quality, and tidal channel network structure to re-establish

7    chemical, physical, and biological functioning of the disturbed waters.  ECF No. 255-1 at 32.

8    Assessing tidal exchange requires installing four stilling wells, deploying water level data loggers

9    annually for one-month durations during summer or winter to capture "king" tide series, and

10   plotting water level time series data alongside publicly available data.  *Id.*  Assessing water

11   quality involves deploying water quality sondes in channels to measure depth, temperature,

12   conductivity, pH, dissolved oxygen, and turbidity for one-month durations annually during

13   summer "king" tide series; ensuring that water quality sondes are calibrated to manufacturer

14   specifications; and plotting time series data alongside publicly available data.  Both assessments

15   are to be conducted annually for the first five years after construction and then in years seven and

16   ten.  *Id.* at 32-34.

17         Subsection 4 of the RIP's monitoring section also includes topography and channel

18   monitoring to be conducted annually for the first five years after construction and then in years

19   seven and ten.  Topography monitoring involves resurveying topography at specified locations;

20   plotting elevations alongside prior data; and calculating topographic changes over time for the

21   marsh plain, levee, and channels.  ECF No. 255-1 at 34-35.  Monitoring the channel planform

22   network requires updating marsh channel extents in GIS from aerial images and assessing the

23   changes in channel network area and linear feet.  *Id.* at 35.

24         Lastly, subsection 4 includes monitoring of the levee breaches and ditch blocks, which

25   requires inspections using UAV or low-draft watercraft to assess erosion or destabilization and

26   natural vegetation establishment.  Such inspections are to be conducted quarterly for the first year

27   after construction, and then reduced accordingly if conditions are stable.  Additionally, if natural

28   vegetation colonization is less than twenty percent of the ditch block surfaces in the first year,

15

1    tules are to be planted during the vegetation dormancy period.  If there is significant erosion or

2    destabilization, a qualified professional should be consulted to determine appropriate corrective

3    actions.  ECF No. 255-1 at 35-36.

4           **H.      The Parties' Filings Concerning the Restoration Implementation Plan**

5           Defendants filed a response to the RIP, arguing that the government's post-trial data

6    should not be considered to avoid "[g]iving the [United States] additional chances to prove its

7    case" and because the government has not established the reliability of each new expert

8    conclusion.  ECF No. 266 at 16, 24-27.  Defendants also argue that the RIP is defective because it

9    is not based on evidence adduced at trial and was authored by non-qualified experts.  *Id.* at 27, 32.

10   Concerning the substance of the government's proposed plan, defendants argue that the reduced

11   scope of proposed restoration actions indicates that the government's experts are not credible, and

12   defendants challenge the validity of certain restoration goals as well as the government's rationale

13   for certain proposed actions.  *Id.* at 36-60.  Defendants also assert that the plan is not achievable

14   because defendant Sweeney "no longer has any available money or equipment."  *Id.* at 30.

15          The United States filed a reply to defendants' response, arguing that certain of defendants'

16   arguments are invalid because they are beyond the scope of the referral order, and that the

17   remaining arguments fail on the merits.  ECF No. 268.  Defendants filed objections to the

18   government's reply, arguing that the filing contained improper expert opinion.  ECF No. 272.

19   The United States filed an opposition, asserting that defendants' objection was not authorized by

20   the court or the Local Rules.  ECF No. 273.

21                                          **Discussion**

22          As stated in the district judge's referral order, the undersigned has the narrow task of

23   identifying a restoration plan and its parameters.  I cannot and will not revisit issues that have

24   been decided by the district judge.  To the extent defendants contend that the proceedings

25   concerning the restoration plan have allowed the United States another chance to "prove its case,"

26   this argument fails.  The government's filings concerning updated restoration actions based on

27   current conditions have no bearing on the liability phase of this case, which has already been

28   resolved in the government's favor.  *See* ECF No. 180.  Additionally, the district judge has

1    determined that as a remedy for defendants' CWA violations, "restoration is an appropriate goal,

2    and an injunction is necessary to achieve it."  ECF No. 210 at 10.  And as explained above, the

3    district judge has found that the 2018 Plan is suitable as a substantive restoration guide, because

4    the plan confers maximum environmental benefits, is achievable as a practical matter, and has an

5    equitable relationship to the degree and kind of wrong it is intended to remedy.  *See id.* at 5, 13-

6    23.  Accordingly, the identification of the parameters of the restoration plan does not include any

7    consideration of the propriety of the mandatory injunction.[7]

8          The mandatory injunction orders defendants to "restore the tidal channel and tidal marsh

9    wetlands ecosystem of Point Buckler Island, consistent with the United States' Restoration Plan

10   for Point Buckler Island as a substantial guide."  ECF No. 210 at 32.  The injunction further

11   instructs defendants to propose, through "professionals with the requisite qualifications, . . . a

12   detailed submission including a schedule and plan for implementing the United States'

13   Restoration Plan for Point Buckler Island, taking into account the current state of the Island and

14   how that may affect the plan."  *Id.*  As stated in the Remedy Order, defendants are permitted to

15   show that "no action is necessary" if they obtain data that show that "natural processes will

16   achieve the goals of the restoration plan."  *Id.* at 10.

17         Defendants have failed to comply with the Remedy Order's requirements.  First,

18   defendants have failed to propose a restoration plan "through professional(s) with the requisite

19   qualifications."  ECF No. 210 at 32.  Indeed, defendants' submissions—and attacks on the

20

21         [7] To the extent that defendants claim that the RIP is not achievable because they are

22   insolvent, I agree with the government that this issue falls outside the scope of the referral
     proceeding.  Furthermore, the Remedy Order considered and rejected defendants' "inability to

23   pay" argument, finding that the record does not show that defendant Sweeney is without funds,
     and that the restoration plan is achievable because its flexibility allows for cost-saving restoration

24   efforts.  In particular, the Remedy Order states that "even without precise information about 'the
     financial resources of defendants and an estimate of the cost of the restoration plan,' the plan is

25   achievable because of its 'indefiniteness.'"  ECF No. 210 at 20-21 (citing *United States v.*

26   *Ciampitti*, 615 F. Supp. 116, 124-25 (D.N.J. 1984) ("Defendants, so long as they are faithful to
     the goals of the plan, will have considerable independence and will be able to do what they feel is

27   desirable to minimize the cost of restoration.")).  If defendants later claim that they are unable to
     implement the restoration plan, the issue of defendants' finances might be considered in a civil

28   contempt proceeding.

                                                    17

government's proposed plan—are based on defendants' counsel's lay opinions and not on expert observations or analysis. For example, defendants assert that the government's own data show that the partial levee breach has in fact restored tidal exchange on the island. But this argument rests on defendants' counsel's *own* interpretation and comparison of aerial photographs depicting the island's interior channels from 2012 and 2023, as well as counsel's non-expert analysis of a graph apparently obtained from the United States Geological Survey ("USGS") website that measures the "conductivity" (or salt levels) of Suisun Bay, and non-expert analysis of a graph from the government's May 2023 update that reflects data measuring water quality in an interior pond in April 2023. *See* ECF No. 248 at 11-16. And while defendants propose creating two new breaches and enlarging the existing breach, their plan is devoid not only of expert support, but also of sufficient detail concerning who would perform the work, what equipment would be used, and what environmental safeguards would be followed. *Id.* at 50-52. In designing an appropriate restoration plan, I must rely on the expertise of qualified professionals, not lay opinion. Accordingly, for this reason alone, defendants' revised restoration plan is deficient and cannot be adopted, and I disregard the portions of defendants' plan that consist of lay opinion challenges to, and interpretations of, the government's data, figures, and models.[8]

Next, defendants have failed to propose a restoration plan "consistent with the United States' Restoration Plan for Point Buckler Island as a substantial guide." *See* ECF No. 210 at 32. Neither have defendants proposed a detailed plan for implementing the government's restoration plan based on the island's current conditions. Instead, by improperly focusing on restoring the

---

[8] Defendants improperly dispute evidence concerning the island's baseline condition prior to the CWA violations by raising arguments based on lay opinion that the island was never suitable as a fish refuge and that the island's current conditions are better than the pre-existing conditions with respect to flushing and tidal exchange. *See* ECF No. 266 at 37-38, 44, 46, 57. Defendants, however, disregard the district judge's factual findings that "[p]rior to and through the year 2011, almost all of Point Buckler Island supported and functioned as a tidal channel and tidal marsh wetlands system" and that the island "performed ecologically important chemical, physical and biological functions, including filtering pollutants, providing habitat and migratory shelter for fish, and producing and exporting coarse organic matter for the estuarine aquatic food chain." *See* ECF No. 210 at 2. The issue of the island's baseline condition prior to defendants' CWA violations is outside the scope of the referral order.

1    island's "pre-existing conditions"—meaning the state of the island in 2011 prior to the

2    unpermitted levee construction—defendants' submission conflicts with the government's plan

3    and the established restoration goals.  For example, defendants in their response to the RIP assert

4    that "the only reasonable way to restore pre-existing conditions is to restore the physical

5    conditions and the natural processes that created them as can reasonably be achieved"; they

6    maintain that their proposal is sufficient because it "allow[s] for tidal flows into the pre-existing

7    channels from breaches located almost exactly where they had been located."[9]  ECF No. 266 at

8    43 (citing ECF No. 248 at 21-23, 43).  Defendants also argue against the RIP's inclusion of ditch

9    blocks, which are to be located at or close to interior channels and will direct native fish into safe

10   habitat in the island's interior channels and not into the borrow ditch, which currently lacks

11   vegetation for native fish to hide from predators.  Defendants assert that "the old remnant borrow

12   ditch did not have ditch blocks to direct the flows" and that "the pre-existing channels maintained

13   themselves," and therefore the proposed ditch blocks "create a wild card" by "altering the proven

14   past conditions."  *Id.* at 48.  As such, defendants argue, the "best and safest course" is to restore

15   pre-existing conditions, which is "most consistent with the recovery goal."  *Id.* (emphasis

16   removed).  By seeking to restore pre-existing conditions, however, defendants have flatly ignored

17   the district judge's rejection of this approach:

18
19
20
21
22
>        Defendants . . . claim the [2018 Plan] would create "a new island
>        that never existed," and would create channels, ponds, and breaches
>        that were not there before.  [Citation.]  They contend the
>        government seeks "enhancement," not restoration.  [Citation.]  In
>        reply, the United States argues its proposed plan aims to restore the
>        tidal channels and marsh functions, rather than "simply re-
>        engineer[] Point Buckler Island to how it looked in 2011" before
>        defendants' CWA violations.  [Citation.]  Based on the record, the

23

24   _____

     [9] Defendants state in their response to the RIP that they cannot afford to create two new

25   levee breaches as they previously proposed, and instead suggest the following alternative actions
     to achieve restoration: defendant Sweeney would fully open the tide gate to allow water to flow in

26   and out, and also would hand-dig a "starter breach" at the mouth of the S-shaped channel.  *See*
     ECF No. 266 at 45.  Defendants contend that "[o]nce water can flow through the channel, natural

27   forces will take effect and the channel will widen just as it has at the existing breach."  *Id.*  This
     will result, defendants assert, in additional flushing from the new breach, and the open tide gate

28   will "more than restor[e] pre-existing conditions."  *Id.*

                                        19

1

2

3

4

5

6

7

8

9

10

11

12

13

court finds the plan appropriately focuses on restoring the island's tidal channels and marsh wetlands ecosystem.  As the United States points out, the injunction's goal is to restore hydrology through daily channel and periodic overbank tidal action, replace invasive species with native tidal marsh wetlands vegetation, rebuild the soil's lost structural integrity, and reestablish breaches and channels for fish movement and exportation of fish food.  [Citation.]

Defendants have cited no evidence to show it is feasible to restore the island to its physical form circa 2011.  More importantly, they have not pointed to evidence to show re-creating the island's prior physical form would restore its tidal marsh wetlands.  [Citation.] Nor does the evidence suggest re-creating the island's prior physical form would confer maximum environmental benefits in the sense that matters here. . . .  [¶]  The record demonstrates affirmatively that if a restoration plan focused solely on returning the island to its prior physical form, it would not restore the tidal marsh wetlands. . . .  Defendants' emphasis on physical form over function would thus frustrate restoration and miscomprehends the purpose of the government's requested injunction.  The mandatory injunction would not require defendants to enhance Point Buckler Island; it requires them to restore the island's tidal channels and marsh wetlands.

14   ECF No. 210 at 11-12.  Because defendants' "return to pre-existing conditions" plan is foreclosed

15   by the Remedy Order, I do not entertain their arguments in support of this approach.

16        Defendants also "propose to restore pre-existing conditions by letting nature take its

17   course," because "[n]ature created the pre-existing conditions on the island, and nature will create

18   them again."[10]  *Id.* at 44.  Defendants' assertion that natural processes have already or will soon

19   restore the island fails because it is not supported by expert data, as required by the Remedy

20   Order.  And, again, the district judge in the Remedy Order found that nothing in the evidentiary

21   record indicates that restoration would occur naturally.  *See* ECF No. 210 at 10.

22        In their response to the RIP, defendants also improperly challenge the validity of several

23   of the eight restoration goals identified in the 2018 Plan.  *See* ECF No. 266 at 58 ("Goals 2 and 3,

24   which are vegetation goals, . . . are inappropriate for a Clean Water Act restoration."); *see id.*

25   ("Goal 6 is based on a false assumption, which is that the levee repair created an "artificially

26

27

28

---

[10] Defendants state that the island's natural state was formed by breaches in the levee during the 1980s and 1990s and by the growth of weeds.  *See* ECF No. 266 at 44.

20

1  increased" mortality risk [for small fish].  Because conditions now are so very similar to

2  conditions then, the mortality risk now should be very similar to the conditions then.").

3  Defendants' argument is again at odds with the Remedy Order, as the district judge not only

4  approved the restoration goals when approving the 2018 Plan as a substantive guide, but also

5  directed defendants to rely on the 2018 Plan, and the established goals, when formulating their

6  own plan.  *See, e.g.*, ECF No. 210 at 13 ("Instead, the plan will serve as a substantive guide,

7  establishing goals and showing defendants how to restore the island based on its pre-trial

8  conditions.").  Accordingly, defendants' argument discounting certain goals is precluded by the

9  Remedy Order and is therefore outside the scope of this referral proceeding.

10      The undersigned notes that, although current conditions reflect some restoration progress,

11  such as the increased growth of native marsh vegetation and a decline in invasive pepperweed,

12  the government's RIP indicates that the levee's partial breach has not remedied the environmental

13  harm caused by the unlawful levee construction.  For example, the most recent data collected by

14  the government's experts show that water in the borrow ditch, interior channels, and crescent

15  ponds reflects high iron oxide concentrations, and that there is limited ebb and flow of tidal

16  mixing in the borrow ditch.  *See* ECF No. 255-1 at 9.  Additionally, invasive reed is now

17  widespread and dense, the island's current water quality does not support aquatic life, and, while

18  the partial levee breach allows fish access, any fish that enter are unable to exit during lower tides

19  based on the current dimensions of the breach.  *Id.* at 8-10.  As shown, the governments' current

20  data, obtained from qualified professionals, establish that restoration actions are still needed to

21  address the environmental damage caused by defendants' CWA violations.

22      Considering that defendants have not submitted a restoration plan that adheres to the

23  district judge's Remedy Order, and after a careful review of the record, including defendants'

24  numerous arguments and objections to the government's proposed restoration actions, I

25  recommend adopting the government's Restoration Implementation Plan, as limited below, to

26  achieve the restoration goals of Point Buckler Island, as the RIP provides a detailed guide for

27  implementation actions and performance monitoring to ensure the successful recovery of the

28  island's tidal marsh ecosystem.

As described above, the RIP sets forth four restoration tasks:

Task 1 includes preparing the site for construction activities, including controlling invasive reed atop the levee, repairing the levee to be used by construction equipment, removing the crane, installing a tide gate at the site of the partial breach, and establishing staging areas. This task sets the foundation for the successful implementation of the subsequent restoration tasks by ensuring that the site is accessible and ready for construction.  ECF No. 255-1 at 12, 15-17.

Task 2 focuses on interior cleanup and construction activities, including channel excavation, constructing ditch blocks, modifying ditch banks, and controlling reed in the interior and exterior.  Although ditch blocks are characterized as "the most challenging element to construct," *id.* at 21, the RIP notes that they can be constructed "cost-effectively, given site conditions at [the] time of construction."  *Id.* at 22.  Overall, Task 2 involves actions to be performed on the island's interior that are essential to the restoration process, with the exception of the sub-task requiring the removal of structures—including shipping containers, trailers, helicopter pads, and artificial turf—that were *not* deemed pollutants in the district judge's liability ruling.  Because the district judge determined that such structures do not qualify as pollutants, and that defendants are not liable under the CWA for placing these items on the island, I find that the RIP is overly broad to the extent that Task 2.2 proposes the removal of such structures.[11]  *See* ECF No. 180 at 60-61; ECF No. 255-1 at 12, 18.

Task 3 involves constructing levee breaches to reconnect the island to the tides, a crucial step to restore tidal exchange and improve marsh land conditions for vegetation and aquatic life. Based on current conditions, the number of proposed levee breaches has been reduced to five locations.  *See* ECF No. 255-1 at 12, 28.

---

[11] The government acknowledges the district judge's ruling on pollutants, but asserts, without identifying supporting authority, that removal of the structures is warranted because such an action is consistent with state law restoration orders issued by the San Francisco Bay Regional Water Quality Control Board and the San Francisco Bay Conservation and Development Commission.  *See* ECF No. 268 at 12.  The undersigned is not persuaded and will not disturb the district judge's liability ruling.

1          Task 4 pertains to as-built surveys to provide baseline documentation of the island's

2    conditions following the completion of construction activities, which will reasonably assess the

3    effectiveness of the restoration efforts and provide a reference for future monitoring activities and

4    adaptive management.  *See id.* at 12, 29.

5          The RIP also includes a detailed monitoring and adaptive management plan to ensure that

6    the island's restoration progress is tracked and that any complications are appropriately

7    addressed, and that the overall goals of restoring Point Buckler Island's tidal marsh ecosystem are

8    met.

9          As limited by the foregoing, the RIP sets forth a detailed, current conditions-based update

10    to the 2018 Plan that is designed to achieve the Remedy Order's restoration objectives, namely,

11    "to recover the loss of approximately 30 acres of tidal channels and tidal marsh underneath and

12    interior of the unlawfully constructed levee on Point Buckler Island and the chemical, physical,

13    and biological functioning of those waters of the United States."  ECF No. 210 at 32.  Although

14    the district judge has already determined that restoration is achievable as a practical matter, the

15    undersigned notes that aspects of the RIP are less burdensome to defendants than the restoration

16    actions specified in the 2018 Plan.  In particular, unlike in the 2018 Plan, the RIP does not

17    mandate the excavation of a new channel head or interior marsh pools, the removal of culverts or

18    the existing tide gate, or repurposing crescent ponds to channel head pools.  The RIP also reduces

19    the number of levee breaches to five, which is well under the maximum of eleven levee breaches

20    that were proposed in the 2018 Plan.  *See* ECF No. 132 at 79, 88-87; ECF No. 255-1 at 14.  And

21    based on current conditions, certain steps of the 2018 Plan have been eliminated, such as lowering

22    the perimeter levee and managing a diked perennial marsh to establish native vegetation; in fact,

23    the growth of native vegetation has eliminated the need for planting the target native species

24    altogether.  Additionally, as explained above, defendants are not required to remove structures

25    that were not deemed pollutants in the district judge's liability ruling, which further reduces their

26    burden.

27          Accordingly, it is RECOMMENDED that the government's Restoration Implementation

28    Plan, ECF No. 255-1, as an update to the 2018 Restoration Plan for Point Buckler Island, ECF

No. 132 at 81-87, be adopted and that defendants be ordered to implement the plan, including the monitoring requirements, except for the removal of structures that do not qualify as pollutants as determined in the district judge's liability order, ECF No. 180.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days of service of these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Any such document should be captioned "Objections to Magistrate Judge's Findings and Recommendations," and any response shall be served and filed within fourteen days of service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   August 14, 2024

JEREMY D. PETERSON
UNITED STATES MAGISTRATE JUDGE