UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | No. 2:17-cv-00112-KJM-SCR |
| Plaintiff, | ORDER |
| v. | |
| John Donnelly Sweeney and Point Buckler Club, LLC, | |
| Defendants. | |

Defendants John Donnelly Sweeney and Point Buckler Club, LLC, seek to have the court amend its prior findings of fact and grant a new trial. In the alternative, defendants request the court alter or amend its prior judgment or provide relief from judgment. Pending resolution of this motion, defendants had requested the court stay proceedings regarding a restoration plan before Magistrate Judge Jeremy Peterson, a request the court previously denied. As explained below, the court now **denies** the remainder of defendants' motion.

1

**I.   BACKGROUND**

The court's prior orders detail the history of this case. *See* Remedy Order (Dec. 9, 2022) at 2–4,[1] ECF No. 210; Liability Order & J. (Sept. 1, 2020) at 4–5, ECF No. 180; Prior Order (Feb. 15, 2023), ECF No. 230. As relevant here, following a bench trial, the court found defendants had violated, and remained in violation of, 33 U.S.C. §§ 1311 and 1344 of the Clean Water Act. Liability Order & J. at 96–97. In reaching its determination, the court made several factual findings. *Id.* at 13–48. The relevant factual findings are reproduced here:

- "The greater San Francisco Bay includes the Suisun Marsh, the largest contiguous brackish water marsh remaining on the west coast of North America[.]" *Id.* ¶ 1.
- "The Suisun Marsh encompasses Point Buckler Island, where defendants' alleged violations of the Act occurred." *Id.* ¶ 3.
- "Point Buckler Island is surrounded by water bodies that are navigable in the traditional sense and subject to the ebb and flow of the tide." *Id.* ¶ 5.
- "Prior to and through the year 2011, almost all of Point Buckler Island supported and functioned as a tidal channel and tidal marsh wetlands system." *Id.* ¶ 19.
- "At the time, tidal water flowed into and out of the island's channels every day, supporting the island's tidal marsh." *Id.* ¶ 20.
- "Point Buckler Island, like other tidal marshes in the Suisun Marsh, is composed of organic soils developed over thousands of years from the accumulation of dead plant material." *Id.* ¶ 21.
- "Point Buckler Island was dominated by native vegetation commonly found in fresh and brackish water tidal marshes in the Suisun Marsh, primarily tule, bulrush, cattail, and reed." *Id.* ¶ 22.
- "As of 2011, Point Buckler Island, like other tidal marsh in the Suisun Marsh, performed ecologically important chemical, physical and biological functions,

---

[1] When citing page numbers on filings, the court uses the pagination automatically generated by the CM/ECF system, with the exception of transcripts of proceedings in this matter, which are cited using the original pagination.

including filtering pollutants, providing habitat and migratory shelter for fish, and producing and exporting coarse organic matter for the estuarine aquatic food chain." *Id.* ¶ 23.

- "At some point before 1958, a prior owner of Point Buckler Island had excavated a 'borrow' ditch and, with soil from that ditch, constructed a levee around the general perimeter of the island." *Id.* ¶ 25.
- "Between 1985 and 2003, Point Buckler Island's old levee had eroded and subsided in large part, allowing the island to return naturally to tidal marsh." *Id.* ¶ 28.
- "By no later than 1991, the tidal waters that surround Point Buckler Island had breached the old levee in several locations, creating three openings greater than 100 feet long each." *Id.* ¶ 29.
- "By 2003, the number of breaches had reached seven." *Id.* ¶ 30.
- "As of 2011, a total of approximately 545 feet of the old levee had breached and had become fully open to the tides." *Id.* ¶ 36.
- "Also as of 2011, approximately 9,500 linear feet, slightly less than two miles, of tidal channels that were both naturally formed and man-made carried water into, throughout and out of the tidal marsh." *Id.* ¶ 37.
- "Defendants' construction of a nearly mile-long earthen levee, including defendants' filling and closure of seven breaches and their new, higher levee's blockage of overbank flow, harmed waters and wetlands on Point Buck[l]er Island." *Id.* ¶ 104.
- "Defendants filled and closed breaches where tidal waters had previously eroded the old levee and/or constructed a new levee closer to the interior where the original levee was; either way, the outcome is identical because defendants' fill material blocked tidal exchange." *Id.* ¶ 105.
- "Specifically, the new levee eliminated tidal exchange to nearly 30 acres." *Id.* ¶ 106.

3

- "Defendants' actions [] caused harm to the chemical, physical and biological functioning of Point Buckler Island's pre-existing tidal channels and marsh wetlands[.]" *Id.* ¶ 130.

Based on these factual findings and more, the court concluded as a matter of law that defendants had discharged pollutants into "waters of the United States" in violation of the Clean Water Act. *Id.* at 65. Specifically, the court found when defendants began their activities, "Point Buckler Island consisted almost entirely of tidal-water channels and marsh wetlands abutting tidal waters, except for a 0.31-acre area on the island's eastern edge, and defendants discharged pollutants into those aquatic areas." *Id.* Further, the court declared defendant Sweeney had violated and remained in violation of the CWA "as a result of his unpermitted, non-exempt construction of a levee." *Id.* at 96. After reaching these conclusions, the court entered judgment in favor of the United States on defendants' liability and then deferred the question of remedial measures to a second phase of proceedings. Liability Order & J. at 97; Remedy Order at 31.

Following additional briefing and a hearing, the court found an injunction was warranted. *See* Gov't Remedy Brief, ECF No. 189; Defendants' Remedy Response, ECF No. 198; Gov't Remedy Reply, ECF No. 202; Defendants' Remedy Sur-Reply, ECF No. 203; Remedy Hr'g Mins., ECF No. 207; Remedy Order at 32. Specifically, the court ordered that defendants "propose to the United States a detailed submission including a schedule and plan for implementing the United States' Restoration Plan for Point Buckler Island[.]" Remedy Order at 32 (emphasis omitted). Later, the court referred the identification of a restoration plan to Magistrate Judge Jeremy Peterson under 28 U.S.C. § 636(b)(3).[2] Referral Order at 3–4, ECF No. 223. However, before the court issued the referral order, defendants filed a motion for reconsideration of the Remedy Order in light of state court judgments issued after this court issued its remedial order. *See* First Mot., ECF No. 216. The court denied defendants' motion to the extent it sought dismissal due to the state court judgments, but then stayed defendants' motion

---

[2] The magistrate judge recently issued findings and recommendations on this issue, *see* F&Rs, ECF No. 278, which the court will address in a separate order.

1 until the court resolved the scope of the referral to Magistrate Judge Peterson regarding the
2 restoration plan. Prior Order (Feb. 15, 2023).
3       Defendants then filed the amended motion addressed by this order. *See* Second Mot.,
4 ECF No. 261. According to defendants, the Supreme Court's intervening decision in *Sackett v.*
5 *Environmental Protection Agency* has "dramatically changed" the law applicable to this case
6 such that defendants are now entitled to amended findings of fact and a new trial. Mot. at 6
7 (citing 598 U.S. 651 (2023)). In opposition, the government acknowledges *Sackett*
8 "substantially affected the scope of 'waters of the United States'" protected under the Clean
9 Water Act but argues the decision did "not affect the Act's protections for tidal waters and their
10 abutting tidal marsh wetlands." Opp'n at 6, ECF No. 267.
11       The motion is fully briefed, *see generally* Opp'n; Reply, ECF No. 270, and the court
12 submitted it on the papers according to Local Rule 230(g), *see* Min. Order (Feb. 5, 2024), ECF
13 No. 269.

14 **II.**    **ANALYSIS**
15       Defendants argue they are entitled to relief because, following *Sackett*, the CWA does not
16 confer jurisdiction on the government to regulate Point Buckler Island. *See generally* Mot.
17 Defendants argue the court should revisit its prior decision under Federal Rules of Civil
18 Procedure 52(b), 59(a), 59(e) and 60(b), because *Sackett* constitutes a change in controlling law.
19 *See id.* at 8–12; *see also Sun P. Mktg. Co-op., Inc. v. DiMare Fresh, Inc.*, No. 06-1404, 2012 WL
20 4482013, at *2 (E.D. Cal. Sept. 28, 2012) ("Fed. Rule Civ. Proc. 52(b) motions are appropriately
21 granted in order to correct manifest errors of law or fact or to address newly discovered evidence
22 or controlling case law." (citation omitted)); *Morgan v. Doran*, No. 02-6316, 2007 WL 781903, at
23 *1 (E.D. Cal. Mar. 13, 2007) (finding motion to alter or amend judgment under Rule 59(a)
24 "appropriate under limited circumstances, such as where . . . there is an intervening change in
25 controlling law"); *San Francisco Baykeeper v. City of Sunnyvale*, No. 20-00824, 2023 WL
26 8587610, at *1 (N.D. Cal. Dec. 11, 2023) ("Under Rule 59(e), a motion for reconsideration
27 should not be granted, absent highly unusual circumstances," such as "where the district court is
28 presented with newly discovered evidence, committed clear error, or if there is an intervening

change in the controlling law." (citation omitted)); Fed. R. Civ. P. 60(b)(6) ("the court may relieve a party . . . from a final judgment, order, or proceedings for . . . any other reason that justifies relief"). However, as explained below, because the court's prior judgment complies with *Sackett*, there is no intervening change in controlling law. Therefore, the court need not revisit its prior decision.

In the United States, the Clean Water Act (CWA) is the primary federal law regulating water pollution. *Sackett*, 598 U.S. at 657–68 (citing 86 Stat. 816, as amended, 33 U.S.C. § 1251 *et seq.*). The CWA prohibits "the discharge of any pollutant" into "navigable waters." 33 U.S.C. § 1311(a), 1362(12)(A). "Navigable waters" are defined as "waters of the United States, including the territorial seas[.]" *Id.* § 1362(7). The Environmental Protection Agency and the Army Corps of Engineers jointly enforce the CWA. *Sackett*, 598 U.S. at 661.

In finding Point Buckler Island consisted of "waters of the United States," the court applied the CWA regulations promulgated in 1986, which the parties agreed were "in effect at the time [of defendants' conduct and] ought to be applied." Liability Order & J. at 64 (citing Trial Tr. for June 5, 2019, at 1288:3–10, ECF No. 168[3]). The 1986 regulations defined "waters of the United States" under the CWA to include tidal waters, or "all waters which are subject to the ebb and flow of the tide." 51 Reg. 41206-0133 (Nov. 13, 1986) (codified at C.F.R. § 328.3(a)(1)). "Waters of the United States" also covered "area beyond tidal waters and their high tide line to encompass adjacent wetlands." 33 C.F.R. § 328.4(b)(2) (1986). "Wetlands" referred to "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." *Id.* § 328.3(b). Using these definitions, the court concluded "Point Buckler Island consisted almost entirely of tidal-water channels and marsh wetlands abutting tidal waters[.]" Liability Order & J. at 64–65. Because defendants discharged pollutants "directly into tidal channels and abutting wetlands," the court found defendants violated the CWA. Liability Order & J. at 65.

---

[3] As noted, when citing transcripts, the court uses the original transcript pagination.

After the court reached these conclusions and entered judgment in favor of the United States, the Supreme Court granted certiorari in *Sackett* "to decide the proper test for determining whether wetlands are 'waters of the United States.'" 598 U.S. at 663 (citation omitted). The Court concluded that "some wetlands qualify as 'waters of the United States.'" *Id.* at 674–75. It adopted the plurality opinion from *Rapanos v. United States*, 547 U.S. 715 (2006). *Id.* at 678, 684. In *Rapanos*, the plurality explained that wetlands qualify as waters of the United States if they are "as a practical matter indistinguishable from waters of the United States," such that it is "difficult to determine where the 'water' ends and the 'wetland' begins." *Sackett*, 598 U.S. at 678 (quoting *Rapanos*, 547 U.S. at 742, 755). According to the *Rapanos* plurality decision, authored by Justice Scalia, this "occurs when wetlands have 'a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands." *Id.* (quoting *Rapanos*, 547 U.S. at 742). In doing so, the Court rejected Justice Kennedy's "significant nexus" standard articulated in his *Rapanos* concurrence. *Id.* at 684. Under the significant nexus standard, wetlands fell "within the statutory phrase 'navigable waters,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring in judgment). Prior to *Sackett*, the Ninth Circuit had followed Justice Kennedy's concurrence in *Rapanos*, but also had not "foreclose[d] the argument that Clean Water Act jurisdiction [could] also be established under the plurality's standard." *N. California River Watch v. Wilcox*, 633 F.3d 766, 781 (9th Cir. 2011). In *Sackett*, the Court did not revisit the definition or import of the term "tidal waters." *See* 598 U.S. at 663. Thus, before and after *Sackett*, "tidal waters" have constituted "Waters of the United States." *Compare* Liability Order & J. at 63–64 (noting CWA's 1986 implementing regulations define term "waters of the United States" to include tidal waters (citing 51 Fed. Reg. 41206-0133 (Nov. 13, 1986) (codified at C.F.R. § 328.3(a)(1))), *with* Revised Definition of "Waters of the United States," 88 Fed. Reg. 3069 (Jan. 18, 2023) (retaining as unchanged text and substance of 1986 regulations covering "traditional navigable waters" including tidal waters), *and* Revised Definition of "Waters of the United

7

States"; Conforming, 88 Fed. Reg. at 61966 (Sept. 8, 2023) (again retaining language that "waters of the United States" include "waters which are subject to the ebb and flow of the tide" and defining tidal waters as "waters that rise and fall in a predictable and measurable rhythm or cycle due to the gravitational pulls of the moon and sun"). In this case, following trial, the court found defendants violated the CWA in part because they "added dredged and fill material from point sources directly into tidal channels," *see* Liability Order & J. at 65, where tidal waters flowed daily, *see id.* ¶ 20. In short, the court found defendants violated the CWA by directly discharging pollutants into tidal waters, which previously were, and continue to be "navigable waters" under the CWA.

The Court's opinion in *Sackett* also does not lead to any doubts that wetlands directly abutting the tidal waters on Point Buckler Island fall under the CWA's protections. In adopting the plurality position in *Rapanos*, the Court majority in *Sackett* reiterated the plurality's two-part test to determine which wetlands[4] are covered under the CWA. *Id.* at 678–79. First, the party asserting jurisdiction over adjacent wetlands must establish the "adjacent body of water constitutes . . . a relatively permanent body of water connected to traditional interstate navigable waters[.]" *Id.* at 678 (cleaned up) (quoting *Rapanos*, 547 U.S. at 742). Second, the party must demonstrate the "wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends, and the 'wetland' begins." *Id.* at 678–79 (quoting *Rapanos*, 547 U.S. at 742).

Under the first part of this test, the government established in this case that the wetlands of Point Buckler Island were "connected to traditional interstate navigable waters." The court found the wetlands of Point Buckler Island "directly abutted the tidal waters of the island's interior [tidal water] channels, Suisun Bay and Grizzly Bay." Liability Order & J. at 72 (quoting Daniel Martel Decl. at 12:27–13:4, ECF No. 128; also citing May 23, 2019 Trial Tr. at 365:15–16; USA Ex. 344). And as discussed above, tidal waters constitute navigable waters. *See, e.g., United*

---

[4] Notably, *Sackett* did not change the definition of "wetlands," which this court previously relied on in finding Point Buckler Island consisted of "wetlands." *Compare* 33 C.F.R. § 328.3(b) (1986), *with* 40 C.F.R. § 120.2 (2023).

*States v. Andrews*, 677 F. Supp. 3d 74, 88 (D. Conn. 2023) (finding first part of the *Sackett* test met, because wetlands directly abutted a traditional navigable body of water).

Under the second part of the test, the government further established the wetlands had a "continuous surface connection" with the tidal waters. Specifically, the government demonstrated the wetlands of Point Buckler Island were connected to the approximately two miles of tidal channels, which carried water into, throughout and out of the tidal marsh. Liability Order & J. ¶ 37; *see also Sackett*, 598 U.S. at 716 (Kavanaugh, J., concurring in judgment) (equating majority opinion's description of "continuous surface connection" with "adjoining covered waters"); *Andrews*, 677 F. Supp. 3d at 88 ("[A] 'continuous surface connection' requires that a wetland have a 'continuous physical connection' to covered waters" (quoting *Rapanos*, 547 U.S. at 747, 751 n.13, 755)). The government also established tidal waters flowed into and out of the island's channels every day, supporting the island's tidal marsh. Liability Order & J. ¶ 20 (citing May 23, 2019, Trial Tr. at 313:11–13, ECF No. 168). Based on this evidence, the court found "Point Buckler Island consisted almost entirely of tidal-water channels and marsh wetlands abutting tidal waters, except for a 0.31-acre area on the island's eastern edge[.]" *Id.* at 65. In other words, the court found the wetlands and the tidal waters indistinguishable as a practical matter, as it was difficult to determine where the water ended and the wetlands began. *See id.* at 25–26 (citing government's photo exhibit showing the difficulty in distinguishing between marsh and tidal channels); *see also Sackett*, 598 U.S. at 677 (noting when wetlands actually abutted a navigable waterway, "the Corps could reasonably determine that wetlands 'adjoining bodies of water' were part of those waters" (citing *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 135 (1985)).

To the extent defendants dispute this conclusion, the court is unpersuaded now as it was before. *See* Mot. at 13–15. The physical separations defendants emphasize are either man-made, temporary or both. Temporary interruptions and man-made barriers do not remove wetlands from the scope of the CWA. *See Sackett*, 598 U.S. at 678 n.16. As the Court noted in *Sackett*, although "a barrier separating a wetland from a water of the United States would ordinarily remove that wetland from federal jurisdiction, a landowner cannot carve out wetlands from

9

federal jurisdiction by illegally constructing a barrier on wetlands otherwise covered by the CWA." *Id.* That is exactly what occurred here. Not only did defendants discharge pollutants directly into navigable waters in violation of the CWA, but defendants also constructed a new levee, which blocked tidal waters from flowing into Point Buckler Island and the adjacent marsh. *See* Liability Order & J. ¶ 106.

Because *Sackett* does not affect this court's prior judgment, defendants are not entitled to relief.

### III.   CONCLUSION

For the reasons set forth above, defendants' motion is **denied**.

This order resolves ECF No. 261.

IT IS SO ORDERED.

DATED: October 18, 2024.

SENIOR UNITED STATES DISTRICT JUDGE